UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN

| | | |
|---|---|---|
| REVZIP, LLC, a Pennsylvania limited liability company, and POWER HOUSE SUBS CORPORATE, LLC, a Pennsylvania limited liability company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| Michael McDonnell d/b/a Subreme Fundraising and Catering, Christopher McDonnell, Jacob Bearer, Dana Bearer, Supreme Fundraising and Catering, LLC, a Pennsylvania limited liability company, Power House Enterprises, LLC, a Pennsylvania limited liability company, Power House II, LLC, a Pennsylvania limited liability company, Power House Catering, LLC, a Pennsylvania limited liability company, and Georgie's Self-serve Food, Inc, a Pennsylvania corporation. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Hon. |
| Defendants. | ) | |

Briar Siljander (P76834)
TRIO LAW PLC
Attorney for Plaintiffs
376 Beach Farm Cir. #1269
Highland, MI 48356
(248) 529-6730
briar@triolawplc.com

## **PLAINTIFFS' COMPLAINT**

NOW COME Plaintiffs, REVZIP, LLC, and Power House Subs Corporate, LLC ("Plaintiffs"), by and through their counsel, Trio Law PLC, and for their Complaint against Defendants, Michael McDonnell, d/b/a Subreme Fundraising and Catering, Christopher McDonnell, Jacob Bearer, Dana Bearer, Supreme Fundraising and Catering, LLC, Power House

Enterprises, LLC, Power House II, LLC, Power House Catering, LLC, and Georgie's Self-Serve Food, Inc, state as follows:

## PARTIES

1. Plaintiff, REVZIP, LLC ("Licensor") is a Pennsylvania limited liability company with its principal place of business at 229 Grazierville Road, Tyrone, Blair County, PA 16686.

2. Plaintiff, Power House Subs Corporate, LLC ("Purchaser") is a Pennsylvania limited liability company with its principal place of business at 1014 Pennsylvania Avenue, Tyrone, Blair County, PA 16686.

3. Upon information and belief, Defendant Michael McDonnell ("Mike") is an individual residing at 608 Garber Street, Hollidaysburg, Blair County, PA 16648.

4. Defendant, Mike, is the owner of the fictitious name, Subpreme Fundraising and Catering ("Subpreme"), with a principal place of business listed as 608 Garber Street, Hollidaysburg, Blair County, PA 16648.

5. Upon information and belief, Defendant Christopher McDonnell ("Chris") is an individual residing at 608 Garber Street, Hollidaysburg, Blair County, PA 16648.

6. Upon information and belief, Defendant Jacob Bearer ("Jake"; together with Mike and Chris, the "Individual Defendants") is an individual residing at 608 Garber Street, Hollidaysburg, Blair County, PA 16648.

7. Upon information and belief, Defendant Dana Bearer ("Dana") is an individual residing at 608 Garber Street, Hollidaysburg, Blair County, PA 16648.

8. Upon information and belief, the Individual Defendants and Dana all reside together.

9. Defendant, Supreme Fundraising and Catering, LLC ("Supreme"), is a Pennsylvania limited liability company with its registered office at 309 A. Allegheny Street, Hollidaysburg, Blair County, PA 16648 and its principal place of business, upon information and belief, in Blair County, Pennsylvania.

2

10. Defendant, Power House Enterprises, LLC ("PHE Seller"), is a Pennsylvania limited liability company with its registered office at 210 East Plank Road, Suite 15, Altoona, Blair County, PA 16602, and its principal place of business, upon information and belief, in Blair County, Pennsylvania.

11. Defendant, Power House II, LLC ("PH2 Seller"), is a Pennsylvania limited liability company with its registered office at 201 Hemlock Street, Washington, New Eagle County, PA 15067, and its principal place of business, upon information and belief, in Blair County, Pennsylvania.

12. Defendant, Power House Catering, LLC ("PHC Seller"; together with PHE Seller and PH2 Seller, "Sellers"), is a Pennsylvania limited liability company with its registered office at 210 East Plank Road, Suite 15, Altoona, Blair County, Pennsylvania 16602, and its principal place of business, upon information and belief, in Blair County, Pennsylvania.

13. Defendant, Georgie's Self-serve Food, Inc. ("Georgie's"; together with Mike, Chris, Jake, Supreme, Sellers, and Georgie's, "Defendants"), is a Pennsylvania corporation with its registered office and, upon information and belief, its principal place of business, at 100 West Plank Road, Altoona, Blair County, PA 16602.

## JURISDICTION AND VENUE

14. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

15. This Court has federal question jurisdiction over this action pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), and (b)(2), and (c).

## GENERAL ALLEGATIONS

16. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

17. Upon information and belief, Mike was and is the sole owner of PHE Seller and PHC Seller, and the holder of a majority of the membership interests in PH2 Seller.

18. Prior to November 12, 2018, Sellers operated the business commonly known as Power House Subs, which included two sub shop locations – one located at 210 E. Plan Rd., Ste. 15, Altoona, Pennsylvania ("Altoona Location"), and the other at 204 Hollidaysburg Plaza, Duncansville, Pennsylvania ("Hollidaysburg Location") – and a catering and fundraising business (the "Business").

19. As a material part of its menu, the Business used and continues to use secret dressing recipes on its subs and salads – the Homemade House dressing (commonly known as the "Power House Dressing") and the Homemade Dark dressing ("Secret Recipes").

20. The Secret Recipes are the signature characteristic of the Business.

21. The Secret Recipes are regularly cited as distinguishing the Business from competing businesses.

22. The fundraising portion of the Business provides subs, salads, apple dumplings, and other items for fundraisers held by schools, sports teams, businesses, and other groups.

23. The fundraising portion of the Business relies on secret business methods and techniques ("Fundraising Methods"), as well as lists of current and past customers and vendors, their current and past orders, contact information, and other information about customers and prospective customers, generally and specifically ("Customer Information"), which are not generally known or readily ascertainable by other persons not privy to them.

24. Sellers operated the Business in Pennsylvania and Maryland.

25. Prior to November 12, 2018, the individual Defendants operated the Business on behalf of the Sellers.

26. On or about November 12, 2018, Sellers and Mike executed an Asset Purchase Agreement, dated November 12, 2018, with Purchasers ("Asset Purchase Agreement"), whereby Sellers and Mike transferred the Business and assets of the Business to Purchaser. *Ex. 1, Asset Purchase Agreement.*

27. While the Purchase Agreement contains the names of Power House Subs LLC and Power House Subs Investment LLC as purchasers, the true purchaser in the Purchase Agreement is the signing entity, Purchaser, which signed the Purchase Agreement. The other parties were inadvertently retained in the Asset Purchase Agreement.

28. The parties intended by the Asset Purchase Agreement to transfer the Business and its assets to Purchaser, a new entity created for that purpose.

29. On November 8, 2018, prior to the Asset Purchase Agreement's execution, Mike, Elevation Holdings LLC, Ryan DelBaggio, and Purchaser executed an Operating Agreement of Purchaser ("Operating Agreement"). *Ex. 2, Operating Agreement.*

30. Mike held fifteen percent (15%) of the membership interest in Purchaser.

31. Elevation Holdings LLC held sixty-five percent (65%) of the membership interest in Purchaser.

32. Ryan DelBaggio held fifteen percent (15%) and John Cook held the remaining five percent (5%) membership interests in Purchaser.

33. In Section 5.03 of the Operating Agreement, Mike agreed and represented that he would "not take any actions to compete with [Purchaser]" while at the Company and for two years after leaving or being terminated.

34. Section 8.04 (a) of the Operating Agreement states: "Each Member agrees to keep confidential and not disclose, divulge, or use for any purpose . . . any confidential information obtained from [Purchaser] pursuant to the terms of [the Operating Agreement] . . . ."

5

35. In the Asset Purchase Agreement, Mike and Sellers agreed to sell all of the intangible assets of the Business, including the name "Power House Subs," customer and supplier lists, telephone numbers, goodwill, trade secrets (which include the Secret Recipes), and intellectual property associated with the Business ("IP").

36. Mike and Sellers represented and warranted in the Purchase Agreement that all of the Business's assets were owned by Sellers.

37. Section 13 of the Asset Purchase Agreement, entitled "Noncompetition Agreement," provides that Mike and the Sellers:

> each covenant, warrant and agree, on a joint and several basis, for the benefit of Buyers, and their subsidiaries, successors and assigns (collectively, the "Covenant Beneficiaries"), that they shall not, within 25 miles of the Businesses (including any location to which any of the Businesses has delivered products or services in the past twelve months) and for a period of two years from the date of Closing, either directly or indirectly (whether as a shareholder, partner, member, associate, owner, employee, or through an agent, third party or otherwise) (i) compete directly, or engage or be involved in any business that competes with the Businesses or Buyers anywhere that Buyers do business; (ii) divert from Buyers, or do anything which would tend to divert from Buyers, any trade or business with any customer or vendor of the Businesses or Buyers; or (iii) solicit, induce or attempt to induce any employee or independent contractor of Buyers to (a) leave the employment of or terminate his, her or its contractual relationship with Buyers, or (b) enter into the employ of or a contractual relationship with any competitor of the Businesses or Buyers. This Covenant and agreement by Sellers and Seller Equityholders shall survive the Closing. Due to the harm that Buyers will suffer as a result of a breach of this covenant, Sellers acknowledge that Buyers may obtain injunctive relief to enforce this agreement.

38. Section 14.1 of the Asset Purchase Agreement provides that Mike and Sellers will indemnify and reimburse Purchaser for all Losses, as that term is defined therein, including reasonable legal fees arising or resulting from "[a]ny failure by [Mike or Sellers] to perform or observe in full, or to have performed or observed in full, any covenant, agreement, or condition to be performed or observed by [Mike or Sellers] under this Agreement."

39. The transaction was completed and Purchaser began operating the Business on December 1, 2018.

40. Licensor's members, Brice Mertiff and Ryan DelBaggio, were tasked with transitioning and managing the Business after the sale.

41. The Business continued to operate in Pennsylvania and Maryland.

42. Mike continued to work in the Business, now owned by Purchaser, as an at-will employee with an annualized salary of One Hundred Thousand Dollars ($100,000) per year.

43. Chris and Jake also continued to work for the Business – now owned and operated by Purchaser.

44. In the initial months following Purchaser's purchase of the Business, Purchaser undertook to clean up serious deficiencies in Sellers' operations and bookkeeping of the Business.

45. Purchaser improved and revamped many of the processes and procedures and ceased Sellers' practices of untracked sales and cash payments.

46. On March 12, 2019, Jake terminated his employment with Purchaser.

47. On May 31, 2019, Elevation Holdings LLC, the holder of a sixty-five percent (65%) membership interest in Purchaser, sold its interest in Purchaser to Licensor.

48. As part of the transaction, Purchaser assigned all of the IP of the Business to Elevation Holdings LLC (*Ex. 3, Assignment of Rights – May 31, 2019*), and Elevation Holdings LLC entered into a License Agreement with Purchaser whereby Purchaser was permitted to operate the Businesses and use the name "Power House Subs," consistent with the terms thereof ("License Agreement"). *Ex. 4, License Agreement.*

49. The purpose of the assignment of IP and License Agreement was to permit Elevation Holdings LLC to prepare to franchise the concept nationally using the IP, while granting to Purchaser the initial license to continue to operate in certain portions of Pennsylvania and Maryland.

50. Also as part of the same transaction, on May 31, 2019, Mike executed a Noncompetition and Non-Solicitation Agreement in favor of Elevation Holdings LLC ("License Noncompete Agreement"), wherein Mike agreed that he was not the owner of any "Confidential Information" of Purchaser or Elevation Holdings LLC, which is defined for purposes of the License Noncompete Agreement as:

> trade secrets (including, without limitation, all recipes, cookbooks, formulas, trade practices, products, sales techniques, merchandising and display techniques, advertising formats, accounting systems, operations systems, policies, procedures, systems, compilations of information, records, specifications, manuals and other confidential information) and copyrighted materials, methods and other techniques, information, know-how, and customer lists [generated or used by Purchaser or Elevation Holdings LLC].

*Ex. 5, License Noncompete Agreement.*

51. Mike also agreed in the License Noncompete Agreement to refrain from using or disclosing any of the "Confidential Information."

52. In the License Noncompete Agreement, Mike agreed to not compete with or engage in any business similar to the Business, directly or indirectly, during the term of the License Agreement and for two years  after termination of the License Agreement or his employment or ownership interest in the Purchaser.

53. Mike specifically agreed that he would not engage in or participate:

> as an employee, consultant, agent, or owner (whether directly or indirectly), alone or with any other person or entity, with any business selling sandwiches, wraps, or salads, or conducting food-based fundraising, or offering or selling a franchise, license, or other arrangement to do the same, within a radius of twenty-five (25) miles of any Business location of Company, Licensor, or any other licensee or franchisee of Licensor. Owner shall never use, directly or indirectly, the systems or concepts of Licensor in any business whatsoever, wherever located.

*License Noncompete Agreement, ¶ 2.*

54. Mike further agreed that he would not, in that period:

> call on, solicit, cause, or encourage any of Licensor's or its affiliates, licensees, or franchisees' ("Licensor Affiliates") partners, customers, potential customers,

members, managers, employees, vendors, or suppliers to alter their relationship with Licensor Affiliates, or (2) solicit or hire away any of Licensor's or Licensor Affiliates' employees or subcontractors.

*License Noncompete Agreement, ¶ 2.*

55. Mike agreed that his violation of the above provisions would cause irreparable harm to Elevation Holdings and its assignees and such parties would be entitled to injunctive relief to prevent such harm without posting a bond.

56. The License Noncompete Agreement provides that any violation by Mike of its covenants will result in the length of the noncompetition and non-solicitation agreements' provisions being extended until Mike is in compliance.

57. Sometime in June or July 2019, Mike requested that Purchaser put together an employment/partner pay agreement for him.

58. Purchaser provided multiple proposals.

59. On or about July 31, 2019, Mike met with Brice Mertiff, a manager of Purchaser and member of Licensor, and demanded that payments to him by Purchaser be guaranteed in a written agreement.

60. Brice Mertiff indicated it would not make any guarantees regarding Mike's pay at Purchaser, and instead presented what Purchaser was willing to commit to.

61. Mike refused the proposal, advised Brice Mertiff that he was "done" with Purchaser, and left the meeting.

62. Without Purchaser's knowledge, prior to the meeting, Mike had entered Purchaser's store and fundraising preparation area, and taken down a food service license with his name.

63. At the store, he advised employees that he was ceasing all association with Purchaser and intended to open a competing business.

64. He advised employees at the store that it would take him thirty (30) days to get his new sub sandwich shop operating.

65. Mike advised Purchaser's employee, Brad Becher, that he was opening a new, competing venture, and solicited Brad to leave Purchaser and work for him.

66. Mike stated that Purchaser had stolen his company from him and otherwise acted fraudulently.

67. Since that time, Mike and Chris repeatedly contacted Purchaser's store employees, disrupting operations and engendering confusion.

68. Mike and Chris have repeatedly contacted employees, vendors, and customers of Purchaser, attempting to defame Purchaser and solicit Purchaser's employees, vendors, and customers.

69. Mike advised Wes Cook, a member of Purchaser, that he intended to begin competing with Purchaser.

70. On approximately August 7, 2019, Mike spoke with Purchaser's apple dumpling vendor and told the vendor he was opening his own competing sub sandwich shop and wanted to use the vendor to supply him.

71. Mike informed Ryan DelBaggio that he would be competing – that a noncompetition agreement "wouldn't stop me from starting again."

72. Chris partook in the conversations and made the statements above despite still being employed by Purchaser.

73. While still employed, Chris repeated the false accusation that Purchaser "stole" the Business from Mike.

74. Chris also told employees that Mike would circumvent his noncompetition agreements by putting new competing entities into Jake's name.

75. Mike, too, made the same false statements that Purchaser "stole" the Business from him and that he would circumvent his noncompetition agreements by operating his new, competing business through Jake.

76. On his separation from Purchaser, Mike retained a chromebook computer belonging to Purchaser and has refused to transfer title to a van owned by Purchaser into Purchaser's name.

77. The chromebook contains the names, contact information, and other details about Purchaser's customers and potential customers.

78. The chromebook also contains at least a local version of Purchaser's calendar, which contains details about customer names, contact information, orders, delivery dates, and other trade secrets and confidential information belonging to Purchaser.

79. Upon information and belief, the Individual Defendants have repeatedly accessed and/or downloaded the information contained on the chromebook.

80. Prior to and on August 15, 2019, Purchaser demanded that the title be transferred and the chromebook returned.

81. To date, Mike has refused to return the chromebook or effectuate transfer of the vehicle title.

82. Shortly after leaving, on August 12, 2019, Mike filed with the Pennsylvania Department of State's Corporations Division a new fictitious name: Subpreme Fundraising and Catering.

83. Mike listed himself as the owner of the fictitious name. The street address is the same address at which Mike, Chris, Jake, and Dana live: 608 Garber Street, Hollidaysburg, PA 16648.

84. Apparently in response to a letter sent on behalf of Plaintiffs on August 15, 2019 (wherein Plaintiffs advised Mike that he was in breach of his noncompetition agreements), on August 27, 2019, Defendants created another entity, differing by one letter from the previous fictitious name: Supreme Fundraising and Catering LLC.

85. Jake was listed as the resident agent for Supreme.

11

86. The entity was created by Defendants for the purpose of misappropriating the Business from Purchaser and recommencing it with one or more Defendants as owners or interested parties.

87. Plaintiffs continued to hear rumors that the Individual Defendants intended to open a business competing with Purchaser.

88. On September 4, Jake's mother and Mike's sister (who also lives with Mike and Jake), Dana Bearer, published a post on Facebook stating the following:

> Hi friends! Just wanted to update everyone with some great news! My brother Mike is no longer associated with Powerhouse [sic] Subs and my son Jake Bearer will be opening a fundraising and catering business in the near future, so stay tuned for details. Exciting things to follow!

89. On or around September 4, 2019, Mike and Jake sought a loan from Reliance Bank in Duncansville, PA, for purposes of opening a business competing with Purchaser.

90. In response to a question asking whether the Secret Recipes would be offered by the new, competing business, Jake's mother stated: "Maybe!!! You' have to do a fundraiser to find out! . . . And I'm sure I've given you the recipe over the years!"

91. Upon information and belief, the Individual Defendants shared the Secret Recipes with Dana, who previously worked with and/or for Sellers.

92. On September 15, 2019, Mike's brother, Chris, also terminated his employment with Purchaser without notice.

93. On the same day, consistent with his past conversations stating that Mike would compete with his nephew, Jake, as a front, Chris notified Purchaser's Director of Fundraising, Robert Emigh, that Chris and Jake would be competing with a new fundraising and catering business.

94. In a message to Robert Emigh, Chris stated: "I wish I had you helping me and my nephew on our new fundraising and catering business."

95. After departing, Chris and Mike continued to regularly communicate with employees of Purchaser, including Alyssa DelBaggio, Robert Emigh, and Brad Becher.

96. In these communications, Chris and Mike openly stated their intentions to operate a competing business.

97. In a message to Purchaser's District Manager, Alyssa DelBaggio, Chris admitted that he intended to steal Purchaser's fundraising business, stating: "I'm going to help out jake . . . . The only thing Jake would ever steal………is fundraiser business!"

98. Upon information and belief, Mike and Chris retained at least one copy of the Secret Recipes upon their departure from Purchaser.

99. Defendants continued to openly compete and defame Plaintiffs.

100.    On October 21, 2019, after Chris met with one of Purchaser's largest vendors, Pacifico, Chris contacted Pacifico, defaming Purchaser by stating Purchaser was lying to the vendor, stating that it was unfortunate the vendor would not provide the same bread used by Purchaser, and claiming that Purchaser was late on multiple deliveries and would not have nearly the volume of business in the future, among other comments.

101.    Chris then stated that Defendants would look to an out-of-town bakery to "make our buns for Supreme fundraising."

102.    On October 22, 2019, Mike contacted the landlord of Purchaser's Altoona Location and told the landlord that Purchaser was trying to "ghost" the landlord – that Purchaser intended to breach its lease at the Altoona Location without notifying the landlord.

103.    Mike requested that the landlord evict Purchaser.

104.    On the same day, at the funeral for Mike's dad, Mike spoke with Purchaser's member, Wes Cook, requesting that Wes attempt to obtain documents and financial information of Purchaser's and provide it to Mike.

105.    On October 23, 2019, pursuant to an Assignment of Rights and Noncompetition Protections ("License Assignment"), all of the IP, including the License Agreement, License

Noncompete Agreement, and all other agreements relating to the License Agreement were assigned by Elevation Holdings LLC to Licensor. *Ex. 6, License Assignment.*

106.     Because of their value to Licensor's and Purchaser's businesses, the Secret Recipes, Fundraising Methods, and Customer Information are kept secret by Licensor and Purchaser and are not generally known to persons outside of Purchaser and Licensor.

107.     Only management-level personnel (including the Individual Defendants) and two employees with the need to know had access to the Secret Recipes.

108.     Plaintiffs ensured at the time it purchased the Secret Recipes, Fundraising Methods, and Customer Information, that Sellers were the only owners of them and that they had been kept secret.

109.     Despite Plaintiffs' efforts, Defendants, having misappropriated Purchaser's trade secrets and are now attempting to openly and blatantly use them to compete with Purchaser.

110.     On or about October 20 and October 21, 2019, Plaintiffs discovered that Defendants Mike and Chris had been communicating with current and former employees.

111.     Specifically, Mike, while acting as an Uber driver, had picked up an employee of Purchaser, requesting that she meet at an off-site location so as to avoid detection by Purchaser.

112.     The employee had not previously known Mike.

113.     Mike proceeded to inform the employee that he was the prior owner, that the company had been stolen from him, and provided extensive detailed information about Purchaser's operations, including how the employee's own performance was viewed.

114.      Mike also volunteered information he knew about recent orders and deliveries and asked for details about them.

115.     Based on the information provided, it was clear Mike still had access to Purchaser's business and Customer Information.

116.     Mike then offered the employee a job at his competing business, stating he would love to have her as an employee in a couple months and that he would pay her more.

117.     Upon information and belief, Defendants have similarly solicited other employees and personnel of Plaintiffs.

118.     On October 21, 2019, Purchaser also discovered that the Individual Defendants have retained access to Purchaser's business, including Purchaser's main calendar, which contains Customer Information and detailed information about Purchaser's operations.

119.     Upon information and belief, Defendants still have access to this information.

120.     Again, on October 23, 2019, Chris contacted Purchaser's District Manager, Alyssa DelBaggio, making clear that he was still communicating with current and former employees and was aware of Purchaser's customers and deliveries.

121.     Chris also stated that he and Jake had a "good headstart" on getting "all the fundraiser business back," and that many others would join in helping them do so.

122.     At some point following Mike's departure, Defendants did indeed begin competing. Mike initially met with owners/agents of Georgie's on more than one occasion at Georgie's location, less than a half mile from Purchaser's Altoona Location.

123.     Soon thereafter, Defendants began selling subs for Georgie's.

124.     The Individual Defendants are regularly working at Georgie's.

125.     Additionally, Mike delivers subs for Georgie's.

126.     On October 31, 2019, Defendants announced that Supreme would be opening for business on November 15, 2019, "[a]ccepting orders for Fundraising, catering, and Boxed Lunches."

127.    Defendants directed customers to "call/text" Chris with their orders and/or questions regarding Supreme's fundraisers.

128.    Upon information and belief, Defendants are also operating the fundraising portion of the competing business through Georgie's, Subpreme, and/or Supreme.

## COUNT I
### BREACH OF CONTRACT – OPERATING AGREEMENT

129.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

130.    Defendant Mike executed the Operating Agreement with Purchaser, and, indirectly, with Licensor.

131.    Mike breached Section 5.03 of the Operating Agreement when he took definitive actions to compete, and began actively competing, against Purchaser, directly and indirectly through Defendants and/or others.

132.    As a direct result of Mike's breach of the Operating Agreement, Purchaser and Licensor suffered significant damages in an amount to be proven at trial.

133.    Additionally, Section 5.03 of the Operating Agreement provides that, if Mike competes with Purchaser, Purchaser may purchase all of Mike's membership interest in Purchaser for one dollar ($1.00).

134.    Mike competed with Purchaser.

135.    Purchaser tendered one dollar ($1.00) to Mike.

136.    Mike, therefore, has surrendered his entire membership interest in Purchaser back to Purchaser.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A. Enter judgment in favor of Purchaser and Licensor, and against Defendant Mike, and find that Defendant Mike's actions are a breach of the Operating Agreement;

B. Enjoin Defendant Mike from violating the noncompetition provisions of Section 5.03 of the Operation Agreement, directly or indirectly through any of the Defendants or any other entity or person;

C. Order Defendant Mike to compensate Purchaser and Licensor for all damages incurred as a result of his breaches;

D. Order and declare that Defendant Mike has forfeited all of his membership interest in Purchaser as provided by the Operating Agreement; and

E. Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT – ASSET PURCHASE AGREEMENT

137.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

138.     Mike and Sellers executed the Asset Purchase Agreement with Plaintiff Purchaser.

139.     Mike breached Section 13 of the Asset Purchase Agreement by:

a. Directly and indirectly through Defendants and/or others, competing, against Purchaser;

b. Directly and indirectly through Defendants and/or others, diverting trade, business, customers, and vendors from Purchaser; and

c. Directly and indirectly through Defendants and/or others, soliciting employees of Purchaser to leave their employment with Purchaser and enter into employment or other contractual arrangements with competitors of Purchasers.

140.     Sellers breached Section 1.1.6 of the Asset Purchase Agreement by failing to transfer the telephone numbers of Mike and Chris used in the operation of the Business.

141.     Sellers breached Section 7.11 of the Asset Purchase Agreement by failing to transfer to Purchaser or terminate the fictitious name "Power House Subs" and failing to amend the

entity names for Power House Enterprises, LLC, Power House II, LLC, and Power House Catering, LLC.

142.     In the Asset Purchase Agreement, Mike agreed to indemnify Purchaser against all losses, diminution in value, liabilities, damages (including compensatory, consequential, direct, indirect, and other), costs, and expenses, including reasonable legal fees, resulting from Mike's failure "to perform or observe in full . . . any covenant, agreement, or condition" in the Asset Purchase Agreement.

143.     As a direct result of Mike's and Sellers' breach of the Asset Purchase Agreement, Purchaser suffered significant damages in an amount to be proven at trial.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A. Enter judgment in favor of Purchaser and against Defendant Mike, and find that Defendant Mike's actions are a breach of the Asset Purchase Agreement;

B. Enjoin Defendant Mike from violating the noncompetition provisions of Section 13 of the Asset Purchase Agreement, directly or indirectly through any of the Defendants or any other entity or person;

C. Order Mike, Chris, and Sellers to transfer the phone numbers of Mike and Chris to Purchaser;

D. Order Sellers to promptly transfer or terminate all fictitious names associated with the Business to Purchaser and amend the entity names for Power House Enterprises, LLC, Power House II, LLC, and Power House Catering, LLC;

E. Order Defendant Mike to compensate Purchaser for all damages incurred as a result of his breaches;

F. Order Defendant Mike to indemnify Purchaser for all diminution in value, liabilities, damages (including compensatory, consequential, direct, indirect, and other), costs, and

expenses, including reasonable legal fees incurred by Purchaser, as provided by the Asset Purchase Agreement; and

G. Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT - NON-COMPETITION, NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT

144. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

145. Defendant Mike executed the License Noncompete Agreement with Licensor.

146. Mike breached the License Noncompete Agreement by:

a. Using "Confidential Information" of Licensor, and information derivable therefrom, for purposes of planning and operating one or more sandwich-related businesses and food-based fundraising businesses with the Individual Defendants and Georgie's;

b. Disclosing "Confidential Information," and information derivable therefrom, of Licensor to third parties, including to the Individual Defendants and Georgie's;

c. Failing to protect Licensor's "Confidential Information" from disclosure;

d. Failing to safeguard Licensor's trade secrets and using the same in operation of competing businesses;

e. Directly and indirectly participating in businesses selling sandwiches, wraps, or salads, and businesses conducting food-based fundraising, through Georgie's, Subpreme, Supreme, and otherwise;

f. Using the systems and concepts of Licensor without permission;

g. Calling on, soliciting, causing, and encouraging Licensor's and Purchaser's partners, customers, potential customers, members, managers, employees, vendors, and suppliers to alter their relationship with Licensor and Purchaser; and

    h.   Soliciting and attempting to hire away employees and/or subcontractors of Licensor and Purchaser.

147.    As a direct result of Mike's breach of the License Noncompete Agreement, Licensor and Purchaser suffered significant damages in an amount to be proven at trial.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

    A.   Enter judgment in favor of Licensor and Purchaser and against Defendant Mike, and find that Defendant Mike's actions are a breach of the License Noncompete Agreement;

    B.   Enjoin Defendant Mike from violating the terms of the License Noncompete Agreement, directly or indirectly through any of the Defendants or any other entity or person;

    C.   Order Defendant Mike to compensate Licensor and Purchaser for all damages incurred as a result of his breaches;

    D.   Order Defendant Mike reimburse Licensor all attorney fees incurred as a result of his breach as provided by the License Noncompete Agreement; and

    E.   Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS**

148.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

149.    Purchaser had existing contractual relations with Mike: the APA and Operating Agreement.

150.    Licensor had an existing contractual relationship with Mike: the License Noncompete.

151.    Defendants Chris, Jake, Dana, Supreme, Subpreme, and Georgie's took purposeful actions intended to harm Plaintiffs' relationship with Mike by convincing Mike they would assist him in competing against Plaintiffs and circumvent his requirements under the APA, Operating Agreement, and License Noncompete, and actually assisting him in so doing.

152.     Defendants and Dana had no justification or privilege to interfere or assist Mike in breaching his agreements with Plaintiffs.

153.     As a result of Defendants' and Dana's interference and assistance, Mike breached and continues to breach the APA, Operating Agreement, and License Noncompete.

154.     Plaintiffs have been and continue to be damaged as a result of Defendants' and Dana's conduct.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A.   Enter judgment in favor of Licensor and Purchaser and against Defendants and Dana, and find that Defendants and Dana intentionally interfered with Plaintiffs' contractual relations with Mike;

B.   Enjoin Defendants and Dana from further interfering with Plaintiffs' contractual relations or assisting Mike in breaching his agreements with Plaintiffs;

C.   Order Defendants and Dana to compensate Plaintiffs for all damages incurred as a result of their interference with Plaintiffs' contractual relations with Mike; and

D.   Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT V
## VIOLATION OF DEFEND TRADE SECRETS ACT

155.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

156.     Licensor is the owner of the Secret Recipes, the Fundraising Methods, and the Customer Information.

157.     The Secret Recipes, Fundraising Methods, and Customer Information are trade secrets as defined by 18 U.S.C. § 1839(3).

158.     The Secret Recipes, Fundraising Methods, and Customer Information are used in and intended for use in interstate commerce.

159.	Defendants Mike, Chris, Jake, and Dana, all former employees and/or contractors of Purchaser, acquired and took with them the Secret Recipes, Fundraising Methods, and Customer Information by improper means, including theft, breach of duties to maintain secrecy, and improper access to Purchaser's calendar and files.

160.	Defendants and Dana acquired the Secret Recipes, Fundraising Methods, and Customer Information through improper means and knew or had reason to know that knowledge of the Secret Recipes, Fundraising Methods, and Customer Information were derived through improper means, acquired under circumstances giving rise to a duty to maintain secrecy, and derived from persons under a duty to maintain their secrecy.

161.	Defendants and Dana have used, continue to use, and intend to continue using and/or disclosing the Secret Recipes, Fundraising Methods, and Customer Information.

162.	Defendants and Dana have willfully and maliciously misappropriated the Secret Recipes, Fundraising Methods, and Customer Information.

163.	Defendants' and Dana's actions are a violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

E.	Enter judgment in favor of Licensor and Purchaser and against Defendants and Dana, and find that Defendants and Dana violated the DTSA;

F.	Enjoin Defendants and Dana from acquiring, using, disclosing, or otherwise misappropriating the Secret Recipes, Fundraising Methods, and Customer Information pursuant to 18 U.S.C. § 1836(b)(3)(A);

G.	Order Defendants and Dana to return to Licensor and/or Purchaser all Secret Recipes, Fundraising Methods, Customer Information, and any other trade secrets and/or confidential information;

H.  Order Defendants and Dana to compensate Plaintiffs for all damages incurred as a result of their violation of DTSA and for all unjust enrichment, and/or to pay reasonable royalties as set forth by 18 U.S.C. § 1836(b)(3)(C);

I.  Order Defendants and Dana to pay to Plaintiffs exemplary damages in the amount of two times the damages award and attorney fees pursuant to 18 U.S.C. § 1836(b)(3)(D); and

J.  Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT VI
## VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT

164.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

165.    Licensor is the owner of the Secret Recipes, the Fundraising Methods, and the Customer Information.

166.    The Secret Recipes, Fundraising Methods, and Customer Information are trade secrets as defined by 12 PA.C.S. § 5302.

167.    Defendants and Dana misappropriated trade secrets of Plaintiffs when they acquired the Secret Recipes, Fundraising Methods, and Customer Information, knowing or having reason to know, that the trade secrets were acquired by improper means, including theft, breach of duties to maintain secrecy, and improper access to Purchaser's calendar and files.

168.    Defendants and Dana misappropriated trade secrets of Plaintiffs by using and disclosing the Secret Recipes, Fundraising Methods, and Customer Information when they knew or had reason to know at the time of their use and disclosure that knowledge of the trade secrets were:

a.  derived from the Individual Defendants and Dana, who had utilized improper means to acquire them,

b.  acquired under circumstances giving rise to a duty to maintain their secrecy; and

23

      c. derived from or through the Individual Defendants and Dana, who owed a duty to Plaintiffs to maintain the secrecy of the trade secrets.

169. Defendants and Dana have used, continue to use, and intend to continue using the Secret Recipes, Fundraising Methods, and Customer Information.

170. Defendants and Dana have willfully and maliciously misappropriated the Secret Recipes, Fundraising Methods, and Customer Information.

171. Defendants' and Dana's actions constitute violations of the Pennsylvania Uniform Trade Secrets Act ("PTSA"), 12 PA.C.S. § 5301 *et seq.*

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A. Enter judgment in favor of Licensor and Purchaser and against Defendants and Dana, and find that Defendants and Dana violated the PTSA;

B. Enjoin Defendants and Dana from acquiring, using, disclosing, or otherwise misappropriating the Secret Recipes, Fundraising Methods, and Customer Information pursuant to PA.C.S. § 5303(a);

C. Order Defendants and Dana to return to Licensor and/or Purchaser all Secret Recipes, Fundraising Methods, Customer Information, and any other trade secrets and/or confidential information;

D. Order Defendants and Dana to compensate Plaintiffs for all damages incurred as a result of their violation of PTSA, including exemplary damages, and for all unjust enrichment, and/or reasonable royalties, pursuant to 12 PA.C.S. § 5304;

E. Order Defendants and Dana to reimburse Plaintiffs' attorney fees, expenses, and costs pursuant to PA.C.S. § 5305; and

F. Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

**COUNT VII**
**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**

172.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

173.     Licensor is the owner of the Secret Recipes, the Fundraising Methods, the Customer Information, and other confidential information.

174.     Defendants and Dana misappropriated the Secret Recipes, the Fundraising Methods, the Customer Information, and other confidential information of Plaintiffs.

175.     Defendants and Dana have used, continue to use, and intend to continue using the Secret Recipes, Fundraising Methods, Customer Information, and other confidential information belonging to Plaintiffs.

176.     Defendants and Dana have willfully and maliciously misappropriated the Secret Recipes, Fundraising Methods, Customer Information, and other confidential information.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A.   Enter judgment in favor of Licensor and Purchaser and against Defendants and Dana, and find that Defendants and Dana misappropriated Plaintiffs' confidential information;

B.   Enjoin Defendants and Dana from acquiring, using, disclosing, or otherwise misappropriating the Secret Recipes, Fundraising Methods, Customer Information, and other confidential information;

C.   Order Defendants and Dana to return to Licensor and/or Purchaser all Secret Recipes, Fundraising Methods, Customer Information, and all other confidential information;

D.   Order Defendants and Dana to compensate Plaintiffs for all damages incurred as a result of Defendants' and Dana's misappropriation, as well as punitive damages for Defendants' outrageous conduct; and

E.   Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT VIII
## <u>CONVERSION</u>

177.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

178.     Pursuant to the Asset Purchase Agreement, Purchaser is the rightful owner of the chromebook and the van used in the Business.

179.     Defendant Mike intentionally dispossessed Purchaser of its property and has refused to surrender the property to Purchaser.

180.     Purchaser has suffered damages as a result of Mike's conversion, including, among other things, loss of use of the chromebook and the information contained on it, and inability to hold clear title to the van.

**WHEREFORE PLAINTIFFS REQUEST** that this Court:

A.  Enter judgment in favor of Purchaser and against Mike, and find that Mike converted the chromebook and van;

B.  Oder Mike to return the chrome book to Purchaser and promptly transfer title of the van to Purchaser;

C.  Order Mike to compensate Purchaser for the loss of use and/or fair value of the converted property; and

D.  Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT IX
## <u>TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS WITH EMPLOYEES</u>

181.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

182.     Purchaser had a business relationship with its employees, Chris and John Macak.

183.     Defendant Mike had knowledge of the business relationship between Chris and Purchaser.

184.     Mike intentionally and improperly interfered with Purchaser's expected continued employment relationship with Chris by inducing Chris to quit.

185.     Mike's interference was for the purpose of undermining Purchaser's business.

186.     As a result of Defendant Mike's interference, Chris did quit his employment with Purchaser, causing Purchaser to suffer damages.

187.     Additionally, Defendants Mike and Chris interfered with Purchaser's relationship with its employee, John Macak.

188.     Mike and Chris had knowledge of the business relationship between John Macak and Purchaser.

189.     Mike and Chris intentionally and improperly interfered with Purchaser's expected continued employment relationship with John Macak by inducing him to terminate his employment with Purchaser.

190.     Mike and Chris's interference was for the sole purpose of disrupting and undermining Purchaser's business.

191.     As a result of Mike and Chris's interference, John Macak terminated his employment with Purchaser, causing Purchaser to suffer damages.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A.  Enter judgment in favor of Purchaser and against Defendants Mike and Chris, finding that Defendants Mike and Chris tortiously interfered with Plaintiffs' business relationships with its employees;

B.  Order Defendants to compensate Plaintiffs for all damages incurred as a result of Defendants' interference; and

C.  Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

**COUNT X**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

192.  Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

193.  Purchaser had a business relationship with:

    a.  Its suppliers, Pacifico and Bake Shop Bakes, LLC; and

    b.  the landlord of Purchaser's Altoona Location.

194.  Defendants Mike and Chris had knowledge of the business relationship between Purchaser and its vendors and landlord.

195.  Mike and Chris intentionally and improperly interfered with Purchaser's business relationship with the landlord, intending to disrupt Purchaser's relationship with the landlord.

196.  Mike and Chris's interference was for the purpose of undermining Purchaser's relationship with the landlord in order to undermine Purchaser's business.

197.  As a result of Mike and Chris's interference, Purchaser's relationships with its vendors and the landlord were damaged.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A.  Enter judgment in favor of Purchaser and against Defendants Mike and Chris, finding that they tortiously interfered with Purchaser's business relationships with its vendors and the landlord of its Altoona Location;

B.  Order Defendants Mike and Chris to compensate Purchaser for all damages incurred as a result of Defendant's interference; and

C.  Award Purchaser attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT XI
## BUSINESS DEFAMATION

198.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

199.     The Individual Defendants have launched a concerted campaign to defame Plaintiffs' business.

200.     Defendants made the following false and defamatory statements concerning Plaintiffs:

   a.   Mike entered the Altoona location while still an agent of Purchaser and proceeded to remove a food service license containing his name and to tell Purchaser's employees that he was opening a competing business;

   b.   Defendants repeatedly stated to members, employees, customers, vendors, and others that Purchaser stole the Business from Mike and that Purchaser and its owners did not know how to operate the business, and were "frauds," "snakes," and other unflattering names;

   c.   Chris contacted Purchaser's largest vendor and stated that Purchaser was lying to it, and claimed that Purchaser would soon be out of business;

   d.   Mike and Chris made specific comments about poor customer service by Purchaser to its fundraiser customers; and

   e.   Mike advised the landlord of Purchaser's Altoona Location that Plaintiffs were planning to "ghost" on their lease – to terminate without notifying the landlord.

201.     The respective Defendants made the statements to third parties without privilege.

202.     Each of the statements was false and defamatory.

203.     Defendants made the statements maliciously, intentionally, recklessly, and/or negligently.

204.      Defendants' statements harmed Plaintiffs' business reputation and goodwill with their

members, employees, customers, and vendors.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A.  Enter judgment in favor of Purchaser and against the Individual Defendants, finding that

that the Individual Defendants defamed Plaintiffs;

B.  Order Defendants to compensate Plaintiffs for all damages incurred as a result of

Defendants' interference and order punitive damages due to the Individual Defendants'

outrageous conduct; and

C.  Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT XII
## BREACH OF FIDUCIARY DUTY

205.      Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully

restated herein.

206.      Chris was an employee and agent of Purchaser until September 15, 2019.

207.      As an employee and agents of Purchaser, Chris owed Purchaser fiduciary duties of

good faith, loyalty, and diligence.

208.      While employed, Chris openly admitted that he intended to compete with Purchaser

and implied that he would, with Jake, assist Mike in circumventing his noncompetition

obligations and opening a business to compete with Purchaser.

209.      While employed, Chris spoke with multiple employees, attempting to induce them to

leave Purchaser's employ, and repeating false accusations that Purchaser had "stolen" the

Business from Mike.

210.      While employed, Chris took definitive steps to compete against Purchaser, including

assisting Mike and Jake in establishing new entities and preparing them to compete against

Purchaser.

211.     While employed, Chris obtained confidential information owned by Purchaser for his own personal use and for use by Defendants.

212.     While employed, Chris collected and retained information about Purchaser's Secret Recipes, Fundraising Methods, and Customer Information for his own purposes and for Defendants' purposes.

213.     Chris's actions amount to a breach of fiduciary duties owed to Purchaser.

214.     As a result of Chris's breach of fiduciary duties, Purchaser suffered extensive damages, including unauthorized disclosure and use of Purchaser's Secret Recipes, Fundraising Methods, and Customer Information, as well as other damages, including loss of customer, vendor, and employee goodwill, and loss of business opportunities.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A.   Enter judgment in favor of Purchaser and against Chris, finding that Chris breached fiduciary duties owed to Purchaser;

B.   Order Chris to compensate Plaintiffs for all damages incurred as a result of Chris's breach of fiduciary duties; and

C.   Award Purchaser attorney fees, costs, and any other relief this Court deems just and proper.

**COUNT XIII**
**CIVIL CONSPIRACY**

215.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

216.     Defendants and Dana, acting in concert with one another, sought to achieve the following unlawful common purposes:

a.   Misappropriation of Plaintiffs' Secret Recipes, Fundraising Methods, and Customer Information in violation of the DTSA and PUTSA;

      b.   Misappropriation of Plaintiffs' confidential information;

      c.   Termination and/or disruption of Plaintiffs' business relationships with its members, employees, customers, vendors, and landlord; and

      d.   Defamation of Plaintiffs' businesses.

217.     Each of the Defendants committed overt acts in pursuance of the unlawful common purposes, including the following:

      a.   Defendants and Dana created one or more new fictitious names and businesses for purposes of operating a business competing against Purchaser and using the Secret Recipes, Fundraising Methods, Customer Information, and confidential information of Purchaser;

      b.   Defendants and Dana attempted to conceal Mike's involvement in the new ventures;

      c.   Defendants and Dana each collected, used, and disclosed the Secret Recipes, Fundraising Methods, Customer Information, confidential information, and other intellectual property of Plaintiffs in furtherance of their common goals of harming Plaintiffs and establishing a competing business;

      d.   Mike and Chris engaged in a multitude of conversations and meetings with Plaintiffs' members, employees, customers, vendors, and landlord in an attempt to disrupt Purchaser's relationships, defame Plaintiffs, and damage their goodwill;

      e.   Mike and Chris failed to transfer their telephone numbers to Purchaser in order to intercept customers and potential customers of Purchaser;

      f.   Defendants and Dana publicly announced their competing ventures and that they intended to use the Secret Recipes.

218.     Plaintiffs suffered serious damages as a result of Defendants' and Dana's conspiracy, including lost profits, employees who ceased working for Plaintiffs, lost goodwill among

members, employees, customers and potential customers, vendors, and their landlord, and other damages in amounts to be determined at trial.

**WHEREFORE PLAINTIFFS REQUESTS** that this Court:

A. Enter judgment in favor of Plaintiffs and against Defendants and Dana, finding that Defendants and Dana conspired against Plaintiffs to commit the unlawful actions described in the other Counts of this Complaint;

B. Order Mike and Chris to promptly transfer their telephone numbers to Purchaser and forward all emails and inquiries relating to the Business to Purchaser;

C. Award Plaintiffs damages resulting from Defendants' conspiracy as determined at trial; and

D. Award Plaintiffs attorney fees, costs, and any other relief this Court deems just and proper.

Respectfully Submitted,
**TRIO LAW PLC**

/s/ Briar Siljander
Briar Siljander (PA 327132)
376 Beach Farm Cir. #1269
Highland, MI 48356
(248) 529-6730
(248) 550-0098
briar@triolawplc.com

Dated: November 6, 2019