## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REVZIP, LLC AND POWER HOUSE SUBS )      Case No. 3:19-cv-191
CORPORATE, LLC,                   )
                                  )
          Plaintiffs,             )      JUDGE KIM R. GIBSON
                                  )
     v.                           )
                                  )
MICHAEL MCDONNELL d/b/a           )
SUBPREME FUNDRAISNG AND           )
CATERING, CHRISTOPHER             )
MCDONNELL, JACOB BEARER, DANA     )
BEARER, SUPREME FUNDRAISING       )
AND CATERING, LLC, POWER HOUSE    )
ENTERPRISES, LLC, POWER HOUSE II, )
LLC, AND POWER HOUSE CATERING,    )
LLC,                              )
                                  )
          Defendants.             )

## <u>MEMORANDUM OPINION</u>

I.     **Introduction**

        Revzip, LLC, and Power House Subs Corporate, LLC ("PHCorp") (collectively, "Revzip"),

owners of the sandwich shop Power House Subs, brought this trade secret action against

Defendants Michael McDonnell ("Mike"),[1] Christopher McDonnell ("Chris"), Jacob Bearer

("Jake"), Dana Bearer ("Dana"), Supreme Fundraising and Catering, LLC ("Supreme"), Power

House Enterprises, LLC ("PHE"), Power House II, LLC ("PH2"), and Power House Catering, LLC

("PHC") (collectively, the "McDonnells").  Revzip alleges that the McDonnells have violated

noncompete agreements, appropriated trade secrets, and tortiously interfered with contractual

---

[1] As multiple defendants in this action share the same last name, the Court will refer to them by their given names.

relations.  The McDonnells moved to dismiss Revzip's Amended Complaint, arguing that Revzip had not stated a federal claim and this Court has no jurisdiction, that the Court should abstain from addressing the state law issues in this case, and that Revzip had failed to state a claim against Dana.  The Motion (ECF No. 44) is fully briefed (ECF Nos. 45, 55, 56) and ripe for disposition.

For the following reasons, the Court **DENIES** the McDonnells' Motion to Dismiss and holds that Revzip has stated a federal trade secrets claim, this Court has jurisdiction over the remaining state law claims, it is improper for this Court to abstain from resolving those claims, and Revzip has stated a claim against Dana.

## II.     Jurisdiction and Venue

This Court has jurisdiction over the action because Revzip's trade secrets claim arises under federal law, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the remaining state law claims in the action form part of the same case or controversy.  28 U.S.C. §§ 1331, 1367; 18 U.S.C. § 1836(c).  Venue is proper in this district because Power House Subs is located in the Western District of Pennsylvania and a substantial portion of the events giving rise to the action occurred in the Western District of Pennsylvania.  28 U.S.C. § 1391.

## III.    Factual Background[2]

This case arises from a dispute over various items of intellectual property and alleged breaches of contract stemming from the sale of a sandwich chain doing business under the name Power House Subs.

---

[2] The Court draws the following facts from the Amended Complaint and accepts them as true for the purposes of deciding the McDonnells' Motion to Dismiss.  (ECF No. 37.)

### A. Power House Subs and the Parties

Power House Subs is a chain of two stores that make submarine-style sandwiches, or "subs," located in the Altoona, Pennsylvania area; one is in Altoona proper, the other is in Duncansville. (ECF No. 37 ¶ 18.) Power House Subs also operates a catering and fundraising business in Pennsylvania and Maryland by selling bulk orders of sandwiches, salads, and other similar products. (*Id.* ¶¶ 25, 40.) Power House Subs has two signature dressings that it uses on its subs and salads: a House Dressing and a Dark Dressing (the "Secret Sauces" or "Recipes"); Power House Subs has used the Secret Sauces for several years and customers consider them distinguishing aspects of Power House Subs' products. (*Id.* ¶¶ 19–22.) As part of its fundraising business, Power House Subs has developed a list of customer information ("Customer Information") to aid in soliciting fundraising business and has also developed certain sandwich preparation techniques ("Secret Methods") that provide it with a competitive advantage in filling bulk fundraising orders. (*Id.* ¶¶ 22–29.)

Prior to November 12, 2018, Mike was the sole owner of Power House Subs and its corporate parents, PHE and PHC. (*Id.* ¶¶ 17–18.) Chris and Jake—Mike's brother and nephew, respectively—both worked at Power House Subs. (*Id.* ¶¶ 59, 120, 121.) Dana is Mike and Chris' sister and Jake's mother. (*Id.* ¶¶ 116.)

Revzip is currently the majority owner of PHCorp, the company that operates Power House Subs; Revzip purchased its interest in Power House Subs through a series of acquisitions, detailed below, *see infra* Section III.B. (*Id.* ¶¶ 42–56, 74–81.)

**B. Revzip Acquires Power House Subs**

On November 12, 2018, Mike sold Power House Subs to PHCorp via an Asset Purchase Agreement. (*Id.* ¶ 42; *see* ECF No. 37-1.) In addition to the Asset Purchase Agreement, on November 8, 2018, Mike executed an Operating Agreement with PHCorp, Elevation Holdings, LLC ("Elevation"), and Ryan DelBaggio. (ECF No. 37 ¶ 45.) DelBaggio, along with Brice Mertiff, are Revzip's members. (*Id.* ¶ 67.) Through these agreements, Elevation acquired a sixty-five percent interest in PHCorp; with Mike and DelBaggio each holding fifteen percent, and a third member, John Cook,[3] holding the remaining five percent. (*Id.* ¶¶ 46–48.)

The Operating Agreement, which Mike signed, included a two-year noncompetition provision. (*Id.* ¶ 49.) Mike also agreed not to disclose any confidential information acquired from PHCorp under the terms of the Operating Agreement. (*Id.* ¶ 50.) Mike also sold all of Power House Subs' intangible assets, including the business's name, lists of customers and suppliers, telephone numbers, good will, and intellectual property ("IP")—including trade secrets. (*Id.* ¶ 51.) The Asset Purchase Agreement contained a second noncompete provision, where Mike agreed not to compete within a 25-mile radius of Power House Subs for a two year period. (*Id.* ¶ 53.) This agreement specifically included covenants to refrain from the following: (1) direct competition; (2) diversion of business; and (3) solicitation of employees or contractors to leave Power House Subs or work for a competitor. (*Id.*) PHCorp began operating Power House Subs on December 1, 2018, after Mike signed the Operating Agreement and the Asset Purchase

---

[3] The Amended Complaint refers to both a John Cook and a Wes Cook owning interests in Power House Subs. (*See* ECF No. 37 ¶¶ 48, 96, 132.) Whether these are the same individual is unclear.

Agreement. (*Id.* ¶ 55.) Mike continued working at Power House Subs as an at-will employee with an annual salary. (*Id.* ¶ 66.)

Following the acquisition, an affiliate of Elevation, EMG Brands, LLC ("EMG"), became the employer of Power House Subs' employees. (*Id.* ¶ 56.) When Mike sold Power House Subs to PHCorp, all employees of Power House Subs signed confidentiality agreements. (*Id.* ¶ 149.) As a condition of employment, EMG required each employee at Power House Subs after the acquisition to abide by its Employee Handbook (the "Handbook"), which also included a confidentiality provision. (*Id.* ¶¶ 57–58.) That confidentiality provision stated that, in the course of their employment, employees might access, among other things, "information that [Power House Subs] considers proprietary and confidential." (*Id.* ¶ 58.) Employees were required to use the information "only for the business" of Power House Subs and could disclose it only upon authorization. (*Id.*) As employees of EMG while continuing to work for Power House Subs, Chris and Jake were both obligated to adhere to the Handbook's provisions and Chris and Jake also signed separate confidentiality agreements. (*Id.* ¶¶ 61–64; *see* ECF No. 37-3.)

On May 31, 2019, Elevation sold its sixty-five percent interest in PHCorp to Revzip. (ECF No. 37 ¶ 74.) In the transaction, PHCorp assigned all of the IP associated with Power House Subs to Elevation and Elevation entered into a License Agreement with PHCorp which permitted PHCorp to operate Power House Subs and use the name "Power House Subs" in a manner consistent with the Licensing Agreement. (*Id.* ¶ 75.) When Elevation sold its interest to Revzip, Mike entered into a third agreement, a License Noncompete Agreement, where he agreed that he did not own any of Elevation or PHCorp's confidential information, including trade secrets such as recipes and operations, as well as customer lists. (*Id.* ¶ 77.) In the License Noncompete

Agreement, Mike again agreed that he would not disclose any confidential information or compete for a term of two years following the termination of the License Noncompete Agreement or his termination of employment with, or ownership interest in, PHCorp. (*Id.* ¶¶ 78–79.) Mike specifically agreed to refrain from using Revzip's "systems or concepts" in any business, from soliciting or requesting any of Revzip's business partners to alter their relationship with Revzip, and from attempting to hire Revzip's employees. (*Id.* ¶¶ 80–81.)

On October 23, 2019, Elevation assigned all IP, including the License Agreement, License Noncompete Agreement, and all related agreements, to Revzip in an Assignment of Rights and Noncompetition Protections ("License Assignment"). (*Id.* ¶ 133.)

## C.  The Secret Sauces, Customer Information, and Secret Methods

Power House Subs has used the Secret Sauces for years and they are a distinctive feature of its products. (*Id.* ¶¶ 21–22.) The recipes for the Secret Sauces are known only to Revzip and various current and former employees who make or have made the Secret Sauces while working at Power House Subs. (*Id.* ¶ 23.) Although the employees who knew or know the recipes for the Secret Sauces are subject to confidentiality obligations, for some period of time after Revzip acquired Power House Subs, an employee posted at least one of the Recipes in the sub preparation room, making it visible to those in the preparation room; when Revzip became aware of the posting, it removed the posting. (*Id.* ¶¶ 23, 136–37.) All employees who worked at Power House Subs during the period that one of the Recipes was posted were and remain subject to confidentiality agreements and the Handbook's confidentiality requirements. (*Id.* ¶ 139.) Revzip believes that Mike currently has at least one copy of the Recipes. (*Id.* ¶ 126.)

The Customer Information lists customers, clients, contacts, and other similar business relations and includes information not generally known to the public about those contacts, including personal telephone numbers, email addresses, preferences, and other information. (*Id.* ¶ 68.)  The Customer Information was gathered over "years of effort." (*Id.* ¶ 146.)  Only upper level employees and managers who work at Power House Subs have access, on a need-to-know basis, to the Customer Information, which is stored on a password protected server. (*Id.* ¶¶ 145, 147.)

Following PHCorp's acquisition of Power House Subs, PHCorp began an effort to make Power House Subs more efficient and reduce various operating and accounting deficiencies. (*Id.* ¶ 69.)  Included in this effort was an improvement on Power House Subs' prior processes, the Secret Methods.[4] (*Id.* ¶ 70.)  The Secret Methods, including setup and sandwich preparation methods and processes, are taught to employees only on a need-to-know basis and are subject to confidentiality agreements. (*Id.* ¶¶ 141–42.)  The Secret Methods cannot be ascertained without having access to the preparation facility or knowing the specific processes; if competitors had access to the Secret Methods, those competitors could produce subs more efficiently. (*Id.* ¶¶ 143–44.)

At least some Customer Information, as well as potentially other trade secrets, resides on a chromebook owned by Power House Subs, which Mike possessed without permission and may have copied from. (*Id.* ¶¶ 103–108.)

---

[4] Revzip does not detail the substance of these improvements or processes.

### D. Jake, Mike, and Chris Quit Power House Subs

On March 12, 2019, Jake quit Power House Subs. (*Id.* ¶ 73.) In either June or July of 2019, Mike requested that PHCorp come up with a pay agreement for him, to which PHCorp provided several proposals in response. (*Id.* ¶¶ 84–85.) On July 31, 2019, Mike met with Mertiff, a manager at Power House Subs and member of Revzip, regarding his compensation. (*Id.* ¶ 86.) Mertiff was unwilling to make guarantees about Mike's compensation and Mike refused PHCorp's proposals, stated that he was "done," and left the meeting. (*Id.* ¶¶ 87–88.) Mike later told DelBaggio that he would be competing and that a noncompete agreement "wouldn't stop me from starting [to sell subs] again." (*Id.* ¶ 98.) Mike told staff at Power House Subs that he planned to cease his association with PHCorp and open a competing business. (*Id.* ¶ 90.) Less than two months later, Chris terminated his employment at Power House Subs on September 15, 2019. (*Id.* ¶ 120.)

### E. Mike Solicits Power House Subs' Employees and Vendors, Dana Posts About Jake's New Business, and Mike, Chris, and Jake Begin Competing

When Mike quit Power House Subs, he told employees that he would need 30 days to begin operations of his new store. (*Id.* ¶ 91.) At some point following his departure from Power House Subs, Mike spoke to Brad Becher, another employee there, about his planned competition and asked Becher to join him. (*Id.*) Since leaving Power House Subs, Mike and Chris have contacted several other Power House Subs employees and vendors in an effort to convince them to either join their competing business or leave Power House Subs. (*Id.* ¶¶ 92–97, 99–103, 159–68.)

On August 12, 2019, after leaving Power House Subs, Mike registered the fictitious name Subpreme Fundraising and Catering with the Pennsylvania Department of State's Corporations Division; Mike registered himself as the owner of the name. (*Id.* ¶¶ 110–11.) Revzip sent Mike a

letter on August 15, 2019, stating that he was in breach of the various noncompete agreements he had signed. (*Id.* ¶ 112.) Shortly after, on August 27, 2019, the business entity Supreme Fundraising and Catering, LLC, was created, with Jake listed as its resident agent. (*Id.* ¶¶ 112–13.)

On September 4, 2019, Dana made a Facebook post stating that Mike had left Power House Subs and that Jake was opening his own fundraising and catering business in the near future. (*Id.* ¶ 116.) In response to a question asking whether the Secret Sauces would be available from Jake's business, Dana replied "Maybe!!! You'll have to do a fundraiser to find out! . . . And I'm sure I've given you the recipe over the years!" (*Id.* ¶ 118.) That same day, Mike and Jake applied for a business loan.[5] (*Id.* ¶ 117.)

When Chris left Power House Subs on September 15, 2019, he informed PHCorp's Director of Fundraising, Robert Emigh, that he and Jake would be opening a new fundraising and catering business and expressed his desire for Emigh to jump ship to the new venture. (*Id.* ¶¶ 121–22.) After Chris quit, he and Mike continued to contact employees at Power House Subs, reiterating their intentions to compete with Power House Subs. (*Id.* ¶¶ 123–25.)

On October 21, 2019, Chris met with one of PHCorp's vendors, Pacifico, in an effort to obtain its services for Supreme; Chris later called Pacifico and stated that PHCorp was lying to Pacifico, was late on deliveries, and would not be doing the same volume of business in the future. (*Id.* ¶¶ 128.) Chris then told Pacifico that Supreme would look elsewhere for its supply. (*Id.* ¶ 129.) The following day, October 22, 2019, Mike spoke to the landlord of Power House Subs'

---

[5] Revzip does not allege the purpose of the business loan.

Altoona location and told the landlord that PHCorp intended to breach its lease and requested that the landlord evict PHCorp. (*Id.* ¶¶ 130–31.)

At some point following Mike's departure from Power House Subs—when, exactly, is not clear—Mike began competing by meeting with representatives of a restaurant located near Power House Subs, Georgie's Self-Serve Food, Inc. ("Georgie's"), and began selling subs through, and working at, Georgie's. (*Id.* ¶¶ 168–71.) On October 31, 2019, Supreme announced that it would begin accepting orders for fundraising, catering, and boxed lunches; Supreme directed customers to contact Chris with orders and questions. (*Id.* ¶ 172–73.) Supreme is currently in operation. (*Id.* ¶ 174; *see* ECF No. 32 (dissolving temporary restraining order and denying motion for preliminary injunction).)

### F.   Mike Files a Declaratory Judgment Action in the Court of Common Pleas of Blair County[6]

Prior to the filing of this case, Mike filed a declaratory judgment action in the Court of Common Pleas of Blair County (the "Blair County Lawsuit"). (ECF No. 45 at 17.) In the Blair County Lawsuit, currently pending at docket number 2019-GN-2993, Mike sought a declaration that the Asset Purchase Agreement was void and unenforceable. (ECF No. 56 at 15.) In the Blair County Lawsuit, Mike does not seek to invalidate either the Operating Agreement or the License Noncompete Agreement. (*Id.*)

---

[6] The Court draws the facts contained in this section from the parties' briefs on the instant motion because they pertain to the McDonnells argument that this Court should abstain from resolving the state law claims. Revzip directly addresses the McDonnells arguments and does not argue that consideration of these facts is inappropriate.

IV.    **Procedural Background**

Revzip filed the Complaint on November 6, 2019, and moved for a preliminary injunction and temporary restraining order the following day.  (ECF Nos. 1, 3, 4, 5.)  After a hearing on November 12, 2019, the Court granted a temporary restraining order.  (ECF Nos. 12, 13.)  On November 26 and November 27, 2019, the Court held a hearing on Revzip's motion for a preliminary injunction and issued an order on December 9, 2019, dissolving the temporary restraining order and denying Revzip's request for a preliminary injunction.  (ECF Nos. 22, 32.)

On December 6, 2019, the McDonnells moved to dismiss Revzip's Complaint.  (ECF No. 30.)  On January 10, 2020, Revzip filed an Amended Complaint.  (ECF No. 37.)  The Court denied as moot the McDonnells' initial Motion to Dismiss on January 13, 2020, and the McDonnells moved to dismiss a second time on February 3, 2020.  (ECF Nos. 40, 44, 45.)  Revzip filed its opposition on February 24, 2020.  (ECF Nos. 55, 56.)  On March 12, 2020, Revzip dismissed its claims against Georgie's by stipulation.[7]  (ECF Nos. 64, 65.)

The Amended Complaint contains thirteen counts: (1) breach of contract related to the Operating Agreement (ECF No. 37 ¶¶ 180–87); (2) breach of contract related to the Asset Purchase Agreement (*Id.* ¶¶ 188–94); (3) breach of contract related to the License Noncompete Agreement (*Id.* ¶¶ 195–98); (4) tortious interference with existing contractual relations (*Id.* ¶¶ 199–205);  (5) violation of the DTSA (*Id.* ¶¶ 206–18); (6) violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA") (*Id.* ¶¶ 219–26); (7) misappropriation of confidential information (*Id.* ¶¶ 227–31); (8) conversion (*Id.* ¶¶ 232–36); (9) tortious interference with business relationships with Revzip's

---

[7] Georgie's is no longer a party to this action.

employees (*Id.* ¶¶ 237–47); (10) tortious interference with business relationships with Revzip's suppliers and landlord (*Id.* ¶¶ 248–53); (11) business defamation (*Id.* ¶¶ 254–60); (12) breach of fiduciary duty (*Id.* ¶¶ 261–70); and (13) civil conspiracy (*Id.* ¶¶ 271–74).

## V.    Legal Standard

The Court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) where the complaint fails "to state a claim upon which relief can be granted." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). But detailed pleading is not generally required. *Id.* The Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of what the claims are and the grounds upon which they rest. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.[8] *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Id.* Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth.") (citation omitted). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when

---

[8] Although *Iqbal* described the process as a "two-pronged approach," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), the Supreme Court noted the elements of the pertinent claim before proceeding with that approach, *see id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly*, 809 F.3d at 787; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Connelly*, 809 F.3d at 786.  Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## VI.     Discussion

The McDonnells advance three principal arguments in their Motion to Dismiss: (1) Revzip has failed to state a plausible claim that the Secret Sauces, Customer Information, and Secret Methods are trade secrets and, as jurisdiction in this Court is premised on a federal trade secrets claim, this Court lacks jurisdiction over both the trade secrets claim and the related state law claims; (2) if the Court were to hold that Revzip had stated a federal claim and the Court had jurisdiction, the Court should abstain from adjudicating the state law claims because there are parallel state proceedings addressing the same issues; and (3) Revzip has failed to state any claim against Dana.

The Court will address each argument, beginning with the DTSA claims, then with whether Revzip has stated a claim against Dana, before finally considering whether abstention is appropriate.

### A. Revzip Has Stated a DTSA Claim

The DTSA provides the owner of a trade secret with a civil remedy for misappropriation of that trade secret.  18 U.S.C. § 1836(b)(1).  Under the DTSA, a "trade secret" is a form or type of business or technical information that the owner has taken "reasonable measures" to keep secret. 18 U.S.C. § 1839(3).  The information must have "independent economic value" by virtue of its

status as unknown or unascertainable information.  *Id.*  Misappropriation of a trade secret is the

acquisition, disclosure, or unauthorized use of that information by improper means.  § 1839(5).

To withstand a motion to dismiss a DTSA claim, a plaintiff must plead that: (1) they own

information; (2) they have taken reasonable steps to keep it secret; (3) it cannot be readily

ascertained by proper means; and (4) those who cannot access the information would gain value

from knowledge of it or its use.  *Jazz Pharms., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434 (E.D.

Pa. 2018).  The McDonnells have not disputed that Revzip owns the alleged information, or that

those who cannot access the information would gain value from having it; accordingly, the Court

need only address whether Revzip's Amended Complaint alleges a plausible claim that it took

reasonable steps to keep the information secret and that the information cannot be readily

ascertained by proper means.

If Revzip properly pleads that it possesses a trade secret under the DTSA, the Court must

then proceed to determine whether it has stated a claim of misappropriation.

### 1.  The Parties' Arguments

The McDonnells contend that this Court must dismiss the case because it lacks subject-

matter jurisdiction due to Revzip's failure to plead that it actually possesses a trade secret.  (ECF

No. 45 at 10.)  The initial Complaint failed to plead that Revzip took reasonable measures to

protect the Recipes, Customer Information, and Secret Methods, and after extensive testimony,

documentation, and briefing on the issue, this Court held that Revzip had failed to establish a

trade secret.  (*Id.*)  Because Revzip has not established a trade secret, this Court must dismiss the

case because the only basis for jurisdiction is the DTSA.  (*Id.*)  Revzip's modifications to its claims,

as embodied in the Amended Complaint are merely "tweaks" intended to avoid dismissal.  (*Id.*

at 11.) Revzip added references to the Handbook, which was never mentioned at the preliminary injunction hearing, and alleged that employees signed confidentiality agreements, an allegation explicitly contradicted by testimony at the hearing. (*Id.*)

The McDonnells concede that the Court must accept as true all well-pleaded factual allegations contained in the Amended Complaint, but argue that in this circumstance, with the Court already having taken extensive testimony on the issues—and found facts based on that testimony—the Court may consider those factual findings preclusive and bar Revzip from relitigating them. (*Id.* at 11–12.) This case is the rare exception embodied in *McTernan v. City of York*, 577 F.3d 521 (3d Cir. 2009), where the Court can afford preclusive effect to prior findings of fact, based upon testimony taken at the preliminary injunction hearing. (*Id.* at 12.) In deciding Revzip's preliminary injunction motion, the Court necessarily determined that Revzip lacked a probability of success on the merits, and the facts the Court found make it impossible for Revzip to establish trade secret status for the Recipes, Customer Information, or Secret Methods. (*Id.* at 12–13.) Further, extensive testimony presented at the preliminary injunction hearing explicitly contradicts Revzip's assertions in the Amended Complaint, and the Court should not accept clearly false allegations made in an attempt to continue the case. (*Id.* at 13–14.) The Court's prior factual findings rest on sufficiently solid ground to be afforded preclusive power over Revzip's new allegations and, as Revzip cannot establish a basis for jurisdiction, this Court must dismiss the DTSA claim. (*Id.* at 15–16.)

Finally, the McDonnells contend that, with the Court dismissing the DTSA claim, the Court must also dismiss the remaining claims in the Amended Complaint. (*Id.* at 16.) Revzip's claims, apart from the DTSA count, all arise under state law and involve only Pennsylvania

citizens, so this Court lacks subject-matter jurisdiction through diversity of citizenship. (*Id.*) The only source of jurisdiction for the Court over the state law claims is through supplemental jurisdiction by way of the DTSA claim. (*Id.*) With no remaining federal claims, and the case not yet at trial, the Court must dismiss the state law claims, as the Court has no jurisdiction. (*Id.* at 16–17.)

Revzip responds that the McDonnells are, in reality, asking this Court to grant summary judgment without an opportunity for it to conduct discovery first. (ECF No. 56 at 7.) Federal Rule of Civil Procedure 12(d) requires that the Court convert any Rule 12(b)(6) Motion into a motion for summary judgment under Federal Rule of Civil Procedure 56 and permit reasonable discovery, but the McDonnells seek to circumvent this requirement. (*Id.*) Although *McTernan* is an exception to this rule, it is inapplicable here because the *McTernan* court reached its holding based on documents appended to the complaint, rather than in reliance on the testimony adduced at a preliminary injunction hearing. (*Id.* at 7–8.) Further, in *McTernan*, the court held that there was no probability of success, unlike this Court, which held, in denying Revzip's request for a preliminary injunction, that there was no likelihood of success on the merits—not no possibility. (*Id.* at 9.) This case, therefore, is not a "rare" *McTernan* exception, the facts the Court found after the preliminary injunction hearing are not preclusive, and the Court should only consider the facts alleged in the Amended Complaint. (*Id.* at 9–13.)

Revzip further asserts that there is no heightened pleading standard that it must meet to state a claim under the DTSA. (*Id.* at 13.) To survive a motion to dismiss, a DTSA claim need only identify the alleged trade secret generally; it need not plead the trade secret with particularity. (*Id.*) Whether a plaintiff has taken appropriate measures to protect the secret is a

factual question better resolved on a more developed record, rather than on a motion to dismiss. (*Id.* at 13–14.)

### 2. Revzip Has Stated a Claim that the Secret Sauces, Customer Information, and Secret Methods are Trade Secrets

The McDonnells' argument proceeds in three parts: (1) this Court has already addressed Revzip's trade secret claims and found them lacking;  (2) as the Court has already taken evidence on the issue, it should afford its prior findings preclusive effect under *McTernan*; and (3) because the Court found that Revzip had no likelihood of success on the merits when it denied Revzip's request for a preliminary injunction, it should dismiss Revzip's DTSA claim.  (ECF No. 45 at 10–16.)  Once Revzip's DTSA claim is dismissed, the Court should then dismiss Revzip's remaining state law claims.  (*Id.* at 16–17.)  The Court will address each prong of the McDonnells' argument in turn.

#### a.  The McDonnells' Reliance upon *McTernan* is Misplaced

Even if Revzip added to its allegations in an attempt to address deficiencies in its pleading that came to light at the preliminary injunction hearing—a point on which the Court expresses no view—the Court cannot, under *McTernan*, afford its prior findings preclusive effect.

In *McTernan*, the plaintiffs sought to assemble on a handicapped accessibility ramp to a medical facility and speak to patients as they were entering and exiting.  577 F.3d at 524.  The plaintiffs filed a complaint and also sought a preliminary injunction to prevent the defendant, the city of York, Pennsylvania, from interfering with their First Amendment rights.  *Id.*  After the preliminary injunction hearing, where the city produced evidence that people congregating on the ramp interfered with access to the facility, the district court denied the request for a

preliminary injunction, holding that the ramp was a nonpublic forum and that the city could therefore exclude people from congregating on it. *Id.* at 524–25. Following its denial of the preliminary injunction, the district court dismissed the case, based on its ruling that the ramp was a nonpublic forum and that the plaintiffs had therefore not suffered a constitutional injury. *Id.* at 525–26.

On review, the Third Circuit affirmed, holding that the district court did not err in relying on its factual findings from the preliminary injunction motion. *Id.* at 530–31. The court recognized that, in most cases, in making the ruling that the district court made, it would ordinarily be required to permit discovery pursuant to Rules 12(d) and 56; however, this was the rare case where such a process was unnecessary. *Id.* at 530. In certain circumstances, a district court's findings on a motion for preliminary injunction can have preclusive effect if the circumstances of the case make it likely that the findings are "sufficiently firm to persuade the court that there is no compelling reason" to relitigate them. *Id. McTernan* was such a case because the issue for the preliminary injunction was identical to the issue for the motion to dismiss, and, crucially, an issue of law rather than fact—whether the ramp was a public or nonpublic forum. *Id.* at 531. The plaintiffs' allegations were only viable if the ramp at issue was a public forum; the district court's holding that it was not—and the Third Circuit's affirmance of that ruling—meant that the plaintiffs had failed to state a claim. *Id.* Further, the Third Circuit also noted that photographs of the ramp the plaintiffs had appended to their complaint supported the conclusion that the ramp was not a public forum because they permitted the district court to more fully analyze the ramp and conclude that, as a matter of law, it was not a public forum. *Id.*

Accordingly, the *McTernan* exception is particularly well suited to legal questions, rather than factual ones.

Here, however, *McTernan* is not applicable. The general rule for motions to dismiss is to consider only the well-pleaded factual allegations contained in the complaint and any documents appended or integral to it; consideration of other evidence requires this Court to convert the motion into one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). Only in rare exceptions, like *McTernan*, is such a deviation permissible, and this is not such a case.

First, the issues here—whether Revzip took reasonable measures to protect its trade secrets and whether the trade secrets are readily ascertainable by proper means—are not legal, but factual. *See Bro-Tech Corp v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009). Second, and relatedly, unlike the district court in *McTernan*, the Court did not find that Revzip had no possibility of success, but rather had failed to establish a likelihood of success. *Compare McTernan*, 577 F.3d at 530, *with Revzip, LLC v. McDonnell*, No. 3:19-cv-191, 2019 WL 6701835, at *5–7 (W.D. Pa. Dec. 9, 2019). This was due to a failure of the evidence Revzip presented at the preliminary injunction hearing to show trade secret status, rather than Revzip's inability to avoid a court's legal conclusion that, under the facts as alleged, there could be no trade secret. *See Gray Holdco, Inc. v. Cassady*, No. 09-cv-1519, 2010 WL 2640134, at *5 (W.D. Pa. June 30, 2010). This difference means that the Court's prior findings were not "sufficiently firm" to justify *McTernan*'s

application in this case.  *Id.* Accordingly, as there has been no opportunity for discovery, as Rule 12(d) requires, the Court may only consider the factual allegations contained in the complaint.

### b.   Revzip Has Stated a Claim that It Has a Trade Secret Under the DTSA

Having determined that its prior findings from the preliminary injunction hearing are not preclusive, the Court must now address whether Revzip's claims, as pleaded, adequately allege a plausible claim of misappropriation of trade secrets.  As noted above, *see supra* Section VI.A, the Court need only consider whether Revzip has plausibly alleged that it took reasonable precautions to secure its trade secrets and whether they are not readily ascertainable by proper means.  Here, Revzip has stated plausible claims that the Secret Sauces, Customer Information, and Secret Methods are trade secrets.

One reasonable measure that a trade secret owner can take to keep its trade secrets secret is to have employees sign confidentiality agreements.  *Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 171 (E.D. Pa. 2017.)  Restricting access to the trade secrets at issue is also a reasonable measure.  *Id.* at 168.  Security measures for physical facilities also constitute reasonable measures. *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019).  A reasonable extension of physical security measures is electronic or computer security measures such as password protection.  *Cf. id.*

Revzip alleges the following measures it took to protect its trade secrets: (1) all of Power House Subs' employees were subject to the confidentiality provisions of the Handbook (ECF No. 37 ¶¶ 57–59); (2) Power House Subs' employees signed confidentiality agreements (*Id.* ¶¶ 60–63); (3) PHCorp stored the Recipes and Customer Information on a password protected server and only gave employees access on a need-to-know basis (*Id.* ¶ 71); (4) Mike was subject to

confidentiality obligations (*Id.* ¶¶ 77–78); (5) when one of the Recipes was posted in a sandwich prep area, Revzip quickly removed the posting (*Id.* ¶¶ 136–37); and (6) Revzip discloses the Recipes and the Secret Methods only on a need-to-know basis. (*Id.* ¶¶ 140–41.)

Requiring employees to sign confidentiality agreements, disclosing the information only on a need-to-know basis, and protecting the information with electronic security could plausibly be considered reasonable measures to protect a trade secret. Accordingly, Revzip has pleaded that it took reasonable measures to protect the Secret Sauces, Customer Information, and Secret Methods.

Turning to Revzip's allegations that its trade secrets are not readily ascertainable by proper means, Revzip alleges the following: (1) without access to Power House Subs' preparation area and knowledge of the specific processes, competitors cannot ascertain the Secret Methods (*Id.* ¶ 143); (2) Power House Subs' employees may not disclose the Secret Recipes, Customer Information, or Secret Methods without authorization and may disclose them only to those who have a need to know the information (*Id.* ¶¶ 57–63, 140–41); (3) the Recipes and Customer Information are stored on a password protected server (*Id.* ¶ 71); and (4) the Customer Information consists of contact information of clients and business relations, gathered over years of effort, and includes information not publicly available. (*Id.* ¶¶ 68, 146.)

These allegations plausibly establish that competitors cannot readily ascertain the Recipes, Customer Information, or Secret Methods by proper methods. Taken as true, the only ways for a competitor to obtain these secrets would be to improperly access Revzip's server or convince an employee to breach his or her confidentiality obligations, neither of which is a "proper" means to ascertain the information. Further, Revzip has plausibly established that

although the Customer Information may be acquired through legitimate means, it is not "readily"

ascertainable because it requires years of effort to acquire.  (*Id.* ¶ 146.)  Accordingly, Revzip has

plausibly alleged that its trade secrets are not readily ascertainable by proper means.

As Revzip has made plausible allegations that it took reasonable measures to protect its

alleged trade secrets and that they cannot be readily ascertained by proper means, Revzip has

stated a DTSA claim that it has a trade secret.

### c.  Revzip Has Plausibly Established Misappropriation on the Part of Mike, Jake, and Chris[9]

Having determined that Revzip has stated a claim that it possesses trade secrets, the Court

must now consider whether Revzip's allegations establish a claim that the McDonnells

misappropriated those trade secrets.  Misappropriation is the obtaining or disclosing of a trade

secret by improper means, or the unauthorized use of a trade secret acquired through improper

means. 18 U.S.C. § 1839(5).

Revzip's allegations plausibly establish that Mike, Jake, and Chris have misappropriated

its trade secrets.  Revzip alleges that Mike took a chromebook that contained Customer

Information when he quit Power House Subs and held it long enough to transfer files, while also

retaining a copy of the Recipes.  (ECF No. 37 ¶¶ 103–108, 126.)  Revzip also alleges that it is the

owner of the various alleged trade secrets at issue in this case and that Mike, Jake, and Chris are

using or plan to use that information, without permission, to compete with Revzip by Jake

opening a fundraising and catering business in which Mike and Chris participate and use the

Secret Sauces and Customer Information.  (*See id.* ¶¶ 110–115, 117, 121–26, 157–71.)  Accordingly,

---

[9] The Court addresses the issue of whether Revzip has stated a claim against Dana for misappropriation below, *see infra* Section VI.B.

Revzip has stated a claim of misappropriation under the DTSA and the Court will not dismiss that claim.

    3.   **The Court Denies the McDonnells' Motion to Dismiss Revzip's State Law Claims**

As Revzip has stated a DTSA misappropriation claim, the Court retains jurisdiction over that claim. Because Revzip's DTSA claim forms part of the same case or controversy as the state law claims, this Court has jurisdiction over those claims also. 28 U.S.C. § 1367. Accordingly, the Court will not dismiss Revzip's state law claims for lack of jurisdiction.

  **B.  Revzip Denies the McDonnells' Motion to Dismiss Revzip's Claims Against Dana**

Revzip has brought claims against Dana for tortious interference with existing contractual relations, violation of both the DTSA and PUTSA, misappropriation of confidential information, and civil conspiracy. The McDonnells move to dismiss those claims, arguing that Revzip has not alleged sufficient facts to state a plausible claim.

    1.   **The Parties' Arguments**

The McDonnells assert that Revzip has failed to state a claim against Dana for her Facebook postings because the allegations in the Amended Complaint are "almost entirely conclusory [and] threadbare recitals" of the elements of a claim that the Court may disregard. (ECF No. 45 at 18.) Revzip's allegations against Dana are limited to the following: (1) she lives with Mike, Chris, and Jake; and (2) she posted on Facebook that her son was going to be opening a sandwich business. (*Id.*) The mere fact that Dana posted on Facebook does not give rise to a claim for misappropriation of trade secrets. (*Id.*) Further, the quote which Revzip uses to allege Dan's misappropriation is a selective misquote of her full comment on Facebook that, read in full, is clearly facetious. (*Id.* at 18–19.) Even if Revzip's allegation is taken at face value, Dana did not

state that anyone is using the Secret Sauces, but rather that her friend to whom she was responding should buy some subs and find out. (*Id.* at 19.)

Revzip responds that it has adequately pleaded a claim against Dana for tortious interference, misappropriation of trade secrets and confidential information, and civil conspiracy. (ECF No. 56 at 16.)   The McDonnells again improperly rely upon testimony adduced at the preliminary injunction hearing to argue that Dana has no connection with the case. (*Id.* at 16–17.)

### 2.  Revzip Has Stated a Plausible Claim Against Dana

Revzip has alleged the following facts about Dana: (1) she lives with Mike, Chris, and Jake (ECF No. 37 ¶ 111); (2) she made a Facebook post about Mike leaving Power House Subs (*Id.* ¶ 116); (3) in the same post, she stated that Jake was opening his own fundraising and catering business (*Id.*); and (4) in response to a question about whether the Secret Sauces would be available from Jake's new venture, she stated that they "maybe" would be available and that she was "sure" she'd given the Recipes out over the years. (*Id.* ¶ 118.)

These facts are sufficient to state a plausible claim that Dana misappropriated Revzip's trade secrets.  It is a plausible inference from Dana's comments that she is aware of Mike and Jake's business dealings, including with PHCorp.  It is also a plausible inference from her statements that she was aware of the Recipes and had disclosed them to others at various points in time.  Although the most obvious implication from that statement is that the disclosure happened sometime prior to Revzip's acquisition of Power House Subs, it is still a reasonable inference that the disclosure occurred after that purchase. As it is plausible that Dana acquired the Recipes, which Revzip has plausibly alleged were both trade secrets and confidential,

knowing or having reason to know that that the information was improperly acquired, the Court will not dismiss Revzip's trade secrets claims against Dana.

Similarly, Revzip has alleged a plausible claim that Dana misappropriated its confidential information. This claim, also known as procuring information by improper means, is defined as follows: the procurement, by improper means, for the purpose of advancing a rival business interest, of information about another's business. *Pestco, Inc. v. Ass'd. Prods., Inc.*, 880 A.2d 700, 708–09 (Pa. Super. Ct. 2005) (citing Restatement (First) Torts § 759). The information need not rise to the level of trade secrets, it must merely be confidential. *Id.* Revzip's allegations plausibly establish this claim for the reasons detailed above: the Recipes are plausibly both trade secrets and confidential and Dana plausibly misappropriated them for the purpose of boosting competing business ventures.

Revzip has also stated a claim of civil conspiracy against Dana. A civil conspiracy claim has three elements: (1) a combination of two or more persons acting with a common purpose to accomplish an unlawful act or lawful act by unlawful means; (2) an over act done to further that purpose; and (3) actual legal damage. *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008). Revzip's allegations plausibly establish that Dana acted in concert with Mike, Chris, and Jake to misappropriate Revzip's trade secrets and confidential information (ECF No. 37 ¶¶ 111, 116, 118), that an overt act of misappropriation occurred (*Id.* ¶ 101–108, 116, 118, 126), and that Revzip suffered damages from the misappropriation. (*Id.* ¶ 22, 24.)

Finally, Revzip has stated a plausible claim of tortious interference with contractual relations against Dana. The elements of a tortious interference claim are the following: (1) a contractual relationship between the plaintiff and a third party; (2) intent on the part of the

defendant to harm the plaintiff by interfering with that relationship; (3) absence of a privilege or justification of the defendant; and (4) harm resulting from the defendant's conduct. *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. Ct. 2009) (citing Restatement (Second) Torts § 766). There is no dispute that Revzip had contracts with Mike, and the Amended Complaint does not contain facts that show a privilege on Dana's part. Further, Revzip has plausibly established damages resulting from interference. Finally, Revzip's allegations permit a plausible inference that Dana acted—postings regarding Jake's new business venture and disclosure of the Recipes—that harmed Revzip's contractual relations with Mike.

Accordingly, Revzip has stated plausible claims against Dana and the Court denies the McDonnells' motion to dismiss her from the case.

### C. The Court Declines to Abstain from Considering the State Law Claims

In certain, very limited, circumstances, although the Court otherwise has jurisdiction, it is appropriate for it to decline to exercise that jurisdiction and abstain from deciding the case. There are four kinds of abstention. *Pullman* abstention counsels federal courts to abstain and permit state courts to resolve substantial constitutional issues that relate to sensitive areas of state social policy. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). *Burford* abstention permits a federal court sitting in diversity to abstain where state courts are likely to have greater expertise in complex areas of state law. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). *Younger* abstention directs federal courts to refrain from deciding cases involving civil rights torts cases brought by those currently under state prosecution for acts connected to the civil rights claims. *See Younger v. Harris*, 401 U.S. 37 (1971). *Younger* only applies in three "exceptional" circumstances: state criminal proceedings, civil enforcement proceedings, and civil cases "involving certain orders

that are uniquely in furtherance of the state courts' ability to perform their judicial functions."

*Gonzalez v. Waterfront Comm'n of N.Y. Harbor*, 755 F.3d 176, 180 (3d Cir. 2014). Finally, *Colorado River* is a prudential abstention doctrine that counsels abstention when there are parallel proceedings in both state and federal courts. *See Colo. River Water Conserv'n Dist. v. United States*, 424 U.S. 800 (1976).

The McDonnells advance no specific theory of abstention as the basis for this Court's suggested abstention. In the absence of a specific argument to the contrary, the Court will construe the request as one for the Court to abstain under *Colorado River*, as the other abstention doctrines are inapplicable to the circumstances of this case.[10]

### 1. The Parties' Arguments

The McDonnells argue that, even if the Court does not dismiss Revzip's DTSA claim, it should abstain from exercising supplemental jurisdiction over the state law claims.[11] (ECF No.

---

[10] In its brief, Revzip contends that the McDonnells are arguing for *Younger* abstention, based on a similar argument presented in their brief in opposition to Revzip's request for a preliminary injunction. (ECF No. 56 at 15; *see* ECF No. 20 at 12–14.) However, as the McDonnells do not refer to a specific doctrine in their brief for the instant motion, the Court considers the appropriateness of the various abstention doctrines. There are no constitutional claims at issue in this case, making *Pullman* inappropriate, and neither party has argued that the claims involve complex areas of state law better resolved by state courts, rendering *Burford* similarly inapplicable. Finally, the case does not involve a state criminal or civil enforcement proceeding, nor does it involve claims that implicate a state court's ability to perform its judicial functions; accordingly, *Younger* does not apply.

[11] As this Court has the power to refrain from exercising supplemental jurisdiction under 28 U.S.C. § 1367(c), the Court also considers the appropriateness of refraining under those circumstances. Section 1367 permits the Court to decline supplemental jurisdiction in four circumstances, where: (1) the case raises novel or complex state law issues; (2) the supplemental claims substantially predominate over the claims over which the Court has original jurisdiction; (3) the Court has dismissed the claims over which it has original jurisdiction; and (4) in "exceptional circumstances," there are "compelling reasons" to decline jurisdiction. Section 1367(c)(1) is analogous to *Burford* and therefore inappropriate; the state law claims do not "substantially predominate" over the DTSA claim, nor has the Court dismissed the DTSA claim, making Sections 1367(c)(1) and (2) improper bases; and, finally, as Section 1367(c)(4) is similar to both *Younger* and *Colorado River*, declining to exercise jurisdiction would be similarly inappropriate for the reasons discussed, *infra*.

45 at 17.)  As the Blair County Lawsuit is an ongoing state proceeding involving Pennsylvania citizens and an agreement executed under Pennsylvania law and in Pennsylvania, the action implicates important state issues.  (ECF No. 45 at 17–18.)  If the Court undertakes resolution of the issues involved in the Blair County Lawsuit, there is a chance that this Court and the Court of Common Pleas could enter conflicting judgments.  (*Id.* at 18.)  This possibility of conflicting judgment counsels the Court's abstention on the state law issues.  (*Id.*)

Revzip replies that abstention is improper in these circumstances.  (ECF No. 45 at 14.)  This Court has no right to decline to exercise jurisdiction where proper, and jurisdiction is proper here.  (*Id.* at 14–15.)  The Blair County Lawsuit has only a single count, regarding the Asset Purchase Agreement—it does not address any of the other contracts at issue in this case, and therefore, even if abstention were proper, it would be limited solely to Revzip's claim regarding that contract in this action.  (*Id.* at 15.)  Except in certain circumstances, abstention is inappropriate, and no such circumstances exist here.  (*Id.* at 15–16.)

### 2. *Colorado River* Abstention Is Inappropriate in this Case

This Court applies *Colorado River* narrowly, in light of its obligation to exercise the jurisdiction Congress confers upon it. *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307 (3d Cir. 2009).  The determination of whether to abstain is a two-part inquiry: (1) whether there is a parallel state proceeding that raises "substantially identical claims and nearly identical issues;" and (2) if there is a parallel proceeding, whether the "extraordinary circumstances" necessary to merit abstention are present. *Id.* at 307–08.

Generally, two cases are parallel when they involve both the same parties and the same claims. *Ryan v. Johnson*, 115 F.3d 193, 196 (3d Cir. 1997).  The presence of additional parties in one

action does not destroy parallelism when all parties in the federal action are also parties to the state action. *Flint v. A.P. Desanno & Sons*, 234 F. Supp. 2d 506, 510 (E.D. Pa. 2002). The cases need not have identical claims, but it must be likely that the state action will resolve all claims presented in the federal case. *Id.* at 510–11.

Applying these principles, abstention is not appropriate here. As far as the Court is aware, Mike is the only one of the McDonnells who is party to the Blair County Lawsuit; hence, all parties in this case are not parties to the Blair County Lawsuit. Further, resolution of the Blair County Lawsuit will not resolve all claims in this case. Although a ruling that the Asset Purchase Agreement is invalid could, potentially, dispose of several claims in this case—specifically, the claim for breach of contract related to the Asset Purchase Agreement, as well as potentially some of the trade secrets and tortious interference claims—it will not dispose of all of them. Accordingly, the Court will permit the case to proceed. Although the Court need not address *Colorado River*'s prudential factors, it will do so briefly in the interests of completeness.

To determine whether the requisite "extraordinary circumstances" exist to justify abstention, this Court considers six factors: (1) in *in rem* cases, which court first assumed jurisdiction over the property; (2) the federal forum's (in)convenience; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the courts obtained jurisdiction; (5) whether state or federal law controls the action; and (6) whether the state court will adequately protect the interests of the parties. *Nationwide*, 571 F.3d at 308. No factor is alone determinative, and the Court must balance its obligation to assume jurisdiction against any factors that counsel in favor of abstaining. *Id.* The test places a heavy thumb upon the scales in favor of exercising jurisdiction. *See id.*

The McDonnells cannot overcome the presumption in favor of this Court's exercise of jurisdiction. This case is not *in rem*, rendering the first factor irrelevant. The federal forum may be inconvenient to the parties relative to the Court of Common Pleas, but only slightly so, with this case currently pending in the Western District of Pennsylvania, which embraces Blair County. Piecemeal litigation is generally disfavored, and this case involves more claims and issues than does the Blair County Lawsuit, meaning that to abstain is to permit piecemeal litigation. Although the Blair County Lawsuit was filed before this case, the Court must consider more than simply when the cases were filed; it must look to the comparative progress of the two cases. *Id.* at 309. The parties have not demonstrated to this Court that the Blair County Lawsuit has moved beyond the stage that this Court has, and this Court has already progressed the case significantly, with its extensive hearing on the preliminary injunction question. Further, the Court of Common Pleas has jurisdiction only over a single count at issue in this case, not the other twelve, so this Court is the first to assume jurisdiction over those claims. Accordingly, the assumption of jurisdiction factor does not favor abstention. State law does, however, control the majority of this action, and there is no indication that the Court of Common Pleas will not adequately protect the interests of the parties.

On balance, and keeping in mind the presumption against abstention, the Court holds that the factors weigh against abstention, and declines to abstain from resolving the case.

## VII.   Conclusion

For the forgoing reasons, the Court holds that Revzip has stated a DTSA claim and the Court therefore has jurisdiction over Revzip's state law claims, that abstention in this case is

improper, and that Revzip has stated plausible claims against Dana. Accordingly, the Court denies the McDonnells' Motion in full.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REVZIP, LLC AND POWER HOUSE SUBS )            Case No. 3:19-cv-191
CORPORATE, LLC,                   )
                                  )
        Plaintiffs,               )            JUDGE KIM R. GIBSON
                                  )
    v.                            )
                                  )
MICHAEL MCDONNELL d/b/a           )
SUBPREME FUNDRAISNG AND           )
CATERING, CHRISTOPHER             )
MCDONNELL, JACOB BEARER, DANA     )
BEARER, SUPREME FUNDRAISING       )
AND CATERING, LLC, POWER HOUSE    )
ENTERPRISES, LLC, POWER HOUSE II, )
LLC, AND POWER HOUSE CATERING,    )
LLC,                              )
                                  )
                                  )
        Defendants.               )

## ORDER

**AND NOW**, this 21ˢᵗ day of April, 2020, after consideration of Defendants Michael

McDonnell, Christopher McDonnell, Jacob Bearer, Dana Bearer, and Supreme Fundraising and

Catering, LLC's, Motion to Dismiss Amended Complaint (ECF No. 44), and for the reasons stated

in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that the Motion is

**DENIED**.

BY THE COURT:

_____

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**