IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REVZIP, LLC AND POWER HOUSE SUBS CORPORATE, LLC, | ) ) ) | Case No. 3:19-cv-191 |
| Plaintiffs, | ) ) | JUDGE KIM R. GIBSON |
| v. | ) ) | |
| MICHAEL MCDONNELL d/b/a SUBPREME FUNDRAISNG AND CATERING, CHRISTOPHER MCDONNELL, JACOB BEARER, DANA BEARER, SUPREME FUNDRAISING AND CATERING, LLC, POWER HOUSE ENTERPRISES, LLC, POWER HOUSE II, LLC, AND POWER HOUSE CATERING, LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court is a Motion for Summary Judgment filed by defendants Michael McDonnell ("Mike") d/b/a Subpreme Fundraising and Catering ("Subpreme"), Christopher McDonnell ("Chris"), Jacob Bearer ("Jake"), Dana Bearer ("Dana"), Supreme Fundraising and Catering, LLC ("Supreme"), Power House Enterprises, LLC ("PHE"), Power House II, LLC ("PH2"), and Power House Catering, LLC ("PHC") (collectively, "Defendants"). (ECF No. 148). Defendants seek judgment as a matter of law against plaintiffs REVZIP, LLC ("REVZIP"), and Power House Subs Corporate, LLC ("PHCorp") (collectively, "Plaintiffs"), who filed the operative Second Amended Complaint in the present action on June 23, 2020. (ECF No. 80). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.

## I.      BACKGROUND

This case centers on a submarine sandwich ("sub") business called Power House Subs. Mike started this business in 2017 and sold it to Plaintiffs in 2018.  Shortly thereafter, Mike departed from Power House Subs and Mike's nephew Jake opened a competing sub business called Supreme.  Plaintiffs have sued Mike, Jake, other members of their family, and the corporate entities operated by these individuals, asserting sixteen claims that relate in various ways to the sale of Power House Subs and its aftermath.

Given the many individuals, entities, and agreements relevant to this dispute, the Court provides below a detailed summary of this case's factual background.  This summary provides both material facts and immaterial facts that are nonetheless necessary for understanding the issues presented.  These facts are undisputed unless otherwise provided.  As explained in Section III, *infra*, many of these undisputed facts are those which were inadequately disputed by the parties and have consequently been deemed admitted.

### a.   CREATION OF POWER HOUSE SUBS

Mike opened Power House Subs on February 3, 2017.  (ECF No. 150 at 10 ¶ 50; ECF No. 160 at 6 ¶ 50).  Mike is the legal owner of three entities related to this business: PHE, PH2, and PHC (collectively, the "Seller Entities").  (ECF No. 150 at 5–6 ¶¶ 7, 15–20; ECF No. 160 at 4–5 ¶¶ 7, 15–20).

Shortly thereafter, two of Mike's relatives joined him in operating Power House Subs: Mike's nephew—Jake—became the business' front-of-house manager, (ECF No. 150 at 10 ¶ 48; ECF No. 160 at 6 ¶ 48), while Mike's brother—Chris—assisted Mike in overseeing the business' fundraising operations.  (ECF No. 150 at 10 ¶ 49; ECF No. 160 at 6 ¶ 49).  Mike and Chris also

received help with business operations from their sister—Dana—who is also Jake's mother.  (ECF No. 150 at 5 ¶¶ 13–14, 10 ¶ 55; ECF No. 160 at 4 ¶¶ 13–14, 6 ¶ 55).

### b.  ACQUISITION OF POWER HOUSE SUBS

In June 2018, Mike was approached by nonparty Ryan DelBaggio ("Ryan"), who informed Mike that nonparty EMG Brands, LLC ("EMG") was interested in buying Power House Subs from him.  (ECF No. 150 at 11–12 ¶¶ 59, 70–71; ECF No. 160 at 7 ¶¶ 59, 70–71).  EMG is owned by three nonparty individuals: Brice Mertiff ("Brice"), John Russell ("John"), and William Russell ("William").  (ECF No. 150 at 12 ¶ 65; ECF No. 160 at 7 ¶ 65).  EMG is also an affiliate of nonparty Elevation Holdings, LLC ("Elevation").  (ECF No. 150 at 12 ¶ 69; ECF No. 160 at 7 ¶ 69).

In the fall of 2018, EMG presented Mike with an offer to purchase Power House Subs.  (ECF No. 150 at 13 ¶ 74; ECF No. 160 at 7 ¶ 74).[1]  In November 2018, Mike, EMG, and other stakeholders executed two agreements effectuating the sale of Power House Subs: the Operating Agreement ("OA") and the Asset Purchase Agreement ("APA") (collectively, the "Acquisition Agreements").  The Acquisition Agreements were executed between Mike, Elevation, Ryan, and three other parties that the Court must briefly introduce.

The first is John Wesley Cook ("Wes"), about whom the parties have left much unclear.  Defendants refer to an individual named "John Cook," (ECF No. 150 at 11 ¶ 83), but Plaintiffs assert that "Wes Cook and John Cook are the same person."  (ECF No. 160 at 8 ¶ 81).  As explained in Section III, *infra*, because Plaintiffs improperly assert this fact without any record citation, the Court must consequently disregard this clarificatory response.  (*See id.*).  The Court nonetheless

---

[1] More specifically, EMG presented Mike with two purchase options.  (ECF No. 150 at 13 ¶ 74; ECF No. 160 at 7 ¶ 74).  The details of these options are disputed by the parties, (ECF No. 150 at 13 ¶¶ 75–76; ECF No. 160 at 7 ¶ 75–76), but these details are immaterial and need not be discussed further.

finds for purposes of this memorandum opinion that "Wes Cook" and "John Cook" are in fact the same person, given Defendants' reference to this individual elsewhere as "John W. Cook," (ECF No. 150 at 17 ¶ 122), as well as Plaintiffs' identification of a defendant named "John Wesley Cook." (ECF No. 80 at 1). Although Plaintiffs assert claims against Wes in the Second Amended Complaint, (*see* ECF No. 80 at 44 ¶¶ 292–93, 298), they appear to abandon those claims in their briefings. *See infra* Section IV.a.v.3. Plaintiffs do not even include Wes in the list of named defendants in the case captions of more recent briefings. (*See, e.g.*, ECF No. 160 at 1). But, there is no dispute that Wes was a party to both of the Acquisition Agreements.

The second is Power House Subs Corporate, LLC ("PHCorp"). The parties' concise statements of material facts do not provide adequate background on PHCorp, but their exhibits indicate that PHCorp is "[t]he purchasing entity of [Power House Subs'] assets and operations" formed as a "joint venture between EMG, [Mike], and Ryan." (*See* ECF No. 164 at 211). Once this entity was created by the OA, it purchased through the APA "[a]ll future business and opportunities" relating to Power House Subs. (*See id.* at 210).

The third is REVZIP, LLC ("REVZIP"). REVZIP is not an original signatory of either the OA or the APA, (ECF No. 150 at 13–14 ¶¶ 80, 87; ECF No. 160 at 8 ¶¶ 80, 87), but Elevation (an affiliate entity of EMG that appears to contract on its behalf) later assigned its majority membership interest in PHCorp to REVZIP. (ECF No. 150 at 21 ¶ 132; ECF No. 160 at 11 ¶ 132). Brice was formerly the Chief Strategy Officer of PHCorp and now owns REVZIP. (ECF No. 150 at 4 ¶ 2, 5; ECF No. 160 at 4 ¶ 2, 5).

This background is necessary for understanding the following material portions of the Acquisition Agreements:

### i.   OPERATING AGREEMENT

On November 8, 2018, Mike, Wes, Elevation, and Ryan formed PHCorp by executing the

entity's OA.  (ECF No. 150 at 13 ¶ 79; ECF No. 160 at 8 ¶ 79).  Pursuant to this agreement, Mike,

Ryan, and Wes held 15%, 15%, and 5% of the membership interest in PHCorp, respectively, while

Elevation held a 65% majority interest.  (ECF No. 150 at 14 ¶ 81; ECF No. 160 at 8 ¶ 81).  Two

sections of the OA are material:

- **Section 5.03**: Under this section, Mike and Ryan agreed "to not take any actions to compete with [PHCorp] unless approved by Elevation Holdings, LLC" for two years beginning on the date of separation.  (ECF No. 155 at 8–9 § 5.03).

- **Section 10.04**: This section provides that the OA "has been adopted to govern the operation of the Company, and shall be binding on and inure to the benefit of the Members and their respective heirs, personal representatives, successors, and assigns." (ECF No. 155 at 16 § 10.04).  A "Member" is "[a]ny person or entity who at the time is a record holder or record owner of Units."  (*Id.* at 2 § 1.01).

### ii.   ASSET PURCHASE AGREEMENT

On November 12, 2018, the Seller Entities, Mike, and Wes (collectively, the "Sellers")

executed the APA with Power House Subs, LLC and Power House Subs Investments, LLC

(collectively, the "Buyers").  (ECF No. 150 at 14 ¶ 86; ECF No. 160 at 8 ¶ 86).  Despite identifying

the "Buyers" as two entities—"Power House Subs, LLC" and "Power House Subs Investments,

LLC"—the APA makes clear that there is a single buyer involved: PHCorp.  (ECF No. 155 at 35).

The following six provisions of the APA are material:

- **Background Paragraph C**:  This paragraph states that, through the APA, the Sellers "desire to sell and assign to [PHCorp] substantially all of the assets associated with the operation of [PHE, PH2, PHC, and Power House Subs, LLC ('the Businesses')]."  (ECF No. 150 at 14 ¶ 88; ECF No. 160 at 8 ¶ 88).

- **Section 1 – Purchased Assets**: This section provides that, "[a]t the Closing . . . [Sellers] shall sell and deliver to [PHCorp], free and clear of all encumbrances, all of the assets,

rights, and interests of every conceivable kind or character, whatsoever, whether real, personal, or mixed, tangible or intangible (including all goodwill), in electronic form or otherwise, that on the Closing Date are owned by [Sellers] or in which [Sellers have] an interest of any kind, including without limitation [to] those assets set forth in Schedule 1a (the 'Purchased Assets') . . . ."  (ECF No. 150 at 15 ¶ 89; ECF No. 160 at 8 ¶ 89) (emphasis omitted).

- **Subsection 1.1.6**:  Although there is no Schedule 1a attached to the APA identifying the Purchased Assets, (ECF No. 150 at 15 ¶ 90; ECF No. 160 at 8 ¶ 90), section 1.1 provides what appears to be a list the Purchased Assets.  (*See* ECF No. 155 at 20 § 1.1).  Material here is subsection 1.1.6, which provides that "[Power House Subs, LLC] shall purchase from [PHE] and [PH2] [t]he business conducted as a going concern, including . . . telephone and fax numbers."  (ECF No. 150 at 15 ¶ 91; ECF No. 160 at 8 ¶ 91).

- **Section 7.11 – Name Change Documents**:  This section states that "Sellers shall have taken all required actions to change all entity names and transfer or terminate all fictitious names relating to their operation of the Businesses and shall have delivered to Buyers a certified copy of documents evidencing the same."  (ECF No. 155 at 25 § 7.11).

- **Section 10.13 – Title to Purchased Assets**:  This section warrants that Sellers "are the sole and absolute owners of the Purchased Assets . . . .  There is no property used in the operation of the Businesses that is owned by or an interest in which is claimed by any other person or entity[.]"  (ECF No. 150 at 15 ¶ 92; ECF No. 160 at 8 ¶ 92).

- **Section 13 – Noncompetition Agreement**:  Under this section, Sellers agreed not to compete with PHCorp and its subsidiaries, successors, and assigns within a 25-mile radius of the Businesses for a period of two years from the date of closing.  (ECF No. 150 at 15 ¶ 92; ECF No. 160 at 8 ¶ 92).

Despite Mike's role as a counterparty to PHCorp in the APA, it does not appear that Mike and the other Sellers divested their shares in PHCorp pursuant to this agreement.  As best the Court can gather from the briefings, Mike, Ryan, and Wes all retained minority ownership shares of PHCorp after selling the Power House Subs assets to it and continue to own those shares at present.

### c. POST-ACQUISITION AGREEMENTS

The parties agree that, "[f]ollowing the Power House Subs acquisition ('the Acquisition'), all Power House Subs employees were employed by EMG."  (ECF No. 150 at 16 ¶ 98; ECF No. 160 at 9 ¶ 98).  To be more specific, EMG (through Elevation) became the majority owner of PHCorp under the OA, and PHCorp became the owner of the Power House Subs business and its assets under the APA.  EMG thereby became the employer of PHCorp's employees, whose work was the operation of Power House Subs.

In this capacity, EMG entered into the following seven material agreements:

### i. CONFIDENTIALITY AGREEMENTS

Following the Acquisition, EMG required all of PHCorp's employees to sign confidentiality agreements in order to continue their employment with Power House Subs.  (ECF No. 150 at 16 ¶ 99; ECF No. 160 at 9 ¶ 99).  On December 2 and 3, 2018, respectively, Chris and Jake entered into Confidential Information Agreements with EMG (collectively, the "Confidentiality Agreements").  (ECF No. 150 at 17 ¶ 101; ECF No. 160 at 9 ¶ 101).

### ii. LICENSING AGREEMENT

In or around May 31, 2019, EMG executed a Licensing Agreement with PHCorp's other shareholders.  (ECF No. 150 at 19 ¶ 116; ECF No. 160 at 10 ¶ 116).  The Licensing Agreement created a limited territory where Power House Subs could operate unencumbered from any Power House Subs franchise.  (ECF No. 150 at 19 ¶ 117; ECF No. 160 at 10 ¶ 117).

### iii. ASSIGNMENT OF RIGHTS AGREEMENT

Also on May 31, 2019, PHCorp, REVZIP, Mike, Ryan, Wes, and Elevation entered into an Assignment of Rights Agreement ("ARA").  (ECF No. 150 at 19 ¶ 118; ECF No. 160 at 10 ¶ 118). Pursuant to the ARA, PHCorp "irrevocably conveys, sells, transfers and assigns to [Elevation] all

of [PHCorp's] rights and obligations under any agreements purporting to license or otherwise grant rights in or to any of the Intangible Assets." (ECF No. 150 at 19 ¶ 119; ECF No. 160 at 10 ¶ 119). Section 8(e) of the ARA, titled "Binding Agreement; Successors," states that "no assignment of [the ARA] will be effective without the express written consent of the other party." (ECF No. 150 at 19 ¶ 120; ECF No. 160 at 10 ¶ 120).

As noted, although EMG is not a direct party to the ARA, Elevation appears to be acting in EMG's stead in the ARA and in all subsequent material agreements.

### iv.  NONCOMPETITION & NON-SOLICITATION AGREEMENT

Effective May 31, 2019, Elevation and Mike entered into a Noncompetition and Non-Solicitation Agreement ("NCA"). (ECF No. 150 at 20 ¶ 123; ECF No. 160 at 10 ¶ 123). The following sections of the NCA are material:

- **Section 1 – Confidentiality Obligation**:  Pursuant to this section, Mike agreed to not "directly or indirectly, [himself] or through another person or entity, use or disclose Confidential Information to any third party or use any advantages derivable from Confidential Information for any purpose except to operate the Businesses consistent with the License Agreement." (ECF No. 150 at 20 ¶ 127; ECF No. 160 at 11 ¶ 127).

- **Section 2 – Noncompetition Obligation**:  Pursuant to this section, Mike agreed to not "directly or indirectly, for a period of two (2) years from the later of (i) termination or expiration of the License Agreement or (ii) termination of employment . . . engage in or participate in . . . any business selling sandwiches, wraps, or salads, or conducting food-based fundraising . . . within a radius of twenty-five (25) miles of any Business location of [PHCorp]." (ECF No. 150 at 20–21 ¶ 129; ECF No. 160 at 11 ¶ 129).

### v.  REVZIP ASSIGNMENT AGREEMENT

Also on May 31, 2019, REVZIP acquired Elevation's majority ownership interest in PHCorp through the Assignment of Membership Interest and Consent and Agreement of Members to Assignment and Right of Reassignment agreement (the "REVZIP Assignment

Agreement" or "RAA").  (ECF No. 5-2 at 59).[2]  Under the RAA, "[Elevation] . . . assigns, transfers, and conveys to [REVZIP] sixty-five (65) Class A Units of membership interest (accounting for sixty-five percent (65%) of all presently outstanding units) in [PHCorp] . . . ."  (*Id.*).  This agreement thereby made REVZIP the majority owner of PHCorp.

### vi.  ASSIGNMENT OF RIGHTS & NONCOMPETITION PROTECTION AGREEMENT

Notwithstanding the above, Defendants assert that REVZIP acquired Elevation's interest in PHCorp on October 19, 2019, through the Assignment of Rights and Noncompetition Protection Agreement ("ARNPA").  (ECF No. 150 at 21 ¶ 132).  Plaintiffs properly controverted this assertion, (ECF No. 160 at 11 ¶ 132), and the Court finds that this transfer of ownership occurred on May 31, 2019, through the RAA rather than the ARNPA.  The Court further finds that the representation made in the ARNPA that "Elevation sold its Membership Interest to REVZIP, LLC, on approximately May 31, 2020" contained a typo, and it construes the agreement to mean that the sale took place on May 31, 2019.

The signatories to the ARNPA are EMG and PHCorp.  (ECF No. 155 at 90).  The purpose of this agreement was "to ratify and document the assignment of all rights under the Confidential Information Agreements and all claims, causes of action, rights to sue, and rights to enforce arising under or relating to the Confidential Information Agreements and/or any employees or past employees of [EMG] who provided services to or on behalf of [PHCorp] . . . ."  (*Id.* ¶ F).

### vii.  ASSIGNMENT OF RIGHTS & CONFIDENTIAL INFORMATION AGREEMENT

---

[2] The parties' signatures on this agreement are dated from June 4–6, 2019, but the agreement expressly states that the parties entered into it on May 31, 2019.  (ECF No. 5-2 at 59).  The Court will treat the latter date—May 31, 2019—as the date on which REVZIP acquired Elevation's majority ownership share of PHCorp.

On June 19, 2020, EMG and PHCorp entered into the Assignment of Rights and Confidential Information Agreement ("AORCIA").  (ECF No. 150 at 21 ¶ 135; ECF No. 160 at 11 ¶ 135).  The AORCIA states that "[EMG] is an affiliate entity of [Elevation]" who has "held a 65% membership interest in [PHCorp] . . . from approximately November 2018 until approximately May 31, 2020."  (ECF No. 150 at 21 ¶ 136; ECF No. 160 at 11 ¶ 136).  During the time in which Elevation was "the majority owner of [PHCorp], all employees staffing and working for or in [PHCorp's] business were employed by [EMG]."  (ECF No. 150 at 22 ¶ 137; ECF No. 160 at 11 ¶ 137).

### d.  MIKE'S DEPARTURE FROM POWER HOUSE SUBS

On August 7, 2019, Mike informed Brice that he was leaving PHCorp and intended to open and operate a business that would compete with Power House Subs.  (ECF No. 150 at 22 ¶ 138; ECF No. 160 at 11 ¶ 138).  Holding the position of PHCorp's Chief Strategy Officer at that time, Brice had the authority to sign and terminate contracts on PHCorp's behalf.  (ECF No. 150 at 22 ¶ 142; ECF No. 160 at 11 ¶ 142).  Brice was also aware that the Acquisition Agreements prohibited Mike from opening a competing business.  (ECF No. 150 at 22 ¶ 143; ECF No. 160 at 11 ¶ 143).

However, the parties dispute the following factual questions relating to this meeting:

- Whether Brice, having been told by Mike about his plans to depart PHCorp and open a business that would compete with Power House Subs, wished Mike "good luck," (ECF No. 150 at 22 ¶ 140; ECF No. 160 at 11 ¶ 140);

- Whether Brice informed Mike that opening a competing business would violate an agreement previously entered into by the parties, (ECF No. 150 at 23 ¶ 145; ECF No. 160 at 12 ¶ 145);

- Whether, during the meeting, Brice told Mike that the agreements Mike had made with EMG were "irrelevant," (ECF No. 150 at 23 ¶ 146; ECF No. 160 at 12 ¶ 146); and

- Whether Ryan or Brice informed Mike by text message that opening a competing business would violate an agreement previously made by the parties, (ECF No. 150 at 23 ¶ 149; ECF No. 160 at 12 ¶ 149).

The parties do not specify the exact date on which Mike departed PHCorp, but the Court gathers from their statements of material facts that Mike's meeting with Brice on August 7, 2019, marked his official departure from the corporation. Additionally, there is no indication from the record that Mike divested his share of PHCorp ownership upon departure.

### e.  MIKE'S RETENTION OF CUSTOMER INFORMATION

Relevant to Mike's departure from PHCorp are certain pieces of customer information that Mike had access to while he was employed at PHCorp, and which he retained access to following his departure therefrom (the "Customer Information"). The Customer Information was contained in three locations: (a) the list of current and potential customers that PHCorp created and Mike used in his selling efforts (the "Customer List"); (b) the Google calendar used only by Chris, PHCorp's general manager, and the company's delivery drivers (the "Google Calendar"); and (c) Mike's personal cell phone, which Mike used to conduct business for Power House Subs ("Mike's Power House Phone"). (ECF No. 160 at 35 ¶ 380).

### i.  CUSTOMER LIST

PHCorp created the Customer List to identify and track current and potential customers, including their names, points of contact, phone numbers, emails, and notes about appointments, interactions, preferences, and other information garnered from the customer or prospect. (ECF No. 160 at 35 ¶ 381). For the duration of his time as a PHCorp employee, Mike tracked his

fundraiser sales in the Customer List. (*Id.* at 36 ¶ 383). Thus, at the time of Mike's departure, the Customer List represented eight months of customer visits, sessions offering PHCorp's samples, client interactions, and fundraiser commitments. (*Id.* ¶ 385).

The names of some of the businesses contained in the Customer List may be obtained by internet searches, but many of the phone numbers and addresses cannot, nor can the records of customer contacts, notes, and fundraiser commitments. (ECF No. 160 at 36 ¶ 386). Thus, although some information contained in the Customer List is publicly available, the Customer List itself is not. (*See id.* ¶ 385). Only Mike, Ryan, Brice, and PHCorp's fundraising director had access to the Customer List, which was stored on PHCorp's password-protected Google cloud drive. (*Id.* ¶ 387).

After the Acquisition, Mike was issued a PHCorp company Google Chromebook laptop (the "Chromebook"). (ECF No. 150 at 40 ¶ 300; ECF No. 160 at 23 ¶ 300). Mike used the Chromebook in his capacity as a sales representative for PHCorp, (ECF No. 150 at 40 ¶ 301; ECF No. 160 at 23 ¶ 301), and he only had access to the Customer List through this device. (ECF No. 160 at 36 ¶ 387). At some point prior to his departure from PHCorp, Mike used his phone to take pictures of the Customer List as displayed on the Chromebook. (ECF No. 160 at 32, 34 ¶¶ 362, 368).[3] These pictures showed customer names, phone numbers, and notes about customers, as well as dates on which Mike had visited them while at PHCorp. (*Id.* at 32 ¶ 363). Mike took the pictures "for future reference" because he "shouldn't have been able to [access the Customer Information] because the Chromebook would have ordinarily been shut down by the

---

[3] When asked whether he took the pictures before or after he had left PHCorp, Mike responded: "I would assume it was after. I would have no reason to take it before." (ECF No. 160 at 34 ¶ 368).

administrator." (*Id.* at 34 ¶ 368).  When shown the pictures during his deposition, Mike said that it "looks like customers that I was adding in the Chromebook to solicit while at Power House. . . . I put all of my contacts that I was soliciting in the Chromebook on a spreadsheet." (*Id.* at 33 ¶ 365).  And, when asked whether he told anyone else that he took the Customer Information, Mike said: "They were my leads. . . .  Because they were my contacts . . . .  They were my personal [contacts].  I made those contacts with them." (*Id.* ¶ 366).

### ii.  GOOGLE CALENDAR

The Google Calendar contained the names of customers, the customers' contact people, the customers' phone numbers and email addresses, the dates and locations of customers' fundraisers, the numbers and types of subs ordered, and other notes regarding customers and their orders.  (ECF No. 164 at 20 ¶¶ 35, 65).  Access to the Google Calendar was protected by password.  (ECF No. 160 at 36 ¶ 389).  As a general practice, PHCorp would change the Google Calendar password of a departing employee to prevent future logins from that individual.  (*Id.* ¶ 390).  PHCorp believed that this practice was an effective means of preventing non-employees from accessing the Google Calendar.  (*See id.* at 37 ¶ 391).

### iii.  MIKE'S POWER HOUSE PHONE & NUMBER

Mike used his personal phone number—(814) 327-6275—to operate Power House Subs ("Mike's Power House Number").  (ECF No. 160 at 31 ¶ 353).  Mike's Power House Number was on Power House Subs' billboards and order forms, and it was the main number used for Power House Subs at the time of the Acquisition.  (*Id.* ¶ 354).

The phone attached to Mike's Power House Number ("Mike's Power House Phone") contained Customer Information that Mike had compiled for Power House Subs and then sold to

PHCorp under the APA. (ECF No. 160 at 32 ¶ 359). This Customer Information was not generally available to the public. (*Id.* ¶ 361).

Mike has refused to transfer his phone number to Plaintiffs since departing from PHCorp. (ECF No. 160 at 31 ¶ 357). Mike testified in his deposition that, after his departure from PHCorp, he used the phone to contact two of the Power House Subs' customers—nonparties Lindy Hilling ("Lindy") and Steve Walters ("Steve")—and inform them of his intent to open a new fundraising business. (ECF No. 150 at 24 ¶ 153; ECF No. 160 at 12 ¶ 153).

### f. CREATIONS OF SUBPREME & SUPREME

On August 8, 2019, Mike applied to register the fictitious name "Subpreme Fundraising and Catering." (ECF No. 150 at 23 ¶ 151; ECF No. 160 at 12 ¶ 151). This application was granted on August 12, 2019. (ECF No. 150 at 24 ¶ 152; ECF No. 160 at 12 ¶ 152). The resulting entity was not a limited liability company, and it did not have any of the licenses or permits necessary to operate a commercial food business in Pennsylvania. (ECF No. 150 at 25 ¶¶ 165–66; ECF No. 160 at 13 ¶¶ 165–66). Defendants assert that Subpreme "has a principal place of business" in Hollidaysburg, Pennsylvania, but they do not specify what the nature of Subpreme's business is. (ECF No. 150 at 5 ¶ 7).

A few days earlier—on August 3, 2019—Mike had contacted Steve to share that he was starting a new company and wanted Steve's business. (ECF No. 160 at 25 ¶ 314). During a follow-up conversation on August 7, 2019, Mike told Steve that he had left PHCorp and again solicited Steve's business—this time for Subpreme. (*Id.* at 26 ¶ 315). Steve told Mike that his organization, the Future Business Leaders of America ("FBLA"), would use Subpreme for future fundraisers. (*Id.* ¶ 317). The parties dispute whether these contacts ultimately led to lost fundraising for

PHCorp, (ECF No. 150 at 25 ¶ 162; ECF No. 160 at 13 ¶ 162), but they do not dispute that Steve and Lindy (both associated with FBLA) were regular customers of Power House Subs.  (ECF No. 154 at 136:9–13).

On August 15, 2019, Mike received a Cease-and-Desist letter from Plaintiffs.  (ECF No. 150 at 25 ¶ 163; ECF No. 160 at 13 ¶ 163).  The letter notified Mike that he was not allowed to compete against Power House Subs under his agreements with Plaintiffs.  (ECF No. 160 at 35 ¶ 379).  Mike lived at that time in the same household as Chris, Dana, and Jake, (*id.* at 38 ¶ 403), and these three relatives of Mike were aware of the Cease-and-Desist letter and its content.  (*Id.* at 35 ¶ 379).

Although the parties disagree on much of what happened thereafter, they do agree that, on August 27, 2019, one of the defendants created a new business entity called "Supreme Fundraising and Catering, LLC."  (ECF No. 150 at 26 ¶ 180; ECF No. 160 at 15 ¶ 180).  Defendants maintain that Jake is the sole member of this business, (ECF No. 150 at 26 ¶¶ 181–82), but Plaintiffs allege that Mike is both a member of Supreme and its de facto owner.  (ECF No. 160 at 14 ¶¶ 181–82).  Jake himself never agreed not to compete against Power House Subs, (ECF No. 150 at 26 ¶ 178; ECF No. 160 at 14 ¶ 178), and Plaintiffs allege that Mike made Jake his "front at Supreme" to circumvent his own non-compete obligations.  (ECF No. 159 at 11).

The parties also do not dispute that Supreme performed sixteen fundraisers, or that ten of those fundraisers involved customers of Power House Subs.  (ECF No. 160 at 34 ¶¶ 369, 372).  Nor do they dispute that most of those ten fundraisers generated over $1,000 in revenue.  (*Id.* ¶ 372).  Indeed, Defendants acknowledge that PHCorp offered facts showing that it suffered at least $1,200 in lost fundraising due to Supreme's competition with Power House Subs.  (ECF No. 169 at 11).

These other events relating to Supreme are material:

- On August 15, 2019, nonparty Jenny Behe ("Jenny") asked Chris: "What's Jake doing?" (ECF No. 160 at 28 ¶ 337).  Chris informed her that Jake "will work for [M]ike soon." (*Id.*).

- On October 23, 2019, Chris and Dana exchanged the following text messages:

  **Chris**: Maybe you can try to talk to Jake.  It will be his company someday . . . but we have to get it opened.  No way Mike's going to let someone have control or ownership again.  You need to trust this . . . cause the last thing you want for [J]ake . . . is Mike looking elsewhere to get funds and give away their ownership . . . and he will do that if forced to.

  **Dana**: Do you really believe that Jake should be working for Michael?  They are both drama queens[.]

  **Chris**:  There will be tough times.  But I really think Jake's good at it.  And in the long run it will be good for him.  But you have to call him and get him to back off.  If there['s] any more delays we will screw ourselves for spring fundraisers.  Get us open[.]

  Tell him to keep his other job and see how things go up there.

  **Dana**: I really don't need [M]ike['s] hoagie drama right now.  It's going to happen in time whether he's a lunatic or not.

  **Chris**: Just tell [J]ake not to fight him.  No reason to raise voices.  Let him open. You want income for the house.  Let this open now.

  (ECF No. 160 at 29 ¶ 343).

- Messages between Dana and Chris on October 25, 2019, reflect Dana's coordination with Mike about securing their father's life insurance proceeds so they "can solicit when we are opening."  (ECF No. 160 at 30 ¶¶ 346–47).  During his deposition, Chris gave the following testimony regarding this correspondence:

  **Q**: And you're telling Dana, "Mike wants to know if you can ask [the] insurance company [for] an approximate day for funds."  Why does Mike care?
  **A**: We're a family and we are broke?  I don't know.
  **Q**: Well, you kind of say why he cares[,] right?  "So we can solicit when we are opening."
  **A**: Well, if I'm worried about getting money from Dana to help get the business, Supreme[,] open, and Mike wasn't allowed to, then I might have made the

reference, you know, that Mike's broke too, so.  We all lived together.  We all used the same car.  It's really not a stretch.

(ECF No. 160 at 38 ¶ 403).

- On November 6, 2019, Dana informed Chris that she would buy Supreme a slicer from nonparty John Rutter, and Chris told her in response that "Mike already had [Rutter] get us one."  (ECF No. 160 at 38 ¶ 348).   And, on December 22, 2019, Dana sent Chris options for shop equipment and directed Chris to "[t]alk to MIKE about it[.]"  (*Id.* ¶ 350).

- On September 18, 2019, Mike advised Steve that Supreme was the same as Subpreme, and that the product produced by both entities was the same.  (ECF No. 160 at 26 ¶ 319).  Mike also told Steve that Supreme would soon be ready to cater Steve's FBLA fundraisers.  (*Id.* ¶ 320).  When Steve sought catering from Supreme for FBLA's October 2019 fundraiser but did not get a timely response from Mike, Steve sought catering from Power House Subs instead.  (*Id.* ¶ 321).

- On October 31, 2019, Mike spoke again with Steve and advised him "to talk to his nephew, Jake, or his brother Chris moving forward[.]"  (ECF No. 160 at 26 ¶ 322).  Mike also told Steve that Supreme was in Jake's name but assured him that the product and everything else would still be the same.  (*Id.*).

- On November 5, 2019, Jake emailed Steve and told him that Supreme was opening on November 15, 2019, and asked Steve to contact him.  (ECF No. 160 at 27 ¶ 328).  Steve had never provided Jake with his contact information.  (*Id.* ¶ 329).

- On December 27, 2019, Steve received an email from the address "supremefundraisers@gmail.com" stating that it was from Jake and announcing that "[w]e are open for business!"  (ECF No. 160 at 27 ¶ 331).  Steve told Jake that he wished to hold a fundraiser catered by Supreme in January 2020.  (*Id.* ¶ 332).

- On January 24, 2020, Steve held a fundraiser catered by Supreme and paid Supreme $1,191.25 for its services.  (ECF No. 160 at 27 ¶ 333).

### g.  CHRIS' DEPARTURE FROM PHCORP

Chris left PHCorp on September 16, 2019, (ECF No. 160 at 37 ¶ 395), but he did not sign out of the Google Calendar upon his departure.  (*Id.* at 393).  By not signing out, Chris retained access to the Google Calendar even after his password had been changed.  (*Id.* ¶¶ 392–93).  Chris

took advantage of this access on multiple occasions in October 2019 before finally losing access at the end of that month. (*Id.* ¶¶ 396–97).

The Court highlights one notable instance of Chris accessing the Google Calendar: on October 16, 2019, nonparty John Macak, who was still working at PHCorp, told Chris about a fundraiser where Power House Subs had forgotten to deliver some salad dressing that was part of the order. (ECF No. 160 at 37 ¶ 396). Chris responded: "I saw the dressing on my calendar and knew they'd forget. I'll be talking to our friend in clarion [sic], that will be her last powerhouse experience." (*Id.*).

### h.  THE SECRET RECIPES AND FUNDRAISING METHODS

Also relevant to Mike and Chris' departures from PHCorp are certain "Secret Recipes" and Fundraising Methods used in Power House Subs' business. As discussed in Section IV.a.v, *infra*, Plaintiffs claim at Count XV that Defendants sold these assets to PHCorp through the APA, and that Defendants' argument that these assets are not proprietary is itself a breach of ownership warranty Defendants made in that agreement. The following information may offer helpful background, but no facts regarding either the Secret Recipes or the Fundraising Methods are material.

### i.  SECRET RECIPES

The "Secret Recipes" at issue are recipes for two types of salad dressing: the Light Dressing and the Dark Dressing. (ECF No. 150 at 29–32 ¶¶ 207–259; ECF No. 160 at 16–19 ¶¶ 207–252). The parties dispute whether the Dark Dressing was made by Power House Subs and used in its sandwiches or salads. (ECF No. 150 at 34 ¶ 248; ECF No. 160 at 19 ¶ 248). Neither party asserts that the Light Dressing was made by Power House Subs, but both generally dispute

whether this recipe was disclosed to PHCorp employees who were not bound by confidentiality agreements, (ECF No. 150 at 30–31 ¶¶ 221–27; ECF No. 160 at 17–18 ¶¶ 221–27), and whether this recipe was easily accessible to such employees.  (ECF No. 150 at 31–33 ¶¶ 228–42; ECF No. 160 at 18–19 ¶¶ 228–42).

### ii.  FUNDRAISING METHODS

In the Second Amended Complaint, Plaintiffs state that "[t]he fundraising portion of the Business relies on secret business methods and techniques" that "enable Plaintiffs to produce more subs faster than competing sub shops[,]" which they call the "Fundraising Methods[.]" (ECF No. 80 at 5 ¶¶ 26, 28).  The Court gathers from the parties' concise statements of material facts that the "assembly methods" discussed therein are the same as the "fundraising methods" discussed in the Second Amended Complaint.  (*See* ECF No. 150 at 35–39 ¶¶ 260–86; ECF No. 160 at 20–21 ¶¶ 260–86).  The parties agree on facts relating to use of an "Original Method" and an "Updated Method" at Power House Subs, (ECF No. 150 at 35–38 ¶¶ 260–80; ECF No. 160 at 20–21 ¶¶ 260–80), and they also agree that Supreme did not use these assembly methods to make its own sandwiches.  (ECF No. 150 at 38 ¶¶ 281–82; ECF No. 160 at 21 ¶¶ 281–82).

### i.  THE PRESENT ACTION

PHCorp and its majority shareholder, REVZIP, initiated this action on November 6, 2019. (ECF No. 1).  They filed the operative Second Amended Complaint on June 23, 2020, naming as defendants Mike d/b/a Subpreme, Chris, Jake, Dana, Wes, Supreme, and the Seller Entities (i.e., PHE, PH2, and PHC).  (ECF No. 80).

On December 5, 2022, Defendants filed a sealed Motion for Summary Judgment.  (ECF No. 148).  On this date, Defendants also filed under seal a Memorandum of Law in Support of

Motion for Summary Judgment ("Defendants' Supporting Brief"), (ECF No. 149); a Concise

Statement of Material Facts in Support of Motion for Summary Judgment ("Defendants' Concise

Statement of Material Facts"), (ECF No. 150); an Appendix of Documents in support of the Motion

for Summary Judgment ("Defendants' Appendix") (ECF No. 151); and five other documents

offered in support of Defendants' Motion for Summary Judgment.  (*See* ECF Nos. 152–56).[4]

     On January 23, 2022, Plaintiffs filed their Memorandum in Opposition to Defendants'

Motion for Summary Judgment (the "Response").  (ECF No. 159).[5]  They also filed on this date an

accompanying Concise Statement of Material Facts.  (ECF No. 160).  On January 27, 2023, Plaintiffs

sought leave from the Court to file an appendix to their Response under seal.  (ECF No. 161).  The

Court granted this leave on January 31, 2023, (ECF No. 163), and Plaintiffs filed their appendix

on the same day ("Plaintiffs' Appendix").  (ECF No. 164).

     On January 31, 2023, the parties filed a Joint Motion for Leave to File Additional Briefing,

seeking leave for Defendants to file a Reply Brief and for Plaintiffs to file a Sur-Reply Brief.  (ECF

No. 165).  On February 2, 2023, the Court entered an order granting this motion on the following

terms: Defendants would have until February 10, 2023, to file their Reply Brief, and Plaintiffs

would have until February 17, 2023, to file their Sur-Reply Brief.  (ECF No. 167 at 1).  Defendants

---

[4] These documents include the following: (1) the transcript of Ryan's deposition on September 14, 2021, (ECF No. 152); (2) the transcript of nonparty Alyssa DelBaggio's deposition on September 15, 2021, (ECF No. 153); (3) the transcript of nonparty Shaun D'Angelo's deposition on September 15, 2021, (ECF No. 154); (4) the OA, (ECF No. 155); and (5) the EMG Employee Handbook as of March 1, 2019, (ECF No. 156).

[5] The Court originally set January 6, 2023, as Plaintiffs' deadline for filing their response to Defendants' Motion for Summary Judgment.  (ECF No. 139).  However, on December 30, 2022, the parties jointly stipulated that this deadline should be moved to January 20, 2023.  (ECF No. 157).  On January 3, 2023, the Court set a new filing deadline consistent with the parties' stipulation.  (ECF No. 158).

timely filed their Reply Brief on February 10, 2023, (ECF No. 169), and Plaintiffs timely filed their Sur-Reply Brief on February 17, 2023.  (ECF No. 170).

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The parties must support their positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (emphasis original).  A disputed fact is material if it might affect the case's outcome under applicable substantive law.  *See Boyle v. Cty. of Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247–48).  Summary judgment is unwarranted where a reasonable jury, based on the evidence presented, could return a verdict favoring the non-movant on the issue on which the movant seeks summary judgment.  *See Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must draw all inferences in a light most favorable to non-movant without weighing the evidence or questioning the witnesses' credibility.  *See Boyle*, 139 F.3d at 393.  The movant has the burden of demonstrating the absence of a genuine issue of material fact, while the non-movant must establish the existence of each element for which it bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  If the movant has pointed to record evidence sufficient to demonstrate that no genuine issues of fact remain, the burden falls on the non-movant to identify record evidence controverting the movant's position.  *See Schulz v. Celotex Corp.*, 942 F.2d 204, 210 (3d Cir. 1991). Rule 56 requires the non-movant to go beyond the pleadings and show, through record evidence, that there is a genuine issue for trial.  *See Celotex v. Catrett*, 477 U.S. at 324.

## III.    THE SUMMARY JUDGMENT RECORD

The Court must determine which statements of material fact are admitted and which are denied.   As explained below, the Court finds that Plaintiffs failed to properly controvert Defendants' statements of material fact in the following paragraphs of Defendants' Concise Statement of Material Facts, (ECF No. 150): ¶¶ 7, 21–32, 34–36, 41–43, 45, 50–58, 65, 67–68, 72–73, 80–83, 90, 106, 113, 116, 136, 141, 150, 165, 191, 198, 206–08, 217, 219, 220–23, 225, 253, 265, 267, 322–24, and 326.   Likewise, the Court finds that Defendants failed to properly controvert the following paragraphs of Plaintiffs' "Additional Material Facts at Issue," (ECF No. 160 at 24): ¶¶ 303–340 and 342–403.  The Court will therefore deem those paragraphs admitted for purposes of deciding Defendants' summary judgment motion.

The Federal Rules of Civil Procedure and this Court's Local Rules contain specific provisions directing how parties should present facts in support of, or in opposition to, a summary judgment motion.  Federal Rule of Civil Procedure 56(c)(1) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."  FED. R. CIV. P. 56(c)(1).  The Local Rules, in turn, require

a responding party to "admit[] or deny[] whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material[,]" and to "set[] forth the basis for the denial if any fact . . . is not admitted in its entirety (as to whether it is undisputed or material), *with appropriate reference to the record*[.]"   LCvR 56.C.1.a–b (emphasis added).   "In clarifying what qualifies as an 'appropriate reference to the record[,]' the Rule refers to LCvR 56.B.1, which states that such references must 'cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact.'"   *Rozier v. United Metal Fabricators, Inc.*, 3:09-CV-257, 2012 WL 170197, at *2 (W.D. Pa. Jan. 19, 2012) (quoting LCvR 56.B.1).

The Court strictly adheres to the summary judgment procedures set forth both by the Federal and Local Rules, and it deems inadequately denied statements of fact as admitted for purposes of deciding a summary judgment motion.   *See Rozier*, 2012 WL 170197, at *2.   These rules apply with equal force to both movants and non-movants.   *See Mastalski v. GEICO Gen. Ins. Co.*, No. 20-CV-1321, 2022 WL 17668801, at *1 n.1 (W.D. Pa. Dec. 14, 2022) (holding that, because "Defendant has not responded to Plaintiff's Concise Statement of Material Facts and Additional Material Facts . . . in accordance with Rule 56.D of the Local Rules of [this Court] . . . Plaintiffs' Additional Material Facts (which cite to evidence of record in accordance with Local Rule 56.C.1) . . . can be deemed admitted for purposes of deciding Defendant's summary judgment motion") (citing LCvR 56.E).

Each party in this case has failed to properly controvert certain statements of material fact offered by the other.   Because there are common defects shared by the parties' responses, the

Court will address paragraphs that received improper responses of the same sort together.  As noted, it will deem those facts admitted.

### a.  MATERIALITY DENIALS

Defendants assert that Plaintiffs failed to adequately controvert the following twenty-six paragraphs: (ECF No. 150 ¶¶ 21–32, 34–36, 50–57, 67, 72–73, 113).   Defendants offer two arguments in support of this assertion: first, by denying these twenty-six paragraphs on grounds of materiality, Plaintiffs did not indicate that they are "factually disputed."  (ECF No. 169 at 5).  And second, "[n]one of these 26 paragraphs include citations to the record."  (*Id.*).

Plaintiffs respond to both arguments by asserting simply that, although "Defendants may not like that Plaintiffs deny assertions . . . based on their immateriality," such denials were nonetheless "done consistent with the rules[.]"  (ECF No. 170 at 6).  On the contrary, this Court has recently held that

> legal opinions and conclusions, statements about opposing counsel, what evidence is admissible at trial and other extraneous commentary, *including whether a fact proffered by the [opposing party] is "immaterial,"* are not facts and thus, are not proper responses to a statement of material facts.

*POM of Pa., LLC v. Pa. Skill Games, LLC,* 18-CV-722, 2012 WL 1788405, at *2 (W.D. Pa. May 5, 2021) (emphasis added).  Thus, assertions of immateriality "will be disregarded in connection with determining if a material fact is disputed." *Id.*[6]

---

[6] Other courts in the Third Circuit have found that such assertions are "perhaps not deficient to the point of warranting that the corresponding statement of fact be deemed admitted[.]" *Park v. Veasie,* No. 3:09-CV-2177, 2011 WL 1831708, at *4 (M.D. Pa. May 11, 2011).  Courts taking this alternative perspective have instead struck the offending party's statement of material facts in its entirety and given that party an opportunity to properly re-file the statement.  *See, e.g., id.* (striking a counter-statement of facts and permitting the filing party to "re-file in strict accordance with Local Rule 56.1" where the statement contained responses that "lodg[ed] an evidentiary objection to purportedly immaterial facts"); *Smith v. Spencer,* No. 1:16-CV-2157, 2019 WL 2502554, at *7 (M.D. Pa. Feb. 27, 2019) (striking the entire statement of

Moreover, Plaintiffs fail to support these denials with "appropriate reference[s] to the record[,]" as Local Rule 56 clearly mandates.  LCvR 56.C.1.b.  Plaintiffs likewise fail to support them by "citing to particular parts of materials in the record[,]" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."  FED. R. CIV. P. 56(c)(1).

Based on the above, the Court will deem Plaintiffs' responses to these paragraphs to be admissions.  *See Westfield Ins. v. Detroit Diesel Corp.*, No. 3:10-CV-100, 2012 WL 1611311, at *1 (W.D. Pa. May 8, 2012) (deeming facts in a party's concise statement of material facts admitted when opposing party failed to adequately controvert them).

### b.  DENIALS WITH ADDITIONAL COMMENTS

Defendants argue that Plaintiffs "deny and insert additional unsupported 'factual' commentary" to the following 53 paragraphs, (ECF No. 169 at 5): (ECF No. 150 ¶¶ 16, 18, 20, 41–43, 45, 58, 63, 65, 67, 75–76, 80, 89, 106, 116–17, 122, 125, 130, 132, 138, 140–41, 149–50, 173, 181, 198, 206–08, 217, 219–223, 225, 232, 236, 240, 246, 265, 267, 285–86, 291, 302, 322–24).  Plaintiffs respond by arguing that "every instance of denial is made by showing that it conflicts with other facts in Defendants' own Statement of Material Facts or by citing to evidence (including specific statements in declarations and depositions) supporting the denial in the parties' appendices." (ECF No. 170 at 6).

Local Rule 56.C.1 imposes the same requirements on non-movants when they partially deny a fact as when they wholly deny one: the response must "set[] forth the basis for the denial"

---

facts and permitting the offending parties to re-file their statements to "enforce compliance with our local rules and promote judicial efficiency") (citing *Park*, 2011 WL 1831708, at *3).

for a fact "not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record[.]" LCvR 56.C.1.b.  This rule cites to Local Rule 56.B.1 "for instructions regarding format and annotation[,]" *id.*, which states in relevant part: "[a] party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact."  LCvR 56.B.1.

The paragraphs listed above, which explain a denial with additional comments but provide no supporting record citation, generally do not constitute proper responses.  However, the Court excepts from this conclusion those paragraphs where the additional comment directly references Defendants' Concise Statement of Material Facts and the specific part of the record cited therein.  One example is paragraph 140 of Plaintiffs' Concise Statement of Material Facts, which states: "Deny.  The record does not support the assertion."  (ECF No 160 at 11 ¶ 140).  Although this response does not contain a specific reference to the record, it does reference the corresponding paragraph in Defendants' Concise Statement of Material Facts, which itself refers to the record.  (ECF No. 150 at 22 ¶ 140).  The Court deems such responses "[i]ntelligble citations to the record" because they do not require the Court to "sift[] through the evidentiary record without adequate guidance[.]"  *Goins v. Newark Housing Auth.*, No. 15-CV-2195, 2019 WL 6769266, at *1 n.2 (D.N.J. Dec. 11, 2019).  The paragraphs fitting this description are as follows: ¶¶ 16, 18, 20, 63, 75–76, 117, 125, 130, 132, 138, 140, 149, 173, 181, 232, 236, 240, 246, 285–86, 291, and 302.

The Court will deem these remaining responses to be admissions: ¶¶ 41–43, 45, 58, 65, 67, 80, 106, 116, 141, 150, 198, 206–08, 217, 219, 220–23, 225, 265, 267, and 322–24.

### c.  ADMISSIONS WITH ADDITIONAL DENIALS

Defendants argue that Plaintiffs give nine responses that, "although styled as admissions, are in actuality either blanket denials or partial denials—none of which [are] supported by a citation to the record."  (ECF No. 169 at 5).  The nine responses that Defendants identify are Plaintiffs' responses to the following: (ECF No. 150 ¶¶ 7, 68, 81–83, 90, 136, 165, 191).

As the Court has previously noted, the Federal Rules of Civil Procedure clearly state that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." FED. R. CIV. P. 56(c)(1).  Of the nine paragraphs that Plaintiff identifies, eight of them dispute Defendants' factual assertions without citing to support in the record (the ninth affirms Defendant's assertion without making any denial whatsoever).[7]  Insofar as those paragraphs deny facts asserted by Defendants without supporting those denials with record citations, the Court will deem those denials to be admissions.

### d.  UNANSWERED PARAGRAPHS

Each party here failed to respond to certain statements of material fact offered by the other.  Plaintiffs do not address paragraphs 253 and 326 of Defendants' Concise Statement of Material Facts.  (*See* ECF No. 160 at 19, 24).  Defendants, in turn, do not address any of the additional material asserted in Plaintiffs' Concise Statement of Material Facts.  (*See generally* ECF No. 169).  That is, Defendants do not respond to paragraphs 303–403 of Plaintiffs' "Additional Material Facts at Issue."  (ECF No. 160 at ¶¶ 303–403).  Because virtually all of Plaintiff's additional statements of material fact cite to record evidence in accordance with Local Rule 56.C.1,

---

[7] In paragraph 90, Defendants assert that "[t]here is no Schedule 1A attached to the APA identifying the Purchased Assets."  (ECF No. 150 ¶ 90) (citation omitted).  In response, Plaintiffs "[a]dmit that the copy of the APA referenced does not have a Schedule 1a."  (ECF No. 160 ¶ 90).  Plaintiffs do not controvert Defendants' assertion at paragraph 90 because their response is fully consistent with that assertion.

the Court will deem these facts admitted. *See Kitko v. Young*, No. 3:10-CV-189, 2013 WL 530816, at *1 (W.D. Pa. Sept. 20, 2013) (holding that "[f]acts insufficiently denied and not otherwise controverted . . . have been deemed admitted").[8] The Court will therefore deem admitted the following statements of material fact: (ECF No. 150 ¶¶ 253, 326; ECF No. 160 ¶¶ 303–340, 342–403).

## IV.    DISCUSSION

### a.    BREACH OF CONTRACT (COUNTS I, II, III, XIV, XV)

Plaintiffs assert breach of contract claims under Pennsylvania state law at Counts I, II, III, XIV, and XV. (ECF No. 22–26, 41–45). To succeed on a breach of contract claim, a plaintiff must establish three elements: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages. *Kelly v. Peerstar LLC*, No. 3:18-CV-126, 2020 WL 5077940, at *15 (W.D. Pa. Aug. 26, 2020) (citing *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).

For the following reasons, the Court will grant Defendants' motion for summary judgment on Count XV, and it will deny this motion on Counts I, III, and XIV. As for Count II, the Court will grant Defendants' motion for summary judgment as to the claims it raises against Wes and the Seller Entities, but it will deny this motion as to those claims raised against Mike.

### i.    OPERATING AGREEMENT (COUNT I)

---

[8] There is one paragraph in Plaintiff's "Additional Material Facts at Issue" that does not have a record citation: paragraph 340. (ECF No. 160 at 28 ¶ 340). However, paragraph 341 includes only a record citation, and this citation appears to correspond with the factual content asserted in paragraph 340. (*See id.* at ¶¶ 340–41). The Court will therefore construe paragraph 340 as having the citation provided in paragraph 341, and it will construe paragraph 341 as having no content at all. Although an admission to paragraph 341 would be inconsequential, the Court does not deem Defendants' lack of response to this paragraph as an admission.

At Count I, Plaintiffs claim that Mike breached the non-compete provision contained in Section 5.03 of the OA by taking "definitive actions to compete" against Power House Subs. (ECF No. 80 at 22–23). This provision barred Mike from "tak[ing] any actions to compete with Power House Subs unless approved by Elevation" for two years beginning on the date of separation. (ECF No. 155 at 8–9 § 5.03). For the following reasons, the Court denies Defendants' motion for summary judgment on this claim.

Contrary to Defendants' assertion that REVZIP is "a stranger to the [OA]" and therefore "cannot assert rights thereunder[,]" (ECF No. 149 at 10), the Court finds that REVZIP does have standing to enforce that agreement. Section 10.04 of the OA states:

> This Agreement has been adopted to govern the operation of the Company, and shall be binding on and inure to the benefit of the Members *and their respective heirs, personal representatives, successors, and assigns.*

(ECF No. 155 at 16) (emphasis added). The OA defines "Member" as "[a]ny person or entity who at the time is a record holder or record owner of Units." (*Id.* at 2 § 1.01). Elevation assigned its majority membership interest in PHCorp to REVZIP under the RAA. (ECF No. 5-2 at 59). As assignee of this interest, REVZIP currently benefits from the OA and may therefore enforce it.

As for the substance of Count I, there are two genuine questions of material fact underlying the legal question of whether Mike breached the OA. First, the parties dispute whether Mike took steps to compete with Power House Subs. (ECF No. 150 at 25 ¶ 164; ECF No. 160 at 13 ¶ 164). Second, the parties dispute whether Plaintiffs had approved of Mike's efforts to do so. (ECF No. 150 at 22–23 ¶¶ 140, 145–47, 149–50; ECF No. 160 at 11–12 ¶¶ 140, 145–47, 149–50). Because either would provide the Court with a sufficient basis for denying Defendants'

motion for summary judgment on Count I, the Court will only discuss the record evidence relating to the latter factual question.

The following facts are not disputed: on August 7, 2019, Mike informed Brice that he was leaving PHCorp and intended to open and operate a business in competition with Power House Subs. (ECF No. 150 at 22 ¶¶ 138–39; ECF No. 160 at 11 ¶¶ 138–39).[9] As Chief Strategy Officer of PHCorp, Brice had the authority to sign and terminate contracts on the company's behalf. (ECF No. 150 at 22 ¶ 142; ECF No. 160 at 11 ¶ 142). Brice also knew that Mike was prohibited from competing against Power House Subs under the OA. (ECF No. 150 at 22 ¶ 143; ECF No. 160 at 11 ¶ 143).

Left in dispute are these questions of material fact:

- Whether Brice, having been told by Mike about his plans to depart PHCorp and open a competitor to Power House Subs, wished Mike "good luck[,]" (ECF No. 150 at 22 ¶ 140; ECF No. 160 at 11 ¶ 140);

- Whether Brice informed Mike that competing with Power House Subs would violate the contractual obligations under the OA not to compete, (ECF No. 150 at 23 ¶ 145; ECF No. 160 at 12 ¶ 145); and

- Whether, during the August 7 meeting, Brice told Mike that the prior agreements Mike had entered into with EMG—including the OA—were "irrelevant." (ECF No. 150 at 23 ¶ 146; ECF No. 160 at 12 ¶ 146).

---

[9] Defendants' statement of material fact at paragraph 138 reads in full: "On August 7, 2019, Mike met with Brice at Perkins in Altoona, Pennsylvania to discuss discrepancies with this income." (ECF No. 150 at 22 ¶ 138). Plaintiffs deny this statement, asserting that "[t]he record cited does not support the assertion regarding discrepancies with Mike's income." (ECF No. 160 at 11 ¶ 138). The Court does not find the intended subject of the meeting to be material, and it deems the remaining content of paragraph 138 admitted due to the absence of any objection by Plaintiffs to it.

Because the above disputes of fact might affect this case's outcome by determining whether Brice relieved Mike of his contractual obligation under the OA not to compete against Power House Subs, these disputes are material. *Boyle*, 139 F.3d at 393.

There is also a genuine question of material fact as to whether Plaintiffs suffered damages from Mike's purported breach of the OA. The parties do not dispute that Supreme performed 16 fundraisers, and that ten of those fundraisers involved customers of Power House Subs. (ECF No. 160 at 34 ¶¶ 369, 372). Nor do they dispute that most of those ten fundraisers generated more than $1,000 in revenue. (*Id.* ¶ 372). In fact, Defendants expressly admit that Plaintiffs have offered facts showing that they suffered at least $1,200 in lost fundraising revenue due to Supreme's competition with Power House Subs. (ECF No. 169 at 11) ("The only customer who claims they were induced by Mike to leave [Power House Subs] is [Steve] Walters. Assuming such inducement was true, it would *only* account for the $1,200 Supreme received from [Steve] Walters.") (emphasis original).

Lastly, the parties do not dispute that the OA was a valid contract that obligated Mike not to compete against Power House Subs. Because a jury could find in Plaintiffs' favor on each of the elements of their breach of contract claim at Count I, the Court will deny Defendants' motion for summary judgment on this claim.

## ii. ASSET PURCHASE AGREEMENT (COUNT II)

At Count II, Plaintiffs claim that Mike, Wes, and the Seller Entities (i.e., PHE, PH2, and PHC) each breached the APA with respect to Sections 13, 1.1.6, and 7.11 thereof. (ECF No. 80 at 23–25). Specifically, they claim that these defendants breached (a) Section 13, by "competing . . . against Power House[,]" "diverting trade, business, customers, and vendors from Power

House[,]" and "soliciting employees from Power House to leave their employment with Power House and enter into employment or other contractual arrangements with competitors of Power House[;]" (b) Section 1.1.6, "by failing to transfer the telephone numbers of Mike and Chris used in the operation of the Business[;]" and (c) 7.11, "by failing to transfer to Power House or terminate the fictitious name 'Power House Subs' and failing to amend the entity names for [PHE], [PH2], and [PHC]." (*Id.* at 23–24). For the following reasons, the Court grants Defendants' motion for summary judgment on these claims as to Wes and the Seller Entities, and it denies the motion on these claims as to Mike.

There is a question of material fact as to whether Mike breached Section 13 of the APA. This section, titled "Noncompetition Agreement[,]" provides that the Sellers will not compete with the Buyers and their subsidiaries, successors, and assigns within a 25-mile radius of the Businesses for a period of two years from the date of closing. (ECF No. 150 at 15 ¶ 92; ECF No. 160 at 8 ¶ 92). Defendants argue that Plaintiffs failed to adduce evidence demonstrating that Mike breached Section 13 "[f]or the reasons discussed in Section (a)(i)(2) of [their] brief"—i.e., that Brice consented to Mike's plan to open a competing business. (ECF No. 149 at 12, 14). The Court found there to be a question of material fact as to whether Brice gave such consent, *see supra* Section IV.a.i, and the Court finds the same question at issue here.

There is also a question of material fact as to whether Mike breached Section 1.1.6 of the APA. Defendants argue that Mike did not breach Section 1.1.6 by "fail[ing] to turn over his *personal* telephone number as well as the personal telephone number of Chris" because this section "makes no reference to the personal telephone numbers of Mike and Chris." (ECF No. 149 at 14) (emphasis original). However, the plain meaning of the APA indicates that these

personal phone numbers would indeed constitute "Purchased Assets" transferred under the APA. Section 10.13 provides that "Sellers are the sole and absolute owners of the Purchased Assets . . . . *There is no property used in the operation of the Businesses that is owned by or an interest in which is claimed by any other person or entity*[.]" (ECF No. 150 at 15 ¶ 92; ECF No. 160 at 8 ¶ 92) (emphasis added). The "Purchased Assets" are listed in Section 1, and Section 1.1.6 makes clear that telephone numbers used in business operations are no exception. (ECF No. 150 at 15 ¶ 91; ECF No. 160 at 8 ¶ 91) (Purchased Assets include "[t]he business conducted as a going concern, including . . . telephone and fax numbers"). Because Mike used his personal phone number to operate Power House Subs, (*see* ECF No. 154 at 133), but did not turn over this number to PHCorp once he departed the company, (ECF No. 160 at 31 ¶ 357), a reasonable jury could find that Mike breached Section 1.1.6.

Lastly, there is a question of material fact as to whether Mike breached Section 7.11 of the APA. Defendants do not dispute that Mike has refused to terminate Power House-related entities and fictitious names, (*see* ECF No. 149 at 13–15), but argue only that there is no record evidence showing that Plaintiffs "suffered any damage due to Mike . . . failing to transfer or terminate the fictitious names 'Power House Subs,' 'Power House Enterprises, LLC,' 'Power House II, LLC,' and 'Power House Catering, LLC.'" (*Id.* at 15). On the contrary, record evidence indicates that Mike's refusal to terminate Power House-related entities and fictitious names has produced a situation where "Plaintiffs will have to pay for them to be shut down and terminated, if even possible[,]" and where their continued existence "causes confusion." (ECF No. 164 at 119 ¶ 24). There is therefore a material question as to whether Plaintiffs suffered damages from Mike's breach of Section 7.11.

Although there is sufficient record evidence indicating that Mike breached the APA, there is no such evidence indicating that either the Seller Entities or Wes did so.  In the Second Amended Complaint, Plaintiffs allege that the Seller Entities breached "Section 1.1.6 . . . by failing to transfer the telephone numbers of Mike and Chris used in the operation of the Business[,]" and "Section 7.11 . . . by failing to transfer to Power House or terminate the fictious name 'Power House Subs' and failing to amend the entity names for [PHE], [PH2], and [PHC]."  (ECF No. 80 at 23:191, 24:192).  But in their briefings, Plaintiffs identify Mike as the cause of these breaches. (ECF No. 159 at 20) (arguing that "Mike's refusal to transfer Mike's Power House Phone Number" and his refusal "to terminate the fictious names" of the Seller Entities violated his obligations under the APA).  There is no evidence in the record indicating that the Seller Entities themselves breached the APA.  Additionally, Plaintiffs do not argue in their briefings that Wes breached the APA, and there is likewise no evidence indicating that he did.

Based on the above, the Court will grant Defendants' motion for summary judgment on Count II as to its claims against Wes and the Seller Entities, but it will deny this motion as to its claims against Mike.

### iii.   NON-COMPETITION, NON-SOLICITATION, & CONFIDENTIALITY AGREEMENTS (COUNT III)

At Count III, Plaintiffs claim that Mike breached the NCA.  (ECF No. 80 at 25–26).  The Court denies Defendants' motion for summary judgment on this claim in its entirety.

Under the NCA, Mike agreed not to (1) disclose PHCorp's confidential information, or (2) compete with Power House Subs within a 25-mile radius for two years following his departure from PHCorp.  (See ECF No. 150 at 20–21 ¶¶ 127, 129; ECF No. 160 at 11 ¶¶ 127, 129).  As the

Court will explain in Section IV.c.iii, *infra*, the record indicates that Mike misappropriated PHCorp's trade secrets.  And, as the Court previously explained in Section IV.a.i, *supra*, the record also indicates that Mike competed against Power House Subs within the 25-mile radius and within two years of his departure from PHCorp.  Either of these facts could support a jury finding that Mike breached the NCA.[10]

### iv.   CHRIS AND JAKE'S BREACHES OF CONTRACT (COUNT XIV)

At Count XIV, Plaintiffs claim that Chris and Jake violated their Confidentiality Agreements with EMG and, in turn, with REVZIP.  (ECF No. 80 at 41–42).  Specifically, they claim that Chris and Jake breached these agreements by "us[ing] and disclos[ing] confidential information belonging to [PHCorp] and relating to their employment by and services provided to [PHCorp], including . . . Customer Information, Secret Recipes, Fundraising Methods, vendor information, and employee information."  (*Id.* at 42).  For the following reasons, the Court will deny Defendants' motion for summary judgment on this claim.

Following the Acquisition, all Power House Subs employees became employees of PHCorp and its majority shareholder, EMG.  (ECF No. 150 at 16 ¶ 98; ECF No. 160 at 9 ¶ 98).  In

---

[10] Defendants' arguments to the contrary are unconvincing.  They argue that Plaintiffs lack standing to assert their breach of contract claim at Count III "for the reasons discussed in Section (a)(i)(1) of this Brief." (ECF No. 149 at 15).  They further argue that Count III "is duplicative of the other claims asserted throughout the Second Amended Complaint[,]" and that, "[f]or the reasons discussed at length in Section IV(a)(i)(2) and Section (a)(ii)(2) of this Brief, Plaintiffs have failed to adduce evidence showing Mike breached a contractual duty owed to Plaintiffs."  (*Id.* at 16).  Lastly, Defendants argue that Count III "fails because Plaintiffs again have not produced any evidence showing [they were] damaged by Mike's alleged breach of the NCA."  (*Id.*).  Although Defendants' brief at ECF No. 149 does not have any sections for "(a)(i)(1)," "IV(a)(i)(2)," or "IV(a)(ii)(2)," this argument seems to reference Sections V(A)(1)(i)–(ii) and V(A)(2)(ii), which argue that Mike did not did not breach the OA and APA, respectively.  (*See id.* at 9–15).  Thus, in Section V(A)(3), Defendants argue that Mike did not breach the NCA for the same reasons offered in V(A)(1)–(2).  The Court rejected those arguments for Counts I and II, *see supra* Sections IV.a.i–ii, and it rejects them for Count III as well.

the course of this transition, EMG required all Power House Subs employees to sign the Confidentiality Agreements as a condition of their employment with PHCorp.  (ECF No. 150 at 16 ¶ 99; ECF No. 160 at 9 ¶ 99).  Defendants do not dispute that Chris and Jake breached the Confidentiality Agreements, (*see* ECF No. 149 at 16–17), but argue instead that Plaintiffs cannot enforce the Confidentiality Agreements because the agreements did not contain an assignability provision that would allow REVZIP to enforce EMG's rights as successor to EMG's majority interest in PHCorp.  (*Id.*) (citing *Hess v. Gebhard & Co.*, 808 A.2d 912, 921 (Pa. 2002)).  In response, Plaintiffs argue that the rule Defendants cite to from *Hess* is not meant to apply in situations "[w]here the successor entity is essentially the same . . . such that the nature of the employment relationship does not change following the transaction[.]"  (ECF No. 159 at 17) (citing *TSG Finishing LLC v. Bollinger*, No. 14-CV-2058, 2016 WL 4690884, at *5 (N.C. Super. Aug. 26, 2016)).

The Court finds that REVZIP may enforce the Confidentiality Agreements.  Under Pennsylvania law, "a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in the sale of assets."  *Hess*, 808 A.2d at 922.  However, the Third Circuit has recognized that "under Pennsylvania law . . . a stock sale, unlike a sale of assets, does not alter the corporate entity."  *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 422 (3d Cir. 2010).  The parties dispute here whether the transfer of ownership over PHCorp from EMG to REVZIP deprived REVZIP of the ability to enforce the Confidentiality Agreements previously entered into by EMG because there was no specific assignability provision relating to those agreements.  EMG's affiliate, Elevation, sold EMG's majority interest to REVZIP through the RAA, which transferred to REVZIP "sixty-five (65) Class A Units of

membership interest . . . in [PHCorp.]" (ECF No. 5-2 at 59). The Court interprets the RAA as a sale of stock rather than a sale of assets, and this interpretation leads it to hold that the RAA did not need a specific assignability provision to assign its rights under the Confidentiality Agreements to REVZIP.

Because REVZIP can enforce the Confidentiality Agreements against Chris and Jake, and because Defendants do not dispute that Chris and Jake breached those agreements, the Court will deny Defendants' motion for summary judgment on Count XIV.

### v. MIKE, WES, & SELLERS' BREACHES OF PURCHASE AGREEMENT (COUNT XV)

At Count XV, Plaintiffs allege that Mike, Wes, and the Seller Entities breached the APA by "alleg[ing] that the Secret Recipes, Customer Information, and Fundraising Methods are not solely the property of Plaintiff [PHCorp,]" and that "they and/or other parties are owners of, have rights to, or are otherwise using" those pieces of information. (ECF No. 80 at 44 ¶¶ 292–93). Plaintiffs allege that this conduct violated the APA's conveyance to PHCorp of the "Purchase Assets," as the APA defines that term. (*Id.* at 43 ¶ 287, 45 ¶ 299). They also allege that Mike breached the APA's noncompetition agreement "by competing against [PHCorp,]" (*id.* at 45 ¶ 298), and that both Mike and Wes breached this agreement "by taking actions . . . that would tend to divert business from [PHCorp]." (*Id.* ¶¶ 297–98).

For the following reasons, the Court will grant Defendants' motion for summary judgment on all claims asserted at Count XV.

### 1. MIKE & SELLER ENTITIES

Plaintiffs claim that, because "[t]he Secret Recipes and Customer Information are assets that were used in the Power House Subs business and as such were assets transferred as part of the APA[,]" Mike and the Seller Entities "breached their warranties [made in the APA] when they said [that they] owned this customer information and [were] selling it." (ECF No. 159 at 21). Regarding this claim, Defendants assert that Plaintiffs have "no proprietary interest in the Dressing Recipes, the Customer List, and the Assembly Methods." (ECF No. 149 at 17). But Defendants do not address the thrust of Plaintiffs' claim, which is that, "*if* [PHCorp] did not own the Secret Recipes or the Customer Information, then [Sellers] breached the APA." (ECF No. 159 at 21) (emphasis original). This claim is contingent on a legal determination that no proprietary interest can be held in the information at issue. "If this is the case,"—i.e., if this information cannot be owned as property—then "APA Sellers breached their warranties when they said [that they] owned this customer information and [were] selling it" because they too would have lacked ownership over the information. (*Id.*).

The Court will grant Defendants' motion for summary judgment on Count XV, but not for any deficiency in Plaintiffs' reasoning. Were the Court to find that Plaintiffs lacked a proprietary interest in the Secret Recipes, Customer Information, and Fundraising Methods, it would have found sufficient evidence in the record to support a jury finding favorable to Plaintiffs on Count XV. However, as explained in Section IV.c.ii, *infra*, the Court does find that Plaintiffs have a proprietary interest in the Customer Information (Plaintiffs abandon their claims in that section as they relate to the Secret Recipes and Fundraising Methods). Because the contingency underlying Plaintiffs' argument at Count XV will not obtain, the Court may properly enter judgment on this claim as a matter of law.

### 2. MIKE

The Court will grant Defendants' motion for summary judgment on Plaintiffs' other claim against Mike at Count XV: that Mike "breached the noncompetition agreement contained in the [APA] by competing against [PHCorp] and taking actions . . . that would tend to divert business from [PHCorp]."  (ECF No. 80 at 45 ¶ 297).  This claim is an apparent duplicate of one asserted by Plaintiffs at Count II.  As discussed in Section IV.a.ii, *supra*, Plaintiffs claim at Count II that Mike breached Section 13 of the APA by "competing . . . against [PHCorp,]" "diverting trade, business, customers, and vendors from [PHCorp,]" and "soliciting employees from [PHCorp] to leave their employment with [PHCorp] and enter into employment or other contractual arrangements with competitors of [PHCorp]."  (ECF No. 80 at 23 ¶ 190).  The Court is authorized to dismiss duplicative claims, *Pansini v. Trane Co.*, No. 17-CV-3948, 2019 WL 2409740, at *2 (E.D. Pa. June 7, 2019), and it will do so here.

### 3. WES

The Court will also grant Defendants' motion for summary judgment on the claim Plaintiffs' assert at Count XV against Wes individually.  Specifically, Plaintiffs claim that Wes "breached the noncompetition agreement contained in the [APA] by taking actions that would tend to divert business from [PHCorp] when he for example, 'liked' and upvoted posts by Defendants regarding their competing sub sandwich business."   (ECF No. 80 at 45 ¶ 298). However, Plaintiffs apparently abandon this claim in their briefing.   (*See* ECF No. 159 at 20) (treating Count XV as a claim that "Mike and the APA Sellers Breached the APA").  Summary judgment on this claim is proper because claims raised in a complaint but ignored at summary judgment are deemed waived. *McCowan v. City of Phila.,* 603 F. Supp. 3d 171, 193 (E.D. Pa. 2022).

### b. TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS (COUNT IV)[11]

At Count IV, Plaintiffs claim that Chris, Jake, Dana, Subpreme, and Supreme tortiously interfered with the contractual relations Plaintiffs had with Mike by "convincing Mike they would assist him in competing against Plaintiffs and circumvent his requirements under the APA, OA, and License Noncompete, and actually assisted him in so doing." (ECF No. 80 at 26–27).[12] For the following reasons, the Court will deny Defendants' motion for summary judgment on this claim as to Chris, Jake, and Dana, but it will grant this motion as to Subpreme and Supreme.

To allege tortious interference with a contract under Pennsylvania law, a plaintiff must allege four elements: (1) that a contractual relationship existed between the plaintiff and another party; (2) that the defendant intended to harm that contractual relationship by purposefully interfering with it; (3) that the defendant lacked privilege or justification for its conduct; and (4) that the plaintiff suffered actual damages as a result of the defendant's conduct. *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009); *Acclaim Sys., Inc. v. Infosys, Ltd.*, No. 13-CV-7336, 2015 WL 4257463, at *3 (E.D. Pa. July 14, 2015).

The Defendants only dispute two elements of this tort: (2) that Defendants intended to harm Mike's contractual relations with Plaintiffs through purposeful interference; and (4) that

---

[11] Plaintiffs asserted two additional tortious interference claims at Counts IX and X. (ECF No. 80 at 34–36). However, they do not contest the dismissal of these claims. (ECF No. 159 at 23–24). The Court will therefore grant Defendants' motion for summary judgment on Counts IX and X.

[12] Plaintiffs also assert this claim against an entity called "Georgie's." (ECF No. 80 at 26–27). However, they do not discuss Georgie's in any of their briefings, let alone offer record evidence indicating that Georgie's tortiously interfered with Mike's contractual relations. Therefore, insofar as Plaintiffs assert the tortious interference claim at Count IV against Georgie's, the Court will grant Defendants' motion for summary judgment on that claim.

Plaintiffs suffered actual damages because of Defendants' conduct.  *Acumed*, 561 F.3d at 212.  The record contains evidence sufficient to support a jury finding favorable to Plaintiffs on both of these elements.

There is a genuine question of material fact as to whether Defendants intended to harm Mike's contractual relations with PHCorp by purposely interfering with the OA, the APA, and the NCA.  The record indicates that Dana, Chris, and Jake knew about the Cease-and-Desist Letter telling Mike that he was prohibited from competing with Power House Subs.  (ECF No. 160 at 35 ¶ 379).  It also indicates that, notwithstanding their knowledge of this prohibition, these three defendants knew about Mike's efforts to establish a competing sub business and actively assisted Mike in this effort.  Specifically:

- Messages between Dana and Chris on October 25, 2019, reflect Dana's coordination with Mike about securing their father's life insurance proceeds so they "can solicit when we are opening."  (ECF No. 160 at 30 ¶¶ 346–47).  On November 6, 2019, Dana informed Chris that she would buy Supreme a slicer from nonparty John Rutter, and Chris told her in response that "Mike already had [Rutter] get us one."  (*Id.* ¶ 348).  And, on December 22, 2019, Dana sent Chris options for shop equipment and directed Chris to "[t]alk to MIKE about it[.]"  (*Id.* ¶ 350).

- The record reflects Dana and Chris's understanding that Mike, rather than Jake, is the actual owner and controlling force behind Supreme.   In a series of text messages exchanged on October 23, 2019, Chris and Dana wrote the following:

  **Chris**: *Maybe you can try to talk to Jake.  It will be his company someday . . . but we have to get it opened.  No way Mike's going to let someone have control or ownership again.  You need to trust this . . . cause the last thing you want for [J]ake . . . is Mike looking elsewhere to get funds and give away their ownership . . . and he will do that if forced to.*

  **Dana**: *Do you really believe that Jake should be working for Michael?*  They are both drama queens[.]

  **Chris**:  There will be tough times.  But I really think Jake's good at it.  And in the long run it will be good for him.  But you have to call him and get him to back off.

If there [are] any more delays we will screw ourselves for spring fundraisers.  Get us open[.]

**Dana**: I really don't need [M]ike['s] hoagie drama right now.  It's going to happen in time whether he's a lunatic or not.

**Chris**: *Just tell [J]ake not to fight him.*  No reason to raise voices.  Let him open.  You want income for the house.  Let this open now.

(ECF No. 160 at 29 ¶ 343) (emphasis added).

- Critically, the record indicates that Chris and Dana knew that Mike's involvement with Supreme violated Mike's contractual obligations.  Chris gave the following testimony in his deposition:

**Q**: And you're telling Dana, "Mike wants to know if you can ask [the] insurance company [for] an approximate day for funds."  Why does Mike care?

**A**: We're a family and we are broke?  I don't know.

**Q**: Well, you kind of say why he cares right?  "So we can solicit when we are opening."

**A**: Well, if I'm worried about getting money from Dana to help get the business, Supreme[,] open, *and Mike wasn't allowed to*, then I might have made the reference, you know, that Mike's broke too, so.  We all lived together.  We all used the same car.  It's really not a stretch.

(ECF No. 160 at 38 ¶ 403) (emphasis added).

The above evidence could lead a reasonable jury to conclude that Chris, Dana, and Jake helped Mike launch Supreme's business, knowing full well that Mike was breaching his contractual obligations not to compete against Power House Subs.

In contrast, no reasonable jury could conclude that Subpreme tortiously interfered with Mike's contractual relations.  Plaintiffs acknowledge that Mike is "d/b/a"—i.e., doing business as—Supreme.  However, "[u]nder Pennsylvania law, 'the use of a fictitious name does not create a separate legal entity, but is merely descriptive of a person or corporation who does business

under another name.'" *Gentry v. Sikorsky Aircraft Corp.*, 383 F. Supp. 3d 442, 453 (E.D. Pa. 2019) (quoting *Burlington Coat Factory of Pa., LLC v. Grace Const. Mgmt. Co., LLC*, 126 A.3d 1010, 1024 (Pa. Super. 2015)).  Subpreme is not a separate party from Mike, and a reasonable jury could no more find that both Mike and Subpreme are liable than it could find Mike liable twice on one claim.

A reasonable jury would be similarly unable to conclude that Supreme tortiously interfered with Mike's contractual relations.  "When a corporation infringes in obedience to the command of an officer with power to cause the corporation to commit or refrain from committing the infringing act, and when that officer participates in and contributes to the infringement, they are in the eye of the law joint tortfeasors and both are liable . . . for the injuries they have jointly inflicted[.]"  *Hitchcock v. Am. Plate Glass Co.*, 259 F. 948, 953 (3d Cir. 1919).  The parties agree that Jake was an owner of Supreme, (ECF No. 150 at 5 ¶ 11; ECF No. 160 at 4 ¶ 11), and a jury could find on this basis that Jake had "the power to cause" Supreme to interfere with Mike's contractual relations.  *Hitchcock*, 259 F. at 953.  And, as discussed above, record evidence indicates that Jake did interfere with those relations.  However, the Court finds no evidence indicating that Jake interfered with Mike's contractual relations *through Supreme*, such that he both had the power to cause Supreme's interference *and actually did cause it*.  Moreover, as the alleged interference with Mike's contractual relations caused Supreme to compete with Power House Subs, concluding that Supreme interfered with these relations would be to conclude, nonsensically, that Supreme caused Mike to cause it (Supreme) to so compete.  A reasonable jury could not find that Supreme interfered with Mike's contractual relations, which is just as well because Supreme has been closed for over two years.  (ECF No. 150 at 29 ¶ 205; ECF No. 160 at 16 ¶ 205) (agreeing that

Supreme ceased operations in or around December 2020).   The Court will therefore grant Defendants' motion for summary judgment on Count IV as to Supreme.

There is also a genuine issue of material fact as to whether Plaintiffs suffered actual damages from the purported tortious interference.   Lost profits stemming from a breach or interference with a contract are recoverable if: "(1) there is . . . evidence to establish the damages with reasonable certainty; (2) the damages were the proximate cause of the wrong; and (3) the damages were reasonably foreseeable."   *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 289 (3d Cir. 2005) (internal quotations omitted).   Plaintiffs allege that they were damaged by Chris, Dana, and Jake's tortious interference because these defendants assisted Mike in earning revenue for Supreme during the contractual noncompetition period that might have otherwise gone to PHCorp.   (ECF No. 159 at 22).   This allegation is supported by record evidence indicating that Supreme performed sixteen fundraisers with PHCorp customers, most of which generated over $1,000 in revenue.   (ECF No. 160 at 34 ¶¶ 369, 372).   It is further supported by Defendants' admission that Plaintiffs offered facts showing that they suffered at least $1,200 in lost revenue. (ECF No. 169 at 11).   A reasonable jury could find that Plaintiffs suffered a loss in revenue, that Supreme's competition against Power House Subs was the proximate cause of this revenue loss, and that this revenue loss was the foreseeable consequence of Supreme's competition.

Because there are genuine questions of material fact as to whether Chris, Dana, and Jake tortiously interfered with Mike's contractual relations, the Court will deny Defendants' motion for summary judgment on Count IV as to these three individuals.   However, for the reasons explained above, the Court will grant this motion on Count IV as to Subpreme and Supreme.

    **c.   MISAPPROPRIATION OF TRADE SECRETS (COUNTS V, VI)**

At Counts V and VI, Plaintiffs claim that Mike, Chris, Jake, and Dana misappropriated Plaintiffs' trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 et seq., and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 PA.C.S. § 5301 et seq.  (ECF No. 80 at 27–32).  For the following reasons, the Court grants Defendants' motion on these claims as to Jake and Dana but denies it on these claims as to Mike and Chris.

Plaintiffs assert that Power House Subs' Secret Recipes, Fundraising Methods, and Customer Information are "trade secrets" protected under DTSA and PUTSA.  (ECF No. 80 at 27–32).  However, in their summary judgment briefings, Plaintiffs apparently abandon this claim as to the Secret Recipes and Fundraising Methods.  (*See* ECF No. 159 at 24) (asserting only that certain "categories of Customer Information are trade secrets of Plaintiffs"); (ECF No. 170 at 9) (addressing only Defendants' arguments regarding pieces of Customer Information).  Accordingly, Counts V and VI only assert claims regarding the Customer Information.  *Del. State Univ. v. Thomas Co., Inc.*, 2020 WL 6799605, at *40 (D. Del. Nov. 19, 2020) ("[W]here a party responds to a dispositive motion, but only addresses some subset of the arguments that are the subject of the motion, courts have consistently held that the claims that are not defended are deemed abandoned.").

Defendants argue that (a) the pieces of Customer Information at issue are not "trade secrets" protected under DTSA and PUTSA, and (b) even if they were trade secrets, Plaintiffs failed to offer evidence supporting misappropriation claims under either statute.  (ECF No. 149 at 16–26).  Although "[t]he question of whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact[,] factual issues are subject to summary judgment whenever the law as applied to uncontroverted facts shows that the movant

is entitled to summary judgment[.]" *Camelot Tech., Inc. v. RadioShack Corp.*, No. 01-CV-4719, 2003 WL 403125, at *5 (E.D. Pa. Feb. 13, 2003). *See also Youtie v. Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 623 (E.D. Pa. 2009). The Court must therefore determine whether there are any controverted facts that might prevent it from ruling on the existence of trade secrets as a matter of law. If there are such facts, the Court will find that a material question of fact exists that requires denial of summary judgment on Counts V and VI. If there are no such facts, the Court will determine whether trade secrets exist and, if they do, it will consider whether a material question of fact exists as to whether those trade secrets were misappropriated.

### i. COMPOSITION OF "CUSTOMER INFORMATION"

The "Customer Information" at issue includes "lists and accounts of current and past customers and vendors, their current and past orders, contact information, and other information about customers and prospective customers, generally and specifically . . . which are not generally known or readily ascertainable by persons outside of [PHCorp]." (ECF No. 80 at 5). Plaintiffs further specify that "[PHCorp] compiled much of its customer information into two platforms: the list of customers and potential customers that [PHCorp] created and Mike used in his selling efforts (the 'Customer List') and the Google calendar ('Google Calendar') used by Chris, [PHCorp's] general manager, and [PHCorp's] delivery drivers." (ECF No. 159 at 24). Plaintiffs also include within the scope of "Customer Information" the customer contact information stored on Mike's Power House Phone. (*Id.*).

In short, Plaintiffs' "Customer Information" is information of the above description located in three locations: (1) the Customer List, (2) the Google Calendar, and (3) Mike's Power House Phone. (ECF No. 160 at 35 ¶ 380). For the sake of convenience, the Court will refer to the

customer information located at each of these locations as a different "type" of customer information, although there appears to be substantial overlap in the content housed in each location.

## ii. EXISTENCE OF TRADE SECRETS

Having identified the constitutive components of Plaintiffs' "Customer Information," the Court finds that each of these components is a trade secret under both federal and state law. "To prevail on a claim for misappropriation of trade secrets under DTSA and PUTSA, a plaintiff must first establish the existence of a trade secret." *Elmagin Capital, LLC v. Chen*, 555 F. Supp. 3d 170, 177 (E.D. Pa. 2021) (citing 18 U.S.C. §§ 1836(b)(1), 1839(3), (5); 12 Pa. C.S. § 5302).

> Although the DTSA and the PUTSA use different wording, both statutes define a 'trade secret' as information that: (1) the owner has taken reasonable means to keep secret; (2) derives independent economic value, actual or potential, from being kept secret; (3) is not readily ascertainable by proper means; and (4) others who cannot readily access it would obtain economic value from its disclosure or use.

*Jazz Pharms., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 444 (E.D. Pa. 2018).

For DTSA, this definition includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839(3). Similarly, for PUTSA, the definition of "trade secret" includes "[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process." 12 Pa. C.S. § 5302.

For the following reasons, the Court holds that all three types of Customer Information identified by Plaintiffs are "trade secrets" under both DTSA and PUTSA.

## 1. CUSTOMER LIST

The Court holds that the Customer List constitutes a trade secret under DTSA and PUTSA because such compilations are protected under both statutes.  18 U.S.C. § 1839(3) (including "all forms and types of . . . compilations" under DTSA's trade secret definition); 12 Pa. C.S. § 5302 (including any "compilation including a customer list" under PUTSA's trade secret definition).

As the Pennsylvania Supreme Court has recognized, in businesses where "permanent and exclusive relationships are established between customers and salesmen," "[t]he customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money," are "highly confidential," and qualify as a trade secret subject to protection.  *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 842 (Pa. 1957). Although customer lists are not protected when they are "available through published lists of suppliers and other catalogue and sales publications[,]" *id.* at 842 n.2, the record here does not indicate that the Customer List is available through other sources of that kind.  Only Mike, Ryan, and Brice had access to the Customer List, which was stored on PHCorp's password-protected Google cloud drive.  (ECF No. 160 at 36 ¶ 387).  The names of some of the businesses contained in the Customer List may be obtained by internet searches, but many of the phone numbers and addresses cannot be found in this manner, nor can the records of customer contacts, notes, and fundraiser commitments.  (*Id.* ¶ 385).  Indeed, Defendants do not dispute Plaintiffs' assertion that the Customer List is "not publicly available."  (*Id.* ¶ 386).  The Customer List therefore qualifies as a trade secret under both federal and state law.

### 2.   GOOGLE CALENDAR

The Google Calendar contained the names of customers and their contact people, customers' phone numbers and email addresses, the dates and locations of customers'

fundraisers, the numbers and types of subs ordered, and other related notes. (ECF No. 160 at 36 ¶ 388). Although the Google Calendar itself cannot be considered a trade secret, the Court finds that certain of the information contained therein—namely, (a) customer names, (b) customer contact persons, (c) customer contact information, (d) customer fundraiser dates and locations, (e) quantities and types of subs ordered, and (d) other order and customer notes—are trade secrets under both DTSA and PUTSA. These collections of information are compilations of the same sort as the Customer List, and they deemed "trade secrets" for the same reasons.

Additionally, PHCorp took reasonable means to keep this information secret, including use of a password to limit access to the Google Calendar, (ECF No. 160 at 36 ¶ 389), and a practice of changing the Google Calendar's password whenever an employee who knew the password left the company. (*Id.* ¶ 390). This information, "represent[ing] a material investment of [PHCorp's] time and money," *Morgan's Home Equip.*, 136 A.2d at 842, derives independent economic value from being kept secret. Because the Google Calendar is password-protected, and because much of the information contained therein cannot be obtained by mere internet searches, (ECF No. 160 at 36 ¶¶ 386, 389), that information is not readily ascertainable by proper means. And, given the apparent value that the information has for PHCorp, competitors (actual or potential) would obtain economic value from the information's unauthorized disclosure or use. The pieces of information listed above therefore constitute "trade secrets" under state and federal law. *Jazz Pharms.*, 343 F. Supp. 3d at 444.

### 3.  MIKE'S POWER HOUSE PHONE

Lastly, the pieces of customer information stored on Mike's Power House Phone— specifically, customer contact details and other information not available online or otherwise,

(ECF No. 160 at 32 ¶ 361)—also constitute trade secrets for similar reasons. Because this information was not generally available to the public, nor was it made public by Plaintiffs themselves, (*id.*), the Court finds that Plaintiffs took reasonable means to keep the information secret, and that the information was not readily ascertainable by proper means. Additionally, because the information was compiled over several years of business and eventually sold to PHCorp through the APA, (*id.*), it evidently had independent economic value in being kept secret from those who could not readily access it. These pieces of information would therefore constitute "trade secrets" under DTSA and PUTSA as well. *Jazz Pharms.*, 343 F. Supp. 3d at 444.

### iii.   MISAPPROPRIATION

Having determined that the three types of Customer Information identified by Plaintiffs are trade secrets, the Court must now determine whether the record contains evidence sufficient to allow a reasonable jury to conclude that Defendants misappropriated this information.

Under both DTSA and PUTSA, "misappropriation" of trade secrets includes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent." *PDC Machs. Inc. v. Nel Hydrogen A/S*, No. 17-5399, 2018 WL 3008531, at *2 (E.D. Pa. June 15, 2018) (citing 18 U.S.C. § 1839(5); 12 Pa. Cons. Stat. Ann. § 5302). Whether misappropriation occurred is a question of fact. *Elmagin*, 555 F. Supp. 3d at 180.

Plaintiffs have produced evidence sufficient to support a jury finding that Defendants misappropriated their Customer List by using it to solicit fundraisers from Power House Subs to Supreme. The parties do not dispute the following facts:

- Mike took pictures on his phone of PHCorp's customer list that was on the Chromebook while the Chromebook was in Mike's possession.  (ECF No. 160 at 32 ¶ 362);

- The pictures that Mike took of the customer lists showed customer names, phone numbers, and notes about customers, as well as dates on which Mike had visited them while at PHCorp.  (*Id.* ¶ 363);

- When shown the pictures, Mike said that it "looks like customers that I was adding in the Chromebook to solicit while at Power House. . . .  I put all of my contacts that I was soliciting in the Chromebook on a spreadsheet."  (*Id.* at 33 ¶ 365);

- When asked whether he told anyone else that he took the Customer Information, Mike said: "They were my leads. . . . Because they were my contacts . . . . They were my personal [contacts].  I made those contacts with them."  (*Id.* ¶ 366);

- Mike took the pictures "for future reference" because he "shouldn't have been able to [access the Customer Information] because the Chromebook would have ordinarily been shut down by the administrator."  (*Id.* at 34 ¶ 368);

- When asked whether he took the pictures before or after he had left PHCorp, Mike responded: "I would assume it was after.  I would have no reason to take it before."  (*Id.*).

This evidence indicates that Mike acquired a trade secret by improper means—i.e., by taking a photo of the Customer List after he had left PHCorp but before he had lost access to the Chromebook, knowing full well that he should not have had access to this information as a former employee.  It also indicates, in conjunction with other evidence discussed above, that Mike used the Customer List without PHCorp's consent to solicit Power House Subs' customers for his own competing business.

The record also contains evidence indicating that Defendants misappropriated the trade secrets contained on the Google Calendar and Mike's Power House Phone by using them without PHCorp's consent.  Regarding the Google Calendar, the parties do not dispute the following:

- Access to the Google Calendar is protected by password and, when an employee leaves PHCorp, the company changes the former employee's password to prevent future logins to the Google Calendar by that individual.  (ECF No. 160 at 36 ¶¶ 389–90);

- Because Chris never signed out of the Google Calendar after his departure from PHCorp, he retained access to the Google Calendar even after his password had been changed. (*Id.* at 37 ¶¶ 392–93);

- Chris accessed the Google Calendar regularly after leaving PHCorp on September 16, 2019, and was able to see all of the information contained therein. (*Id.* ¶ 395); and

- On October 31, 2019, Chris wrote to John Macak: "Ha ha.  They finally erased my calendar." (*Id.* ¶ 397).

This evidence shows that PHCorp took affirmative steps to keep former employees like Chris from accessing the Google Calendar, but that, due to an oversight on PHCorp's part, Chris retained access to the calendar after his departure from the company.  It also shows that Chris continued to access the Google Calendar after his departure, despite knowing that he should not have had continued access to it.

As for Mike's Power House Phone, the record contains evidence that Mike used the trade secrets contained therein without PHCorp's consent.  After his departure from Power House Subs, Mike used his phone solicit business from two of Power House Subs' regular customers—Steve and Lindy—and succeeded at making them into Supreme's earliest customers.  (ECF No. 150 at 24 ¶ 153; ECF No. 160 at 12 ¶ 153; ECF No. 164 at 259).  This evidence could allow a reasonable jury to conclude that Mike used the proprietary customer information contained on his Power House Subs phone to draw business away from Power House Subs and toward Supreme.

Regarding Mike and Chris, Plaintiffs' have offered evidence supporting each element of their misappropriation of trade secrets claim with respect to each trade secret composing Power House Subs' "Customer Information" (i.e., the Customer List, the Google Calendar, and Mike's

Phone Information). In contrast, Plaintiffs have offered no evidence indicating that Dana and Jake misappropriated this Customer Information. The Court will therefore grant Defendants' motion for summary judgment on Counts V and VI as to Dana and Jake and deny it on those counts as to Mike and Chris.

### d. BREACH OF FIDUCIARY DUTY (COUNT XII)

At Count XII, Plaintiffs claim that Chris breached certain fiduciary duties that he owed to PHCorp. (ECF No. 80 at 38–39). This claim is preempted by PUTSA and the Court will therefore grant Defendants' motion for summary judgment on it.

PUTSA "displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret," with the exception of "(1) contractual remedies, whether or not based upon misappropriation of a trade secret; (2) other civil remedies that are not based upon misappropriation of a trade secret; or (3) criminal remedies, whether or not based upon misappropriation of a trade secret." 12 Pa. Cons. Stat. Ann. § 5308(a)–(b). Therefore, unless a claim falls within one of these exceptions, it is preempted by PUTSA to the extent it is based on the same conduct that constitutes a misappropriation of trade secrets. *Kimberton Healthcare Consulting, Inc., v. Primary PhysicianCare, Inc.*, 2011 WL 6046923, at *4 (E.D. Pa. Dec. 6, 2011) (citing *Youtie*, 626 F. Supp. 2d at 521).

Plaintiffs' breach of fiduciary duty claim is neither a contract remedy nor a criminal remedy, and it appears to be based solely on alleged misappropriation of trade secrets. Plaintiffs admit that "PTUSA . . . preempts Count XII only if the dressing recipes, assembly methods, and customer information are deemed to be trade secrets under the PUTSA[.]" (ECF No. 159 at 33).

Because the Court found in Section IV.c.ii, *supra*, that the Customer Information is indeed a trade secret, there is no dispute that PUTSA preempts Count XII.

Accordingly, the Court will grant Defendants' motion for summary judgment on this claim. *Hassell v. Budd Co.*, 374 F. Supp. 3d 433, 444 (E.D. Pa. 2019) (granting motions for summary judgment "[t]o the extent that Plaintiff's claims are pre-empted").

### e.   CIVIL CONSPIRACY (COUNT XIII)

At Count XIII, Plaintiffs claim that Defendants conspired with one another to achieve certain unlawful purposes alleged at other counts—namely, (a) misappropriation of Plaintiffs' Secret Recipes, Fundraising Methods, and Customer Information in violation of DTSA and PUTSA; (b) Misappropriation of Plaintiffs' confidential information; (c) Termination and/or disruption of Plaintiffs' business relationships with its members, employees, customers, vendors, and landlord; (d) Breach of the Confidentiality Agreements of Chris and Jake; and (e) Defamation of Plaintiffs' businesses.  (ECF No. 80 at 39–41).

For the following reasons, the Court will grant Defendants' motion for summary judgment on this claim in its entirety; that is, with respect to all of the unlawful purposes listed above.

### i.   UNLAWFUL PURPOSES (a) & (b)

The Court held in Section IV.c.ii, *supra*, that the Customer Information at issue constituted a trade secret, and it holds in Section IV.f, *infra*, that Plaintiffs' Misappropriation of Confidential Information claim is preempted by PUTSA because it is based on conduct constituting a misappropriation of trade secrets under that statue.  The Court likewise holds that Plaintiffs' Civil

Conspiracy claim is preempted as to "unlawful purposes" (a) and (b) listed above, as both involve trade secret misappropriation as well.

As noted above, PUTSA preempts claims that are not (1) a contractual remedy, (2) a civil remedy not based on the misappropriation of a trade secret, or (3) a criminal remedy. 12 Pa. Cons. Stat. Ann. § 5308(a)–(b). The unlawful purposes at (a) and (b)—i.e., misappropriation of trade secrets and confidential information—are both based on the misappropriation of trade secrets, and neither is a contractual or criminal remedy. Therefore, PUTSA preempts Count XIII as to these allegations.

### ii.  UNLAWFUL PURPOSES (c) & (e)

Plaintiffs have not opposed dismissal of their Tortious Interference with Business Relationships claims at Counts IX and X, or of their Business Defamation claim at Count XI.  (ECF No. 159 at 23–24, 35).  Because the conduct alleged in Counts IX, X, and XI is that which Plaintiffs allege Defendants to have conspired in (c) and (e), the Court's dismissal of Counts IX, X, and XI leads the Court to dismiss Count XIII as to these unlawful purposes.  *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000) ("A verdict on civil conspiracy should yield to a finding for the defendant on the underlying tort because the cause of action is wholly subordinate to the underlying tort's existence.").

### iii.  UNLAWFUL PURPOSE (d)

As for (d), although Plaintiffs' Breach of Contract claim against Chris and Jake at Count XIV is based on misappropriation of the Customer Information that the Court has found to be a trade secret, (ECF No. 80 at 42), PUTSA does not preempt "contractual remedies, whether or not based upon misappropriation of a trade secret[.]" 12 Pa. Cons. Stat. Ann. § 5308(b)(1).  Therefore,

PUTSA does not preempt Plaintiffs' Civil Conspiracy claim as to the unlawful purposes alleged in Count XIV. *Triage Consulting Grp., Inc. v. Implementation Mgmt. Assistance, Inc.*, No. 12-CV-4266, 2013 WL 3283462, at *4 (E.D. Pa. June 27, 2013) ("By its express terms, the PUTSA does not preempt Plaintiff's breach of contract claim against [the defendant], regardless of whether it is based on [the defendant's] alleged misappropriation of Plaintiff's trade secrets.").

However, Plaintiffs' Civil Conspiracy claim still fails as to (d) because "[a] breach of contract cannot serve as the basis for a civil conspiracy claim." *Assurity Life Ins. Co. v. Nicholas*, No. 14-CV-6522, 2015 WL 5737397, at *5 (E.D. Pa. Oct. 1, 2015).  Plaintiffs could only have brought a Civil Conspiracy claim relating to the Confidentiality Agreements based on a Tortious Interference claim.  However, the only Tortious Interference claim that Plaintiffs assert in this matter is Count IV, which alleges that Chris, Jake, and others tortiously interfered with the contractual relations Plaintiffs had with Mike, and not the other way around.  (ECF No. 80 at 26–27).  It makes far more sense to understand (d)—"Breach of the Confidentiality Agreements of Chris and Jake"—as referring to Plaintiffs' claim that Chris and Jake violated the Confidentiality Agreements at Count XIV.  (*Id.* at 41–42).  For this reason, Court will grant summary judgment to Defendants on Count XIII as to this claim as well.

### f.   MISAPPROPRIATION OF CONFIDENTIAL INFORMATION (COUNT VII)

At Count VII, Plaintiffs assert that Defendants misappropriated confidential information. (ECF No. 1 at 32–33).  The Court will grant Defendants' motion for summary judgment on this claim because it is based on alleged misappropriation of the same pieces of information as the Misappropriation of Trade Secrets claim (i.e., "the Customer List, information from the Google Calendar, and information from Mike's [Power House Subs] Phone").  (ECF No. 159 at 35).  These

pieces of information constitute trade secrets, *see supra* Section IV.c.ii, and a civil state law claim is preempted by PUTSA to the extent it is based on conduct constituting misappropriation of trade secrets. *See* 12 Pa. Cons. Stat. Ann. § 5308(a)–(b); *Kimberton*, 2011 WL 6046923 at *4. Plaintiffs' claim at Count VII is wholly based on such conduct, and the Court therefore finds it wholly preempted.

### g.  CONVERSION (COUNT VIII)

At Count VIII, Plaintiffs claim that Mike converted the Chromebook laptop and a 2009 Ford Econoline.  (ECF No. 80 at 33–34).  However, Plaintiffs have informed the Court that they do not oppose dismissal of this claim because Mike has since returned those items to PHCorp.  (ECF No. 159 at 35).  The Court will therefore grant Defendants' motion for summary judgment on this claim.

### h.  BUSINESS DEFAMATION (COUNT XI)

At Count XI, Plaintiffs claim that Defendants defamed their business.  (ECF No. 80 at 36–37).  However, Plaintiffs have informed the Court that they do not oppose dismissal of this claim.  (ECF No. 159 at 35).  The Court will therefore grant Defendants' motion for summary judgment on this claim.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **REVZIP, LLC AND POWER HOUSE SUBS CORPORATE, LLC,** | ) ) ) | **Case No. 3:19-cv-191** |
| Plaintiffs, | ) ) | **JUDGE KIM R. GIBSON** |
| v. | ) ) | |
| **MICHAEL MCDONNELL d/b/a SUBPREME FUNDRAISNG AND CATERING, CHRISTOPHER MCDONNELL, JACOB BEARER, DANA BEARER, SUPREME FUNDRAISING AND CATERING, LLC, POWER HOUSE ENTERPRISES, LLC, POWER HOUSE II, LLC, AND POWER HOUSE CATERING, LLC,** | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

**AND NOW**, on this ___4th___ day of May, 2023, the Court having considered Defendants'

Motion for Summary Judgment, (ECF No. 148), **IT IS HEREBY ORDERED** as follows:

(1) Defendants' motion at ECF No. 148 is **GRANTED** on Counts VII, VIII, IX, X, XI, XII, XIII, XV, and XVI.

(2) Defendants' motion at ECF No. 148 is **DENIED** on Counts I, III, and XIV.

(3) Defendants motion at ECF No. 148 is **GRANTED IN PART** on Count II as to the claims against (i) John Wesley Cook; (ii) Power House Enterprises, Inc.; (iii) Power House II, LLC; and (iv) Power House Catering, LLC. This motion is **DENIED IN PART** on Count II as to the claims against Michael McDonnell.

(4) Defendants' motion at ECF No. 148 is **GRANTED IN PART** on Counts V and VI as to the claims against (i) Dana Bearer and (ii) Jacob Bearer.  This motion is **DENIED IN PART** on Counts V and VI as to the claims against (i) Michael McDonnell and (ii) Christopher McDonnell.

(5) Defendants' motion at ECF No. 148 is **GRANTED IN PART** on Count IV as to the claims against (i) Subpreme Fundraising and Catering; (ii) Supreme Fundraising and Catering, LLC; and (iii) Georgie's.  This motion is **DENIED IN PART** on Count IV as to the claims against (i) Christopher McDonnell; (ii) Dana Bearer; and (iii) Jacob Bearer.

**BY THE COURT**:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**