IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REVZIP, LLC, *et al*

*Plaintiffs*,

v.

MICHAEL MCDONNELL *doing business as*
SUBPREME FUNDRAISING AND
CATERING, *et al,*

*Defendants*.

Civil Action No. 3:19-cv-191

Hon. William S. Stickman IV

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiffs REVZIP, LLC ("REVZIP") and Power House Subs Corporate, LLC ("PHCorp") (collectively, "Plaintiffs") brought this action against Defendants Michael McDonnell ("M. McDonnell"), Christopher McDonnell ("C. McDonnell"), Jacob Bearer (" J. Bearer"), and Dana Bearer ("D. Bearer") (collectively, "Defendants") asserting various claims relating to the sale of a submarine sandwich business. (ECF No. 80). At Count One,[1] Plaintiffs allege that M. McDonnell breached an operating agreement by competing against Plaintiffs' business in violation of a non-competition provision. (*Id.* ¶¶ 180-87). At Count Two, Plaintiffs allege that M. McDonnell breached the asset purchase agreement executed in relation to the sale of his business by competing against the business, failing to transfer assets to the business, and failing to transfer the business name or terminate the fictitious name in accordance with the agreement. (*Id.* ¶¶ 188-94). At Count Three, Plaintiffs allege that M. McDonnell breached a

---

[1] The operative complaint is Plaintiffs' Second Amended Complaint. (ECF No. 80).

license noncompetition agreement by taking various actions related to the misuse of Plaintiffs' confidential information and operating a competing business entity. (*Id.* ¶¶ 195-98). At Count Four, Plaintiffs allege that C. McDonnell, J. Bearer, and D. Bearer engaged in tortious interference with existing contractual relations with respect to M. McDonnell's agreements with Plaintiffs. (*Id.* ¶¶ 199-205). At Counts Five and Six, Plaintiffs allege that M. McDonnell and C. McDonnell misappropriated trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S. § 5301 *et seq.* (*Id.* ¶¶ 206-26). Finally, at Count Fourteen, Plaintiffs allege that C. McDonnell and J. Bearer violated a confidentiality agreement with Plaintiffs executed in connection with their employment. (*Id.* ¶¶ 275-83).[2]

A nonjury trial was held before the late Judge Kim R. Gibson on August 21 and 22, 2023. (ECF Nos. 200, 201). Following its conclusion, the Court permitted the parties to file proposed findings of fact and conclusions of law. (*See* ECF Nos. 207, 208). After the litigation was transferred to the undersigned on May 14, 2025, (ECF No. 222), the Court permitted the record to be reopened and allowed the parties to place any new evidence before the Court on July 2, 2025. (ECF Nos. 228-29).

The Court hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. *See* FED. R. CIV. P. 52. The Court grants judgment in favor of Plaintiffs and against Defendants on all counts.

---

[2] The Court previously granted summary judgment in (1) Defendants' favor at Counts Seven through Thirteen and Counts Fifteen and Sixteen; (2) John Wesley Cook, Power House Enterprises, Inc, Power House II, LLC, and Power House Catering, LLC's favor at Count Two; (3) D. Bearer and J. Bearer's favor at Counts Five and Six; and (4) Subreme Fundraising and Catering, Supreme Fundraising and Catering, LLC, and Georgie's Self-Serve Food, Inc.'s favor at Count Five. (ECF No. 176, pp. 58-59).

# I.    STANDARD OF REVIEW[3]

Plaintiffs carry the burden to prove each claim and damages by a preponderance of the evidence.  A preponderance of the evidence is "the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence."  *Raker v. Raker*, 847 A.2d 720, 724 (Pa. Super. 2004).  The preponderance test is the normal burden of proof in most civil proceedings.  *See Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 408 (Pa. 2014) (internal citations omitted).  Indeed, the term "burden of proof," standing alone, implicitly means "by the preponderance of the evidence."  *Se–Ling Hosiery v. Margulies*, 70 A.2d 854, 856–57 (Pa. 1950); *see also Burden of Proof and Preponderance of Evidence*, PENNSYLVANIA SUGGESTED STANDARD CIVIL JURY INSTRUCTIONS, §5.00 (2024) ("Preponderance of the evidence means that a fact is more likely true than not.").

# II.    FINDINGS OF FACT

## A.  Background and Executed Agreements

This litigation centers around a submarine sandwich business, Power House Subs, which focused mainly on catering its customers' fundraisers.  M. McDonnell opened Power House Subs on or around February 3, 2017.  (ECF No. 198, ¶ 13).  Two of his relatives, J. Bearer and C. McDonnell, were also employed by Power House Subs.  (*Id.* ¶ 22).

In the fall of 2018, EMG Brands LLC ("EMG") presented M. McDonnell with an offer to purchase Power House Subs.  EMG is an affiliate of Elevation Holdings, LLC ("Elevation").  (*Id.* ¶ 21).  PHCorp was the purchasing entity of Power House Subs' assets and operations.  (*See* Plaintiffs' Exhibit 2).  PHCorp was formed as a joint venture between Elevation, M. McDonnell,

---

[3] The law of the forum, here Pennsylvania, governs the applicable burden of proof as burdens of proof are substantive, not procedural.  *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1174-75 (3d Cir. 1976).

and Ryan DelBaggio ("DelBaggio"). (Plaintiffs' Exhibit 1). As part of the sale of Power House Subs, M. McDonnell and PHCorp signed and were parties to three relevant contracts: (1) an operating agreement ("Operating Agreement"); (2) an asset purchase agreement ("Asset Purchase Agreement"); and (3) a license noncompetition agreement ("License Noncompetition Agreement"). (ECF No. 198, ¶¶ 1-3).

PHCorp was created by the Operating Agreement and subsequently purchased all of Power House Subs' assets through the Asset Purchase Agreement. (*See* Plaintiffs' Exhibits 1-2). Through the Asset Purchase Agreement, PHCorp acquired "[a]ll future business and opportunities" relating to Power House Subs. (Plaintiffs' Exhibit 2). REVZIP, one of the plaintiffs in this action, was not an original signatory of either the Operating Agreement or the Asset Purchase Agreement. Elevation, an affiliate entity of EMG, subsequently assigned its majority membership interest in PHCorp to REVZIP. (ECF No. 198, ¶ 23).

### B. The Operating Agreement

On November 8, 2018, PHCorp was formed through the execution of the Operating Agreement. PHCorp was created to effectuate the sale of Power House Subs and its assets from M. McDonnell and his entities to PHCorp. (*Id*. ¶ 14). PHCorp was initially owned by the following members: Elevation, 65%; M. McDonnell, 15%; DelBaggio, 15%; and John Wesley Cook ("Cook"), 5%. (*Id*. ¶¶ 1, 14). M. McDonnell signed and was a party to the Operating Agreement. (*Id*. ¶ 1). Sections 5.03 and 10.04 of the Operating Agreement are material to this action. Section 5.03 of the Operating Agreement states:

> **Covenants Not to Compete**. Michael McDonnell and Ryan DelBaggio agree and represent to not take any actions to compete with the Company unless approved by Elevation Holdings LLC. Covenants not to compete are in effect during the member's tenure at the company. In the case of either Member leaving the Company or being terminated by the Company, the Members agree to a two year non compete for any activity related to Power House Subs or competing business

units outside of the activities of this company from the date of separation from the
Company. In the case of Michael McDonnell or Ryan DelBaggio breaching this
Covenant Not to Compete the members agree to forfeit their shares back to the
company for fair and just compensation of $1 USD (One Dollar).

(*Id.* ¶ 16); (Plaintiffs' Exhibit 1, p. 8).

Section 10.04 provides that the Operating Agreement "has been adopted to govern the
operation of the Company and shall be binding on and inure to the benefit of the Members and
their respective heirs, personal representatives, successors, and assigns." (*Id.* at 16). A
"Member" was defined as "[a]ny person or entity who at the time is a record holder or record
owner of Units." (*Id.* at 1).

### C.  The Asset Purchase Agreement

The Asset Purchase Agreement was executed on November 12, 2018. (ECF No. 198, ¶
2). M. McDonnell signed and was a party to the Asset Purchase Agreement. (*Id.* ¶ 2). Despite
identifying the "Buyers" as two entities —"Power House Subs, LLC" and "Power House Subs
Investments, LLC"— there was only a single buyer involved: PHCorp. The following six
provisions of the APA are material:

a.  **Background Paragraph C**:  This paragraph states that, through the Asset
Purchase Agreement, the Sellers "desire to sell and assign to [PHCorp]
substantially all of the assets associated with the operation of [Power House
Subs]." (Plaintiffs' Exhibit 2, p. 1).

b.  **Section 1 – Purchased Assets**:  This section provides that, "[a]t the Closing . . .
[Sellers] shall sell and deliver to [PHCorp], free and clear of all encumbrances, all
of the assets, rights, and interests of every conceivable kind or character,
whatsoever, whether real, personal, or mixed, tangible or intangible (including all
goodwill), in electronic form or otherwise, that on the Closing Date are owned by
[Sellers] or in which [Sellers have] an interest of any kind, including without
limitation [to] those assets set forth in Schedule 1a (the 'Purchased Assets') . . . ."
(*Id.* at 2).

c.  **Subsection 1.1.6**:  Although there is no Schedule 1a attached to the APA
identifying the Purchased Assets, section 1.1 provides what appears to be a list the
Purchased Assets. (*Id.*). Material here is subsection 1.1.6, which provides that

5

"[Power House Subs, LLC] shall purchase from . . . [t]he business conducted as a going concern, including . . . telephone and fax numbers." (*Id.* at 3).

d. **Section 7.11 – Name Change Documents**: This section states that "Sellers shall have taken all required actions to change all entity names and transfer or terminate all fictitious names relating to their operation of the Businesses and shall have delivered to Buyers a certified copy of documents evidencing the same." (*Id.* at 6).

e. **Section 10.13 – Title to Purchased Assets**: This section warrants that Sellers "are the sole and absolute owners of the Purchased Assets . . . . There is no property used in the operation of the Businesses that is owned by or an interest in which is claimed by any other person or entity[.]" (*Id.* at 9).

f. **Section 13 – Noncompetition Agreement**: Under this section, Sellers agreed not to compete with PHCorp and its subsidiaries, successors, and assigns within a 25-mile radius of the Businesses for a period of two years from the date of closing. (*Id.* at 14).

### D. Post-Acquisition Agreements

Following the Power House Subs acquisition, all employees of PHCorp were employed by EMG. (ECF No. 198, ¶ 21). EMG (through Elevation) became the majority owner of PHCorp under the Operating Agreement, and PHCorp became the owner of the Power House Subs business and its assets under the Asset Purchase Agreement. EMG thereby became the employer of PHCorp's employees, who were responsible for the operation of Power House Subs. Following the acquisition, EMG required all of PHCorp's employees to sign confidentiality agreements in order to continue their employment. (*Id.* ¶ 22). On December 2 and 3, 2018, respectively, C. McDonnell and J. Bearer entered into confidential information agreements with EMG (collectively, the "Confidentiality Agreements"). (*Id.* ¶¶ 4-5).

On or around May 31, 2019, EMG executed a licensing agreement ("Licensing Agreement") with PHCorp's other shareholders. (*Id.* ¶ 23). Elevation and PHCorp signed and were parties to the Licensing Agreement. (*Id.* ¶ 8). The Licensing Agreement created a limited

territory where Power House Subs could operate unencumbered from any Power House Subs franchise. (Plaintiffs' Exhibit 10, p. 1).

Also on May 31, 2019, PHCorp, REVZIP, M. McDonnell, DelBaggio, Cook, and Elevation entered into an assignment of rights agreement ("Assignment of Rights Agreement"). (Plaintiffs' Exhibit 11). Pursuant to the Assignment of Rights Agreement, PHCorp "irrevocably conveys, sells, transfers and assigns to [Elevation] all of [PHCorp's] rights and obligations under any agreements purporting to license or otherwise grant rights in or to any of the Intangible Assets." (*Id.* at 1). Section 8(e) of the Assignment of Rights Agreement, titled "Binding Agreement; Successors," states that "no assignment of [the Assignment of Rights Agreement] will be effective without the express written consent of the other party." (Plaintiffs' Exhibit 9, p. 3). Although EMG was not a direct party to the Assignment of Rights Agreement, Elevation acted on EMG's behalf in executing the Assignment of Rights Agreement and in all subsequent material agreements.

Effective May 31, 2019, Elevation and M. McDonnell entered into a License Noncompetition Agreement. (Plaintiffs' Exhibit 3). The following sections of the License Noncompetition Agreement are material:

a. **Section 1 – Confidentiality Obligation**: Pursuant to this section, M. McDonnell agreed to not "directly or indirectly, [himself] or through another person or entity, use or disclose Confidential Information to any third party or use any advantages derivable from Confidential Information for any purpose except to operate the Businesses consistent with the License Agreement."

b. **Section 2 – Noncompetition Obligation**: Pursuant to this section, M. McDonnell agreed to not "directly or indirectly, for a period of two (2) years from the later of (i) termination or expiration of the License Agreement or (ii) termination of employment . . . engage in or participate in . . . any business selling sandwiches, wraps, or salads, or conducting food-based fundraising . . . within a radius of twenty-five (25) miles of any Business location of [PHCorp]."

(*Id.* at 1-2).

Also on May 31, 2019, REVZIP acquired Elevation's majority ownership interest in PHCorp through the Assignment of Membership Interest and Consent and Agreement of Members to Assignment and Right of Reassignment agreement (the "REVZIP Assignment Agreement"). (ECF No. 198, ¶ 23). The REVZIP Assignment Agreement thereby made REVZIP the majority owner of PHCorp. (*Id.*). M. McDonnell signed and was a party to the agreement. (*Id.* ¶ 9). On October 19, 2019, EMG, REVZIP, and PHCorp entered into the Assignment of Rights and Noncompetition Protection Agreement. (*Id.* ¶ 10). On June 18, 2020, EMG and PHCorp entered into the Assignment of Rights and Confidential Information Agreement. (*Id.* ¶ 11).

### E. M. McDonnell's Activities Prior to Leaving PHCorp

On August 3, 2019, M. McDonnell contacted Steve Walter ("Walter"), a customer of PHCorp, and informed Walter that he was planning to open a new sandwich fundraising business. (*Id.* ¶ 26). On August 5, 2019, M. McDonnell contacted an individual who created business logos and requested the creation of a website for his future business. (*Id.* ¶ 27). M. McDonnell provided specific information for the developer to use for the business's website, menu, and other marketing content. (*Id.*). On August 6, 2019, M. McDonnell ordered a walk-in refrigerator. (*Id.* ¶ 28). On August 7, 2019, M. McDonnell advised Brice Mertiff ("Mertiff"), the owner of REVZIP, that he was leaving PHCorp and intended to open a competing business. (*Id.* ¶ 24). August 6 and 7, 2019, M. McDonnell again contacted Walter, soliciting Walter to bring his business to M. McDonnell's new venture. (*Id.* ¶ 29). Also on August 7, 2019, M. McDonnell contacted Linda Hilling ("Hilling"), another customer of PHCorp, and solicited her business. (*Id.* ¶ 30). PHCorp paid M. McDonnell one extra dollar in his final paycheck in

exchange for the forfeiture of his membership interest in PHCorp pursuant to § 5.03 of the Operating Agreement. (*Id.* ¶ 48).

### F.  M. McDonnell's Departure from PHCorp

REVZIP, PHCorp, and their predecessors in interest did not approve or consent to M. McDonnell opening a competing business in violation of the terms of the various applicable noncompetition provisions. (ECF No. 205, p. 99). REVZIP, PHCorp, and their predecessors in interest did not waive their right to enforce the terms of the Operating Agreement, the Asset Purchase Agreement, or the License Noncompetition Agreement against M. McDonnell. (*Id.*). These agreements were never amended to edit or remove the noncompetition related terms. (*Id.*).

On August 8, 2019, one day after he separated from PHCorp, M. McDonnell created the business name "Subpreme Fundraising and Catering." (ECF No. 198, ¶ 31). He registered the name on August 12, 2019. (*Id.*). His registration application was granted on August 12, 2019. (*Id.*). On August 15, 2019, M. McDonnell received a cease-and-desist letter from Plaintiffs. (Plaintiffs' Exhibit 24). The letter notified M. McDonnell that he was not allowed to compete against PHCorp under his agreements with Plaintiffs. (*Id.*). C. McDonnell, J. Bearer, and D. Bearer were aware of the cease-and-desist letter and its contents. (*Id.* ¶ 46). Specifically, they were aware that M. McDonnell was not permitted to compete with PHCorp. (*Id.* ¶ 47). On August 27, 2019, a new limited liability company, Supreme Fundraising and Catering, LLC ("Supreme"), was created in the Commonwealth of Pennsylvania. (*Id.* ¶ 35).[4] J. Bearer was listed as the owner of Supreme. (*Id.*). On August 29, 2019, the logo developer emailed J. Bearer

_____

[4] The new business at issue has been referred to as "Subpreme" and "Supreme" throughout its creation and operation. To avoid confusion, the Court will refer to the competing business as "Supreme" throughout its Findings of Facts and Conclusions of Law.

regarding logos for Supreme and provided logo options for both "Subpreme" Fundraising and Catering and "Supreme" Fundraising and Catering. (*Id.* ¶ 36). M. McDonnell visited Supreme's business location on multiple occasions. (*Id.* ¶ 38). He attempted to lease real estate in Hollidaysburg to operate a sandwich shop, and Supreme ultimately operated at the same location M. McDonnell was pursuing. (*Id.* ¶ 39). This location was within a twenty-five (25) mile radius of PHCorp.

M. McDonnell secured funding for his competing business, in part, from Cynthia Grygier ("Grygier"). Grygier loaned D. Bearer $25,000.00 to be used for what she believed was going to be M. McDonnell's "sub shop." (Plaintiffs' Exhibit 54.I, p. 86). Ultimately, Supreme performed sixteen fundraisers. (ECF No. 198, ¶ 54). Ten of those fundraisers involved PHCorp customers. (*Id.* ¶ 55). The fundraisers generated at least $17,454.05. (*Id.* ¶ 56). The record includes evidence indicating that M. McDonnell was the operator and driving force behind Supreme. For example, on August 15, 2019, Jenny Behe asked C. McDonnell via text message: "What's Jake doing?" (Plaintiffs' Exhibit 26, p. 59). C. McDonnell replied: "For now he works at a beer distributer. but [sic] *he will work for [M]ike soon.* Dana's girlfriend is putting up all the money." (*Id.* (emphasis added)). On October 23, 2019, C. McDonnell and D. Bearer exchanged the following text messages:

> **C. McDonnell:** Maybe you can try to talk to Jake. It will be his company someday . . . but we have to get it opened. *No way Mike's going to let someone have control or ownership again.* You need to trust this . . . cause the last thing you want for [J]ake . . . is Mike looking elsewhere to get funds and give away their ownership . . . and he will do that if forced to.

> **D. Bearer:** Do you really believe that *Jake should be working for Michael*? They are both drama queens[.]

> **C. McDonnell**: There will be tough times. But I really think Jake's good at it. And in the long run it will be good for him. But you have to call him and get him to back off. If there['s] any more delays we will screw ourselves for spring

fundraisers.  Get us open[.]  Tell him to keep his other job and see how things go up there.

**D. Bearer:**  I really don't need [M]ike['s] hoagie drama right now.  It's going to happen in time whether he's a lunatic or not.

**C. McDonnell:** Just tell [J]ake not to fight him.  No reason to raise voices.  Let him open.  You want income for the house.  Let this open now.

(Plaintiffs' Exhibit 26, p. 58 (emphasis added)).  These messages demonstrate C. McDonnell and D. Bearer's understanding that J. Bearer worked for M. McDonnell at Supreme.

Text messages between D. Bearer and C. McDonnell on October 25, 2019, reflect D. Bearer's coordination with M. McDonnell about securing their father's life insurance proceeds so they "can solicit when we are opening."  (*Id.* at 51).  On November 6, 2019, D. Bearer informed C. McDonnell that she would buy Supreme a meat slicer from nonparty John Rutter, and C. McDonnell told her in response that "Mike already had [Rutter] get us one." (*Id.* at 54).  On December 22, 2019, D. Bearer sent C. McDonnell options for shop equipment and directed him to "[t]alk to MIKE about it[.]"  (*Id.* at 55).  C. McDonnell acknowledged that J. Bearer and himself "piggybacked off of [M. McDonnell] after he got the cease and desist."  (ECF No. 204, p. 131); (*see also id.* at 135).  The record is clear – M. McDonnell operated and controlled Supreme.  His family's involvement was at his behest and subject to his direction.

M. McDonnell attempted to solicit PHCorp customers to bring their business to Supreme.  In September or October 2019, M. McDonnell advised Walter that his new business name changed from Subpreme Fundraising and Catering to Supreme Fundraising and Catering.  (ECF No. 204, p. 42).  He also told Walter that Supreme would soon be ready to cater his fundraisers.  When Walter sought catering from Supreme for his October 2019, fundraiser but did not get a timely response from M. McDonnell, Walter obtained catering from PHCorp instead.  (*Id.* at 44).  In October 2019, M. McDonnell spoke again with Walter and advised him to communicate with

J. Bearer in the future. (*Id.* at 46). Walter believed that Supreme had the same products and services as PHCorp. (*Id.* at 51). Walter never had any interactions with J. Bearer before this conversation with M. McDonnell. (*Id.*) J. Bearer subsequently contacted Walter and Supreme hosted a fundraiser for him. (Plaintiffs' Exhibit 44, pp. 1-2). M. McDonnell contacted or attempted to contact Walter at least seven more times in August, September, October, and November 2019, to solicit his business. (ECF No. 198, ¶ 32). M. McDonnell contacted or attempted to contact Hilling at least four more times in August, September, October, and November 2019 to solicit her business. (*Id.* ¶ 33). M. McDonnell ordered bread samples for sandwiches in August 2019, and communicated with other vendors and suppliers he planned to use in his competing business. (*Id.* ¶ 34).

**G. M. McDonnell's Retention of Customer Information**

M. McDonnell had access to certain pieces of customer information while he was employed at PHCorp. He retained access to that customer information following his departure therefrom. The customer information at issue was contained in three locations: (a) the list of current and potential customers that PHCorp created and M. McDonnell used in his selling efforts (the "Customer List") (*id.* ¶ 37); (b) the Google calendar used only by C. McDonnell, PHCorp's general manager, and the company's delivery drivers (the "Google Calendar") (*id.* ¶ 49); and (c) M. McDonnell's personal cellular telephone, which he used to conduct business for Power House Subs (*id.* ¶ 42).

      i.  <u>The Customer List</u>

PHCorp created the Customer List to identify and track current and potential customers. It includes their names, points of contact, telephone numbers, email addresses, notes about appointments, interactions, preferences, and other information garnered from the customer or

prospect.  (ECF No. 205, pp. 142-47); (Plaintiffs' Exhibit 17).  For the duration of his time as a PHCorp employee, M. McDonnell tracked his fundraiser sales in the Customer List.  (ECF No. 205, pp. 142-47).  At the time of his departure, the Customer List represented eight months of customer visits, sessions offering PHCorp's samples, client interactions, and fundraiser commitments.  (*Id.*).  The names of some of the businesses contained in the Customer List may be obtained by internet searches, but many of the telephone numbers and addresses cannot, nor can the records of customer contacts, notes, and fundraiser commitments.  (*Id.*).  Although some information contained in the Customer List is publicly available, the Customer List itself is not.  (*Id.*).  Access to the Customer List was restricted.  It was stored on PHCorp's password-protected Google cloud drive.  (*Id.* at 135).

After the sale of Power House Subs to PHCorp, M. McDonnell was issued a PHCorp company Google Chromebook laptop (the "Chromebook").  (ECF No. 198, ¶ 37).  At some point prior to his departure from PHCorp, M. McDonnell took pictures with his cellular telephone of the Customer List as displayed on the Chromebook.  (*Id.*); (*see also* Plaintiffs' Exhibit 17).  These pictures contained customer names, telephone numbers, and notes about customers, as well as dates on which M. McDonnell had visited them while employed by PHCorp.  (Plaintiffs' Exhibit 17).  He took the pictures "for future reference" because he "shouldn't have been able to [access the Customer List] because the Chromebook would have ordinarily been shut down by the administrator" after an employee separated from PHCorp.  (Plaintiffs' Exhibit 54.C, p. 153).  When shown the pictures of the Customer List during his deposition, M. McDonnell said that it "looks like customers that I was adding in the Chromebook to solicit while at Power House. . . . I put all of my contacts that I was soliciting in the Chromebook on a spreadsheet."  (*Id.* at 151).  When asked whether he took the pictures before or after he had left PHCorp, M. McDonnell

responded: "I would assume it was after.  I would have no reason to take it before."  (*Id.* at 153).

When asked whether he told anyone else that he took the customer information, Mike said:

"They were my leads. . . .  Because they were my contacts . . . .  They were my personal

[contacts].  I made those contacts with them."  (*Id.* at 152-53).

ii.  <u>M. McDonnell's Power House Sub Phone & Number</u>

M. McDonnell used the telephone number 814-327-6257 ("the Power House Subs

Number") on his cellular telephone to operate Power House Subs.  (ECF No. 198, ¶ 40).  At the

time the Asset Purchase Agreement was signed, the Power House Subs Number was on

billboards and order forms for PHCorp.  (*Id.* ¶ 41).  At the time of the execution of the Asset

Purchase Agreement, M. McDonnell's cellular telephone contained contact information of past

and present customers of PHCorp.  (*Id.* ¶ 42).  Thus, the cellular telephone and the Power House

Subs Number were assets covered by the Asset Purchase Agreement and should have transferred

to PHCorp upon the execution of the agreement.  (*See* Plaintiffs' Exhibit 2).  After separating

from PHCorp, M. McDonnell retained possession of the cellular telephone and the Power House

Subs Number.  He used the assets to contact PHCorp customers to attempt to solicit them to

bring their business to Supreme.  (ECF No. 198, ¶ 45).

iii.  <u>The Google Calendar</u>

PHCorp's Google Calendar had the names, telephone numbers, and email addresses of

PHCorp's customers, the dates and locations of customers' fundraisers, the number and types of

sandwiches ordered, and other order and customer notes.  (*Id.* ¶ 49).  Access to the Google

Calendar was password protected.  (*Id.* ¶ 50).  C. McDonnell had access to the Google Calendar

on his cellular telephone when he was employed by PHCorp.  (*Id.* ¶ 51).  He separated from

PHCorp on September 16, 2019.  (*Id.* ¶ 52).  Because C. McDonnell did not sign out of the

14

Google Calendar upon his departure, he retained access to the Google Calendar even after his password had been changed.  (*Id.* ¶ 52-53).  C. McDonnell took advantage of this access on multiple occasions and used the calendar to access customer information before losing access at the end of October 2019.  (ECF No. 204, pp. 118); (ECF No. 98, ¶ 52).

### III.  CONCLUSIONS OF LAW

### A.  Count One: Breach of Contract (Operating Agreement) against M. McDonnell

At Count One, Plaintiffs allege that M. McDonnell breached the noncompetition provision contained in § 5.03 of the Operating Agreement by taking "definitive actions to compete" against PHCorp.  (ECF No. 80, ¶¶ 180-87).  This provision barred M. McDonnell from "tak[ing] any actions to compete with Power House Subs unless approved by Elevation" within twenty-five miles of Power House Subs for two years beginning on his date of separation from the business.  (ECF No. 198, ¶ 16).  For the following reasons, the Court finds M. McDonnell liable by a preponderance of the evidence for breaching the noncompetition provision of the Operating Agreement.

Under Pennsylvania law, a claim for breach of contract has three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."  *Kaymark v. Bank of Am.*, 783 F.3d 168, 182 (3d Cir. 2015) (quoting *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. 2004)).  The parties do not dispute the existence of the Operating Agreement or the requirements of the noncompetition provision at § 5.03 of the agreement.  (ECF No. 198, ¶¶ 1, 16).  Thus, the issues are whether (1)

15

M. McDonnell took steps to compete with PHCorp;[5] (2) Plaintiffs consented to this competition; and (3) Plaintiffs suffered damages as a result of M. McDonnell's purported breach.

First, the Court finds that M. McDonnell took steps to compete with PHCorp in violation of § 5.03 of the Operating Agreement. Before he separated from PHCorp, M. McDonnell contacted Walter, a PHCorp customer, to tell Walter that *he* (not J. Bearer) was starting a new sandwich fundraising business. (ECF No. 198, ¶ 26). M. McDonnell contacted an individual to create a logo for Supreme and ordered a walk-in refrigerator, presumably for his new business. (*Id.* ¶¶ 27-28). After informing Mertiff, and thus Plaintiffs, of his intent to separate from PHCorp and start a new business, M. McDonnell contacted Walter and Hilling, another PHCorp customer, to inform them of his new business. (*Id.* ¶¶ 29-30). These steps, although taken before his separation from PHCorp, demonstrate that M. McDonnell was preparing to begin a new, competing business before he separated from PHCorp. M. McDonnell does not dispute that he was planning to open a competing business at this time. (*Id.* ¶ 26).

The Court finds that after receiving a cease-and-desist letter from Plaintiffs on August 15, 2019, M. McDonnell continued to take steps to compete with PHCorp by operating Supreme. M. McDonnell contends that he ceased his efforts to open Supreme at this time and, instead, J. Bearer and C. McDonnell became the driving forces behind Supreme – "piggybacking" off M. McDonnell's efforts. The Court rejects this argument and does not find it to be credible. The Court finds that after he received the cease and desist, M. McDonnell attempted to use his family members as a smoke screen to conceal his continued violations of § 5.03 of the Operating

---

[5] It is undisputed that Supreme was established and operated within two years of M. McDonnell's separation from PHCorp and within twenty-five miles of PHCorp. The question presented is whether M. McDonnell was operating Supreme – or whether it was being operated by J. Bearer or C. McDonnell.

Agreement.  Despite M. McDonnell's attempts to claim that Supreme was J. Bearer's business, the evidence shows that M. McDonnell was the operator of Supreme, even after August 2019.

On October 23, 2019, months after M. McDonnell received the cease-and-desist letter, C. McDonnell and D. Bearer's text messages make it clear that Supreme was M. McDonnell's business.  J. Bearer was working for M. McDonnell – not operating Supreme as his and C. McDonnell's business.  (*See* Plaintiffs' Exhibit 26, p. 58 ("No way Mike's going to let someone have control or ownership again."); *id.* ("Do you really believe that Jake should be working for Michael?")).  In November and December 2019, when D. Bearer was attempting to purchase equipment for Supreme, C. McDonnell directed D. Bearer to consult with M. McDonnell regarding the equipment – not J. Bearer – once again demonstrating that M. McDonnell was operating and making decisions for Supreme, not J. Bearer or C. McDonnell.  (*Id.* at 51, 55-56).  Further, M. McDonnell admits that *he*, not J. Bearer, attempted to contact former PHCorp customers in September, October, and November 2019.  (ECF No. 198, ¶¶ 32-33).  Supreme ultimately conducted sixteen fundraisers – ten of those fundraisers involved customers of PHCorp.  (*Id.* ¶ 55).  The Court finds that M. McDonnell breached the noncompetition provision of the Operating Agreement, § 5.03, when he took action to compete against PHCorp before and after separating from PHCorp, and when he continued to operate Supreme through C. McDonnell, D. Bearer, and J. Bearer.

Second, the Court finds that PHCorp did not consent to M. McDonnell's opening a new business or otherwise waive or amend the noncompetition provision of the Operating Agreement.  The Court credits Mertiff's testimony that he did not consent to M. McDonnell opening a competing business nor did he waive or amend any of M. McDonnell's noncompetition obligations.  (ECF No. 204, p. 99).  Plaintiffs sent M. McDonnell a cease-and-

desist letter eight days after M. McDonnell informed Mertiff that he was opening a competing business. Plaintiffs' quick response objecting to M. McDonnell's conduct supports Mertiff's testimony. Sending a cease-and-desist letter is inconsistent with the claim that Mertiff, on behalf of Plaintiffs, previously consented to M. McDonnell's conduct. The Court does not find credible the claim that Mertiff gave M. McDonnell consent to open a competing business.

Third, the Court finds that Plaintiffs suffered damages as a result of M. McDonnell's breach of § 5.03 of the Operating Agreement. Under Pennsylvania law, damages for breach of a noncompetition agreement are usually measured as the profits that the non-breaching party lost as a result of the breach. *American Air Filter, Inc. v. McNichol*, 527 F.2d 1297, 1299 (3d Cir. 1975) (stating that the plaintiff's damages were properly measured as "the profits it would have made on sales it could reasonably expect to have secured had [the defendant] not sold in breach of the agreement"); *Scobell, Inc. v. Schade*, 688 A.2d 715, 718-19 (Pa. Super. 1997) (same). There are "three distinct, yet equally important, theories of damages to remedy a breach of contract: 'expectation' damages, 'reliance' damages, and 'restitution' damages." *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998); *see also Trosky v. Civil Service Comm'n*, 652 A.2d 813, 817 (Pa. 1995). Expectation damages are the "preferred basis for contract damages" and seek to give the injured party the benefit of its bargain by attempting to place the aggrieved in as good a position as it would have been, had the contract been performed. *Id.* Expectation damages are measured by "the losses caused and gains prevented by defendant's breach," less any savings or other benefits from the defendant's non-performance. *Id.* (citing *American Air Filter*, 527 F.2d at 1299).

Supreme, operated by M. McDonnell, performed sixteen fundraisers in violation of § 5.03 of the Operating Agreement. (ECF No. 198, ¶ 54). Ten of those fundraisers involved

customers of PHCorp and most of those fundraisers generated over $1,000 in revenue. (*Id.* ¶ 55). The fundraisers generated at least $17,454.05. (*Id.* ¶ 56). PHCorp customers hired Supreme to perform fundraisers instead of PHCorp. Plaintiffs reasonably could have expected to have secured these fundraisers if M. McDonnell was not acting in violation of the Operating Agreement. Thus, Plaintiffs suffered damages in the form of lost profits as a result of M. McDonnell operating Supreme in violation of the noncompetition provision of the Operating Agreement.[6]

To the extent that M. McDonnell argues that the Operating Agreement is not enforceable because it was not negotiated or executed in good faith, this argument fails. Lack of good faith is not a defense to contract enforcement or an independent cause of action. *Zaloga v. Provident Life & Acc. Ins. Co. of Am.*, 671 F. Supp. 2d 623, 631-32 (M.D. Pa. 2009). A claim that a party did not act in good faith is in essence a breach of contract claim. *Id.* M. McDonnell does not allege that Plaintiffs breached the Operating Agreement. He does not maintain any counter claims against Plaintiffs in this litigation. To the extent M. McDonnell raises a good faith argument with regard to Count One, this argument is irrelevant as to whether he breached the Operating Agreement.

M. McDonnell also contends that since the "Asset Purchase Agreement speaks for itself with regards to the non-compete; the clause encompasses all previous subject matter, negotiations and agreements, including the non-compete in the Operating Agreement." (ECF

---

[6] Lost profits in the breach of contract context may include loss of future profits. *See AM/PM Franchise Ass'n v. Atl. Richfield Co.*, 584 A.2d 915, 925 n.19 (Pa. 1990) (noting the Pennsylvania Supreme Court's "extensive history of allowing claims for loss of prospective profits in breach of contract case[s]"); *Mass. Bonding & Ins. Co. v. Johnston & Harder, Inc.*, 22 A.2d 709, 714 (Pa. 1941) ("[I]f it reasonably appears that profits would be realized if the contract were carried out, and that the loss of such benefits necessarily followed the breach, their amount may constitute the true measure of damages." (quoting *Macan v. Scandinavia Belting Co.*, 107 A. 750, 753 (Pa. 1919))).

No. 207, ¶ 110). In other words, M. McDonnell asserts that the parties entered into a substituted agreement or novation, claiming that his obligations under the Operating Agreement were displaced and extinguished by the Asset Purchase Agreement. The required essentials of a substitute contract or novation are "the displacement and extinction of a valid contract, the substitution for it of a valid new contract, . . ., a sufficient legal consideration for the new contract, and the consent of the parties . . . ." *Yoder v. T.F. Scholes, Inc.*, 173 A.2d 120, 121–22 (Pa. 1961). The party asserting a novation or substituted contract has the burden of proving that the parties intended to discharge the earlier contract. *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 486 (Pa. Super. 1984).

There is no evidence that the parties intended the later-signed Asset Purchase Agreement to supplant the Operating Agreement. The Asset Purchase Agreement does not state that it supersedes the Operating Agreement. (*See* Plaintiffs' Exhibit 2). The Asset Purchase Agreement and the Operating Agreement are between different parties[7] and address different subject matter. The Operating Agreement created PHCorp to effectuate the sale of the business and assets of Power House Subs from M. McDonnell and his entities to PHCorp. (See Plaintiffs' Exhibit 1). The Asset Purchase Agreement governed the purchase of Power House Subs' assets by PHCorp. (Plaintiffs' Exhibit 2); *see Sklaroff v. Zaken*, 2017 WL 3574018, at *5 (Pa. Super. Aug. 18, 2017) (holding that an employment agreement was a separate and independent agreement which did not supersede or modify an operating agreement). The fact that the Asset Purchase Agreement contains an integration clause does not mean that it supersedes distinct previous agreements, even if there are overlapping parties. *See Lanard & Axilbund, LLC v. Wolf*,

---

[7] The parties to the Operating Agreement were M. McDonnell and Cook, representing Power House Subs, and John Russell ("J. Russell"), representing PHCorp. (Plaintiffs' Exhibit 1). The parties to the Asset Purchase Agreement were Elevation, M. McDonnell, DelBaggio, Cook, J. Russell, William Russell, and Murphy Poindexter. (Plaintiffs' Exhibit 2).

2014 WL 4722702, at *3 n.4 (E.D. Pa. Sept. 23, 2014) ("[A]n integration clause is not a talisman that operates magically to moot a separate agreement involving distinct subject matter, even if the signatories overlap."). No evidence exists that the Asset Purchase Agreement acted as a substitute contract or novation for the Operating Agreement. There is no evidence that the parties intended to discharge the obligations of the Operating Agreement by executing the Asset Purchase Agreement.

Finally, the Court holds that by violating § 5.03 of the Operating Agreement, M. McDonnell forfeited his shares of PHCorp. The Operating Agreement contained a provision stating that: "in the case of [M. McDonnell] or Ryan DelBaggio breaching this Covenant Not to Compete[,] the members agree to forfeit their shares back to the company for fair and just compensation of $1 USD (One Dollar)." (Plaintiffs' Exhibit 1, p. 9). PHCorp paid M. McDonnell one extra dollar in his final paycheck in accordance with this provision.

### B. Count Two: Breach of Contract (Asset Purchase Agreement) against M. McDonnell

At Count Two, Plaintiffs allege that M. McDonnell breached §§ 1.1.6, 7.11, and 13 of the Asset Purchase Agreement. (ECF No. 80, ¶¶ 188-94). M. McDonnell concedes that he signed and was a party to the Asset Purchase Agreement. (ECF No. 198, ¶ 2). The issue is whether he violated the above sections of the agreement and whether Plaintiffs suffered damages as a result of the breaches. For the following reasons, the Court finds by a preponderance of the evidence that M. McDonnell is liable at Count Two for violating §§ 1.1.6, 7.11, and 13 of the Asset Purchase Agreement.

Section 1.1.6 of the Asset Purchase Agreement states that PHCorp shall purchase from Power House Subs: "The business conducted as a going concern, including any and all goodwill, email addresses, telephone and fax numbers, and yellow-page advertisements ('Goodwill')[.]"

(Plaintiffs' Exhibit 2, p. 2); (ECF No. 198, ¶ 19).  Section 10.13 of the agreement provides: "Sellers are the sole and absolute owners of the Purchased Assets . . . .  There is no property used in the operation of the Businesses that is owned by or an interest in which is claimed by any other person or entity[.]"  (Plaintiffs' Exhibit 2, p. 9).  The "Purchased Assets" are listed in § 1, and § 1.1.6 makes clear that telephone numbers used in business operations are no exception. (*See id.* at 1) (Purchased Assets include "[t]he business conducted as a going concern, including . . . telephone and fax numbers").  Because M. McDonnell used his personal cellular telephone number to operate Power House Subs, (ECF No. 198, ¶¶ 40-43, 45), but did not transfer this number to PHCorp once he departed the company, (*id.* ¶ 43) the Court finds that he breached § 1.1.6 of the Asset Purchase Agreement.

Section 7.11 of the Asset Purchase Agreement provides: "**Name Change Documents**. Sellers shall have taken all required actions to change all entity names and transfer or terminate all fictitious names relating to their operation of the Businesses and shall have delivered to Buyers a certified copy of documents evidencing the same."  (Plaintiffs' Exhibit 2, p. 6); (ECF No. 198, ¶ 20).  M. McDonnell concedes that he has not terminated Power House Subs related entities or fictitious names.  (*Id.* ¶ 44).  The Court finds that M. McDonnell breached § 7.11 of the Asset Purchase Agreement.

Section 13 of the Asset Purchase Agreement states:

> **Noncompetition Agreement**. Sellers and Seller Equity holders each covenant, warrant and agree, on a joint and several basis, for the benefit of Buyers, and their subsidiaries, successors and assigns (collectively, the "Covenant Beneficiaries"), that they shall not, within 25 miles of the Businesses (including any location to which any of the Businesses has delivered products or services in the past twelve months) and for a period of two years from the date of Closing, either directly or indirectly (whether as a shareholder, partner, member, associate, owner, employee, or through an agent, third party or otherwise) (i) compete directly, or engage or be involved in any business that competes with the Businesses or Buyers anywhere that Buyers do business; (ii) divert from Buyers, or do anything

which would tend to divert from Buyers, any trade or business with any customer or vendor of the Businesses or Buyers; or (iii) solicit, induce or attempt to induce any employee or independent contractor of Buyers to (a) leave the employment of or terminate his, her or its contractual relationship with Buyers, or (b) enter into the employ of or a contractual relationship with any competitor of the Businesses or Buyers. This Covenant and agreement by Sellers and Seller Equity holders shall survive the Closing. Due to the harm that Buyers will suffer as a result of a breach of this covenant, Sellers acknowledge that Buyers may obtain injunctive relief to enforce this agreement.

(ECF No. 198, ¶ 18); (Plaintiffs' Exhibit 2, p. 13). Based on the evidence explained above, the Court finds that M. McDonnell breached § 13 of the Asset Purchase Agreement by competing with PHCorp through Supreme; diverting trade, business, customers, and vendors from PHCorp; and soliciting PHCorp employees to leave their employment with PHCorp, namely C. McDonnell and J. Bearer, to enter into employment with Supreme, a competitor of PHCorp.

The Court finds that PHCorp suffered damages as a result of M. McDonnell's breach of the Asset Purchase Agreement. As detailed above, Supreme, operated by M. McDonnell, performed sixteen fundraisers in violation of the Asset Purchase Agreement. (ECF No. 198, ¶ 54). Based on undisputed facts, PHCorp customers hired Supreme to perform fundraisers instead of PHCorp. Plaintiffs reasonably could have expected to have secured these fundraisers if M. McDonnell was not acting in violation of the Asset Purchase Agreement. They suffered damages in the form of lost profits as a result of M. McDonnell operating Supreme in violation of the noncompetition provision of the Asset Purchase Agreement. Plaintiffs suffered damages as a result of M. McDonnell's retention of the Power House Subs Number because M. McDonnell's retention of the Power House Subs Number allowed M. McDonnell to facilitate operations of Supreme, his competing business. Finally, the Court finds that Plaintiffs have incurred damages as a result of M. McDonnell's failure to terminate Power House Sub related entities and fictitious names as the entities have caused confusion that could be reasonably

expected to interfere with PHCorp's business, especially in light of M. McDonnell's operations of Supreme, a competing entity.

M. McDonnell contends that the Asset Purchase Agreement was not supported by sufficient consideration. (ECF No. 207, ¶¶ 97-103). The agreement provides that the purchase price for the purchased assets was $20.00. (Plaintiffs' Exhibit 2, p. 4). An element of contract formation is consideration – an act, forbearance, or return promise bargained for and given in exchange of the original promise. *Ruggiero v. Nocenti*, 556 F. Supp. 3d 512, 523 (E.D. Pa. 2021). For most contracts, Pennsylvania courts have historically held that while the existence of consideration is a necessary element for any enforceable contract, the adequacy of the consideration is not a factor to be considered in determining the validity and enforceability of a contract. *See, e.g., Thomas v. Thomas Flexible Coupling Co.*, 46 A.2d 212, 216 (Pa. 1946) ("[I]t is an elementary principle that the law will not enter into an inquiry as to the adequacy of the consideration.") (citing *Hillcrest Foundation v. McFeaters*, 2 A.2d 775, 778 (Pa. 1938)). The exception to this rule is restrictive covenants in employment contracts. In this context, the Pennsylvania Supreme Court has repeatedly inquired into the adequacy of the consideration required to support such contracts. *See Socko v. Mid-Atl. Sys. of CPA, Inc.*, 99 A.3d 928, 935 (Pa. Super. 2014), *aff'd*, 126 A.3d 1266 (Pa. 2015).

While Count Two pertains to a restrictive covenant, the Asset Purchase Agreement was not entered into in the employment context. It was executed in connection with the sale of a business, Power House Subs. This is a critical distinction. *See Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 920 (Pa. 2002) ("[T]his Court has historically distinguished the covenant not to compete contained in an employment agreement from one that is contained in an agreement of sale."). Because the Asset Purchase Agreement is not a restrictive covenant entered into in

connection with employment – but rather the sale of a business – the Court will not delve into whether $20.00 is "sufficient" consideration to support the execution of the agreement. The sale of Power House Subs' assets was for $20.00. The Court declines to consider the adequacy of the consideration in determining the validity and enforceability of a contract. The contract was supported by consideration and is enforceable.

Finally, M. McDonnell asserts that the Asset Purchase Agreement "was a scam" because, in part, the agreement contained knowingly false "verbiage," M. McDonnell was purposefully approached to sign the agreement at "the most inopportune time, while [he] was overwhelmed," and "no other document exists or was presented that consummates the deal." (ECF No. 207, ¶¶ 104-09). The Court views these contentions as an extension of M. McDonnell's argument that the agreements supporting the sale of Power House Subs were not executed in good faith. As detailed above, lack of good faith is not a defense to contract enforcement and does not relieve M. McDonnell of liability for his breaches of the Asset Purchase Agreement.

### C. Count Three: Breach of Contract (License Noncompetition Agreement) against M. McDonnell

At Count Three, Plaintiffs allege that M. McDonnell breached the License Noncompetition Agreement by disclosing PHCorp's confidential information and competing with PHCorp within a twenty-five mile radius within two years of his separation from PHCorp. (ECF No. 80, ¶¶ 195-98). For the following reasons, the Court finds, by a preponderance of the evidence, that M. McDonnell is liable at Count Three for violating the License Noncompetition Agreement.

The first issue is whether M. McDonnell executed and was thus bound by the License Noncompetition Agreement. He admits that the agreement contains his signature, (ECF No. 198, ¶ 3), but contends that he signed it mistakenly. The Court does not credit M. McDonnell's self-

25

serving assertion. Any contention that M. McDonnell did not intend to execute the License Noncompetition Agreement is undermined by his previous shifting claims regarding the agreement. M. McDonnell initially asserted that Mertiff fraudulently signed his name on the agreement. (Plaintiffs' Exhibit 22, pp. 3-4). M. McDonnell claimed that he viewed the agreement but did not sign it. (*Id.*). M. McDonnell contacted law enforcement officers about Mertiff's alleged forging of his signature. (*Id.*). The Hollidaysburg Police Department investigated this matter and found that the internet protocol address ("IP address") at which M. McDonnell viewed the License Noncompetition Agreement was the same IP address from which it was signed. (*Id.*). This IP address was different from the IP addresses associated with any other signer of the agreement. (*Id.* at 7-8). Based on this information, the Court finds that M. McDonnell intended to and did execute the License Noncompetition Agreement. Thus, the issues remaining are whether he breached the agreement and whether Plaintiffs suffered damages as a result.

Section 1 of the License Noncompetition Agreement provides:

**Confidentiality Obligation**. Owner agrees that Licensor is the owner of all Confidential Information. Owner shall not, directly or indirectly, itself or through another person or entity, use or disclose Confidential Information to any third party or use any advantages derivable from Confidential Information for any purpose except to operate the Businesses consistent with the License Agreement. Owner shall protect Confidential Information from disclosure. Owner shall return to Company and/or Licensor (or, at Licensor's request, destroy and provide evidence of such destruction to Licensor) all Confidential Information no later than thirty (30) days after the expiration or termination of the License Agreement or at such earlier time as requested by Licensor.

Owner acknowledges that its knowledge of Confidential Information is derived entirely from information disclosed to it by or on behalf of Licensor and that such information is proprietary, confidential, and a trade secret of Licensor. Owner agrees to maintain confidentiality of such information and to exercise the highest degree of diligence in safeguarding Licensor's trade secrets during and after the term of this Agreement, including all Confidential Information. Owner shall divulge such material only to Company employees and only to the extent

necessary to permit the effective operation of Company's Businesses. It is expressly agreed that the ownership of all the proprietary property and Confidential Information is and shall remain vested solely in Licensor.

If, during the term of this Agreement, Owner develops any new formulas, recipes, know-how, processes, products, techniques, ideas, plans, improvements, or information in connection with the operation of a Business or any other similar aspect of the business ("Innovations"), Owner shall fully and promptly disclose this to Licensor and may use the same only as approved by Licensor. Licensor and its affiliates own and have the right to authorize use of Innovations without any compensation to Owner. Owner will execute all documents as requested by Licensor to confirm ownership (and transfer to Licensor, if necessary) of all Innovations.

(Plaintiffs' Exhibit 3, p. 1).

The Court finds that M. McDonnell breached § 1 of the License Noncompetition Agreement when he (1) took photographs of customer information contained in a spreadsheet on PHCorp's Chromebook that he possessed after he separated from PHCorp, and which he had used while employed by PHCorp to solicit business for PHCorp (ECF No. 198, ¶ 37); (2) refused to transfer the Power House Subs Number to PHCorp after separation; and (3) continued to use the Power House Subs Phone to contact former PHCorp customers, including Walter (*id.* ¶¶ 32, 43).  The Court finds that M. McDonnell used and disclosed PHCorp's confidential information to open and operate Supreme, a competing business, in violation of § 1 of the agreement.

Section 2 of the License Noncompetition Agreement states:

**Noncompetition Obligation**. During the term of this Agreement and any renewal thereof, Owner shall not, without the express written consent of Licensor, directly or indirectly, engage in or participate as an employee, agent, or owner, alone or with any other person, partnership or entity, in any other business which is the same as or similar to the Business, nor shall Owner use, directly or indirectly, any system or concept of Licensor except in the operation of the Businesses for Company.

Owner shall not directly or indirectly, for a period of two (2) years from the later of (i) termination or expiration of the License Agreement or (ii) termination of employment and any ownership interest in Company, engage in or participate, as an employee, consultant, agent, or owner (whether directly or indirectly), alone or

with any other person or entity, with any business selling sandwiches, wraps, or salads, or conducting food-based fundraising, or offering or selling a franchise, license, or other arrangement to do the same, within a radius of twenty-five (25) miles of any Business location of Company, Licensor, or any other licensee or franchisee of Licensor. Owner shall never use, directly or indirectly, the systems or concepts of Licensor in any business whatsoever, wherever located.

Owner shall not directly or indirectly, during the time this Agreement is in effect and for a period of two (2) years from the later of (i) termination or expiration of the License Agreement or (ii) termination of employment and any ownership interest in Company, do, attempt, or cause or encourage anyone to do or attempt, either of the following: (1) call on, solicit, cause, or encourage any of Licensor's or its affiliates, licensees, or franchisees' ("Licensor Affiliates") partners, customers, potential customers, members, managers, employees, vendors, or suppliers to alter their relationship with Licensor Affiliates, or (2) solicit or hire away any of Licensor's or Licensor Affiliates' employees or subcontractors.

Owner agrees that, for a period of twelve (12) months following expiration or termination of this Agreement, Owner shall notify Licensor of any new employment or business ownership, including the start date of such employment or business ownership, the name and address of the employer or business, and the title and description of services offered by the employer or business.

If Owner violates any of these provisions, then, in addition to any other relief to which Licensor may be entitled, the period of time for which the restriction shall apply shall be extended by a period equal to the period of noncompliance.

Owner acknowledges that Owner has previously worked in or has been gainfully employed in other fields of endeavor and that these provisions will in no way prevent Owner from earning a livelihood. Further, Owner acknowledges that violation of these non-competition covenants will result in immediate and irreparable injury to Licensor for which no adequate remedy at law will be available. Therefore, Owner agrees Licensor shall be entitled to injunctive relief to prohibit any conduct by Owner in violation of the non-competition covenants contained herein.

Owner covenants that it shall not appropriate, use, or duplicate the Licensor's system, or any portion thereof, for use in any other business. If any provision of this Section shall be deemed unenforceable by law, then such restrictions shall be reduced to the minimum extent necessary to be legally enforceable.

(Plaintiffs' Exhibit 3, pp. 1-2). The Court previously addressed the evidence underlying its finding that M. McDonnell competed with PHCorp by operating Supreme – an entity, in a twenty-five-mile radius of PHCorp, which sold sandwiches and conducted food-based

28

fundraising. The Court will not recite all of the facts underlying this holding but incorporates by reference the evidence addressed above. The Court finds that M. McDonnell breached § 2 of the License Noncompetition Agreement by competing with PHCorp through Supreme. Specifically, by soliciting customers from PHCorp to bring their fundraising business to Supreme.

Section 3 of the License Noncompetition Agreement states: "**Non-Circumvention**. Owner agrees that Owner will not, directly or indirectly, contact, deal with, or otherwise become involved with any entity or person for purposes of circumventing or frustrating the purpose of this Agreement." (*Id.* at 2). M. McDonnell breached this section of the License Noncompetition Agreement when he opened and operated Supreme, a competing entity. He frustrated the noncompetition and confidentiality sections of the License Noncompetition Agreement. To evade liability for his breach of the agreement, M. McDonnell attempted to use C. McDonnell and J. Bearer to circumvent the noncompetition section of the agreement. The Court finds that M. McDonnell breached § 3 of the License Noncompetition Agreement.

The Court finds that Plaintiffs suffered damages as a result of M. McDonnell's breach of the License Noncompetition Agreement. As detailed above, Supreme, operated by M. McDonnell, performed sixteen fundraisers in violation of the Asset Purchase Agreement. (ECF No. 198, ¶ 54). Based on undisputed facts, PHCorp customers hired Supreme to perform fundraisers instead of PHCorp. Plaintiffs reasonably could have expected to have secured these fundraisers if M. McDonnell was not acting in violation of the License Noncompetition Agreement. Plaintiffs suffered damages in the form of lost profits as a result of M. McDonnell operating Supreme in violation of the noncompetition provision and using Plaintiffs' confidential information in violation of §§ 1-3 of the License Noncompetition Agreement.

### D. Count Four: Tortious Interference with Existing Contractual Relations against C. McDonnell, J. Bearer, and D. Bearer

At Count Four, Plaintiffs allege that C. McDonnell, J. Bearer, and D. Bearer tortiously interfered with their existing contractual relations with M. McDonnell by "convincing [M. McDonnell] that they would assist him in competing against Plaintiffs and circumvent his requirements under the [Asset Purchase Agreement, Operating Agreement, and License Noncompetition Agreement], and actually assisting him in so doing." (ECF No. 80, ¶¶ 199-205). The Court, by a preponderance of the evidence, finds C. McDonnell, D. Bearer, and J. Bearer liable at Count Four for tortious interference with M. McDonnell's existing contractual relations with Plaintiffs.

"[A] party is liable for pecuniary loss due to tortious interference with a contractual relationship when the party 'intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract . . .'" *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. 2013) (quoting *Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. 2009), *aff'd*, 20 A.3d 468 (Pa. 2011)). The elements of tortious interference with a contractual relationship are:

> (1) [T]he existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Id.* (internal citations omitted).

First, it is undisputed that there were three relevant contracts between Plaintiffs and M. McDonnell. PHCorp and M. McDonnell were parties to the Operating Agreement and the Asset Purchase Agreement. (ECF No. 198, ¶¶ 1-2); (Plaintiffs' Exhibits 1-2). REVZIP and M.

McDonnell were parties to the License Noncompetition Agreement. (ECF No. 198, ¶ 3); (Plaintiffs' Exhibit 3).

Second, the Court finds that C. McDonnell, J. Bearer, and D. Bearer had the intent to harm Plaintiffs by interfering with the Operating Agreement, Asset Purchase Agreement, and License Noncompetition Agreement. C. McDonnell, J. Bearer, and D. Bearer knew that M. McDonnell received a cease-and-desist letter. (ECF No. 198, ¶ 46). They were aware that the letter informed M. McDonnell that he was violating the terms of his contracts with Plaintiffs by opening and operating Supreme – a competing entity. (*Id.* ¶ 47). Notwithstanding their knowledge of this prohibition, C. McDonnell, J. Bearer, and D. Bearer knew of M. McDonnell's efforts to establish a competing business and actively assisted him in this effort.

D. Bearer secured $25,000.00 from her friend Grygier for what Grygier believed was going to be M. McDonnell's "sub shop." (Plaintiffs' Exhibit 54.I, p. 86). D. Bearer and C. McDonnell worked together to secure funding and equipment for Supreme. Specifically, messages between D. Bearer and C. McDonnell on October 25, 2019, reflect D. Bearer's coordination with M. McDonnell about securing their father's life insurance proceeds so they "can solicit when we are opening." (Plaintiff's Exhibit 26, p. 51). On November 6, 2019, D. Bearer informed C. McDonnell that she would buy Supreme a slicer from nonparty John Rutter, and C. McDonnell told her in response that "Mike already had [Rutter] get us one." (*Id.*). And, on December 22, 2019, D. Bearer sent C. McDonnell options for shop equipment and directed him to "[t]alk to MIKE about it[.]" (*Id.* at 55).

The record reflects D. Bearer and C. McDonnell's understanding that M. McDonnell, rather than J. Bearer, was Supreme's operator and driving force. Evidence also reflects J.

Bearer's role in working for Supreme.  In a series of text messages exchanged on October 23, 2019, C. McDonnell and D. Bearer wrote the following:

> **Chris**: Maybe you can try to talk to Jake.  *It will be his company someday . . . but we have to get it opened.  No way Mike's going to let someone have control or ownership again.*  You need to trust this *. . . cause the last thing you want for [J]ake . . . is Mike looking elsewhere to get funds and give away their ownership . . . and he will do that if forced to.*

> **Dana**: *Do you really believe that Jake should be working for Michael?*  They are both drama queens[.]

> **Chris**:  There will be tough times.  But I really think Jake's good at it.  And in the long run it will be good for him.  But you have to call him and get him to back off.  If there [are] any more delays we will screw ourselves for spring fundraisers.  Get us open[.]

> **Dana**:  I really don't need [M]ike['s] hoagie drama right now.  It's going to happen in time whether he's a lunatic or not.

> **Chris**: *Just tell [J]ake not to fight him.*  No reason to raise voices.  Let him open.  You want income for the house.  Let this open now.

(*Id.* at 58) (emphasis added).

M. McDonnell used J. Bearer to disguise his role at Supreme to avoid his obligations under the Operating Agreement, Asset Purchase Agreement, and License Noncompetition Agreement.  J. Bearer was listed as the owner of Supreme on the business's limited liability Pennsylvania registration.  (ECF No. 198, ¶ 35).  M. McDonnell advised Walter, a customer that he was attempting to persuade to move his business from PHCorp to Supreme, to contact J. Bearer for his future fundraising needs.  (*Id.* ¶ 51).  J. Bearer ultimately contacted Walter and Supreme hosted a fundraiser for his organization.  (Plaintiff's Exhibit 44, pp. 1-2).  The logo developer that M. McDonnell previously contacted to procure a logo for Supreme emailed J. Bearer regarding logos for Supreme and provided a logo option for the new business.  (*Id.* ¶ 36).

In light of the record evidence, particularly the messages exchanged between C. McDonnell and D. Bearer, the Court rejects Defendants' claims that C. McDonnell, J. Bearer, and D. Bearer were trying to establish Supreme on J. Bearer's behalf. J. Bearer acted as a smoke screen to obfuscate M. McDonnell's role in Supreme. C. McDonnell and D. Bearer assisted M. McDonnell in obtaining funds and equipment for Supreme. The Court finds that C. McDonnell, J. Bearer, and D. Bearer assisted M. McDonnell in opening and operating Supreme, knowing that M. McDonnell was breaching his contractual obligations not to compete against PHCorp. The Court further finds that they acted with the intent to harm PHCorp since they assisted M. McDonnell, knowing that his goal was to solicit customers and business from PHCorp.

Third, there is no evidence that C. McDonnell, J. Bearer, or D. Bearer acted with any privilege or justification for their conduct. *See LVL Co., LLC v. Atiyeh*, 469 F. Supp. 3d 390, 421 (E.D. Pa. 2020) (holding that the defendants did not have any privilege or justification for attempting to circumvent restrictive covenants).

Fourth, the Court holds that Plaintiffs suffered actual damages from the tortious interference. Lost profits stemming from tortious interference with a contract are recoverable if: "(1) there is . . . evidence to establish the damages with reasonable certainty; (2) the damages were the proximate cause of the wrong; and (3) the damages were reasonably foreseeable." *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 289 (3d Cir. 2005) (internal quotations omitted). Plaintiffs suffered damages because of C. McDonnell, J. Bearer, and D. Bearer's interference as these defendants assisted M. McDonnell in earning revenue for Supreme during the contractual noncompetition period that might have otherwise gone to PHCorp. This conclusion is supported by record evidence indicating that Supreme performed sixteen fundraisers, ten of which involved PHCorp customers, most of which generated over $1,000 in revenue. (ECF No. 198, ¶ 54-55).

33

The fundraisers generated at least $17,454.05. (*Id.* ¶ 56). The Court finds that Plaintiffs suffered a loss in profits, that Supreme's competition against PHCorp was the proximate cause of the profit loss, and that this profit loss was the foreseeable consequence of Supreme's competition with PHCorp.

### E.  Count Five: Violations of the DTSA against M. McDonnell and C. McDonnell

At Count Five, Plaintiffs allege M. McDonnell and C. McDonnell misappropriated Plaintiffs' trade secrets in violation of the DTSA, 18 U.S.C. §§ 1831 *et seq.* (ECF No. 80, ¶¶ 206-18). The Court finds by a preponderance of the evidence that M. McDonnell and C. McDonnell are liable for violating the DTSA by misappropriating Plaintiffs' trade secrets.

The DTSA creates a private right of action for the misappropriation of trade secrets. 18 U.S.C. § 1836(b)(1). To establish a claim under the DTSA, Plaintiffs must prove:

> (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]" *id.* § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, *id.* § 1839(5).

*Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021).

Plaintiffs assert that PHCorp's customer information are trade secrets protected under the DTSA. (ECF No. 80, ¶¶ 206-18). The customer information at issue includes "lists and accounts of current and past customers and vendors, their current and past orders, contact information, and other information about customers and prospective customers, generally and specifically . . . which are not generally known or readily ascertainable by persons outside of [PHCorp]." (ECF No. 80, ¶ 26). As discussed above, PHCorp compiled much of its customer information into two platforms: (1) the Customer List (ECF No. 198, ¶ 37) and (2) the Google

Calendar (*id.* ¶ 49).  Also included within the scope of PHCorp's customer information is the customer contact information stored on M. McDonnell's Power House Subs Phone.  (*Id.* ¶ 42).

Defendants argue that Plaintiffs failed to establish that PHCorp's customer information, located in all three sources, were trade secrets.  (ECF No. 207, p. 17).  This argument fails.  The Court, in its Memorandum Opinion on summary judgment (ECF No. 176), held that PHCorp's customer information located in the Customer List, the Google Calendar, and M. McDonnell's Power House Subs Phone constituted trade secrets under the DTSA and PUTSA.  (ECF No. 176, p. 50).  This holding is binding under the law of the case doctrine[8] and the Court reasserts its prior holding that PHCorp's customer information (compiled in the Customer List, Google Calendar, and M. McDonnell's Power House Subs Phone) constitutes trade secrets as defined by the DTSA and PUTSA.  (*See id.* at 47-50).

There is no dispute that the second element of the DTSA is met – PHCorp's customer information relates to the sale of its products and services.  The issue is whether M. McDonnell and C. McDonnell misappropriated Plaintiffs' customer information.  The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" or the "disclosure or use" of a trade secret without the consent of the owner.  18 U.S.C. §§ 1839(5)(A)–(B).

Plaintiffs have proved, by a preponderance of the evidence, that M. McDonnell and C. McDonnell misappropriated their Customer List by using it to solicit fundraisers from PHCorp to Supreme.  This conclusion is supported by the following facts:

---

[8] The law of the case doctrine is an equitable doctrine that provides that a decision on an issue of law made at one stage of the case is binding precedent to be followed in successive stages of litigation.  *Deisler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1087 (3d Cir. 1995) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)).

- M. McDonnell took pictures on his cellular telephone of PHCorp's Customer List that was on the Chromebook while the Chromebook was in his possession. (ECF No. 198, ¶ 37).

- The pictures that M. McDonnell took of the Customer List contained customer names, telephone numbers, and notes about customers. (Plaintiff's Exhibit 17);

- When shown the pictures, M. McDonnell said that it "looks like customers that I was adding in the Chromebook to solicit while at Power House . . . . I put all of my contacts that I was soliciting in the Chromebook on a spreadsheet." (Plaintiffs' Exhibit 54.C, p. 151).

- When asked whether he told anyone else that he took the customer information, M. McDonnell said: "They were my leads. . . . Because they were my contacts . . . . They were my personal [contacts]. I made those contacts with them." (*Id.* at 152-53).

- M. McDonnell took the pictures "for future reference" because he "shouldn't have been able to [access the customer information] because the Chromebook would have ordinarily been shut down by the administrator." (*Id.* at 153);

- When asked whether he took the pictures before or after he separated from PHCorp, M. McDonnell responded: "I would assume it was after. I would have no reason to take it before." (*Id.* at 153-54).

This evidence proves that M. McDonnell acquired a trade secret by improper means—by taking a photograph of the Customer List, knowing that he should not have had access to this information after separating from PHCorp. It also indicates, in conjunction with other evidence discussed above, that M. McDonnell used the Customer List without PHCorp's consent to solicit their customers for his competing business.

The record also proves that C. McDonnell misappropriated the trade secrets contained on the Google Calendar by using them without PHCorp's consent.  This conclusion is supported by the following facts:

- Access to the Google Calendar is protected by password and, when an employee departs from PHCorp, the company changes the former employee's password to prevent future logins to the Google Calendar by that individual.  (ECF No. 198, ¶ 50); (ECF No. 205, p. 135).

- Because C. McDonnell never signed out of the Google Calendar after his departure from PHCorp, he retained access to the Google Calendar even after his password had been changed.  (ECF No. 198, ¶¶ 51-53); and

- C. McDonnell accessed the Google Calendar on multiple occasions after his departure from PHCorp on September 16, 2019, and was able to see all of the information contained therein.  (*Id.* ¶ 53).

PHCorp took affirmative steps to keep former employees, like C. McDonnell, from accessing the Google Calendar.  However, due to PHCorp's oversight, C. McDonnell retained his access to the Google Calendar after his departure from the company, and he continued to access it after his departure despite knowing that he should not have continued access to it while working for Supreme, a competing entity.

As for M. McDonnell's Power House Subs Phone, the record contains evidence that M. McDonnell used the trade secrets contained therein without PHCorp's consent.  After his departure from Power House Subs, M. McDonnell used the Power House Subs Phone to solicit business from two of PHCorp's regular customers—Walter and Hilling—and succeeded in making them Supreme's customers.  (ECF No. 198, ¶¶ 30, 32-33, 57).  M. McDonnell used the

trade secret customer information that he should not have retained after separating from PHCorp contained in the Power House Subs Phone to solicit customers to Supreme and away from PHCorp.

The Court finds that M. McDonnell and C. McDonnell misappropriated PHCorp's trade secret customer information (the Customer List, the Google Calendar, and M. McDonnell's Power House Subs Phone information).

## F.  Count Six: Violations of the PUTSA against M. McDonnell and C. McDonnell

At Count Six, Plaintiffs allege M. McDonnell and C. McDonnell misappropriated Plaintiffs' trade secret customer information in violation of the PUTSA, 12 Pa. C.S. § 5301 *et seq*. (ECF No. 80, ¶¶ 219-26).[9]  The Court finds M. McDonnell and C. McDonnell liable, by a preponderance of the evidence, of violating the PUTSA by misappropriating Plaintiffs' trade secrets.

The DTSA and the PUTSA are substantially similar, as both are closely related to the Uniform Trade Secrets Act ("UTSA").  *Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 736 (3d Cir. 2019) ("The Pennsylvania General Assembly based the PUTSA on the provisions of the [UTSA]."); *Oakwood*, 999 F.3d at 910 ("[Congress] recognized the DTSA and the UTSA as similar." (internal quotation marks and citations omitted)).  The definitions of "trade secret" under the DTSA and the PUTSA are almost identical.  *Cf*. 18 U.S.C. § 1839(3); *with* 12 Pa. C.S. § 5302.  Thus, although the above discussion focuses on the DTSA, the Court concludes that the same analysis applies to Plaintiffs' claims under the PUTSA and it reaches the same conclusion.  *See, e.g., Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018)

---

[9] The same trade secrets at issue in Count Five are the focus of Count Six.  As stated above, the Court previously held that this information is a trade secret as defined by the PUTSA in its Memorandum Opinion on summary judgment.  (ECF No. 176, pp. 47-50).

(consolidating the analysis of claims under the DTSA and PUTSA); *Jazz Pharms., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 445 (E.D. Pa. 2018) (same); (ECF No. 176, pp. 47-50 (same)).  M. McDonnell and C. McDonnell misappropriated Plaintiffs' trade secret customer information contained in the Customer List, Google Calendar, and M. McDonnell's Power House Subs Phone in violation of the PUTSA.

### G. Count Fourteen: Breach of Confidentiality Agreements against C. McDonnell and J. Bearer

At Count Fourteen, Plaintiffs claim that C. McDonnell and J. Bearer breached their Confidentiality Agreements with Plaintiffs by "us[ing] and disclos[ing] confidential information belonging to [PHCorp] and relating to their employment by and services provided to [PHCorp]." (ECF No. 80, ¶¶ 275-83).   The Court finds C. McDonnell and J. Bearer liable, by a preponderance of the evidence, of breaching their Confidentiality Agreements as alleged at Count Fourteen.

Following PHCorp's acquisition of Power House Subs, all Power House Subs employees became employees of PHCorp and its majority shareholder, EMG.  (ECF No. 198, ¶ 21).  In the course of this transition, EMG required all Power House Subs employees to sign the Confidentiality Agreements as a condition of their employment with PHCorp.  (*Id.* ¶ 22).  C. McDonnell and J. Bearer concede that they executed Confidentiality Agreements on December 2 and 3, 2018, respectively.  (ECF No. 198, ¶¶ 4-5); (Plaintiffs' Exhibits 5-6).  The existence and enforceability of the contract is not at issue.  The questions are whether (1) C. McDonnell and J. Bearer breached these agreements and (2) Plaintiffs suffered damages as a result of the breaches.

The Confidentiality Agreements that C. McDonnell and J. Bearer signed were identical.  (*See* Plaintiffs' Exhibits 5-6).  Under these contracts, Defendants agreed:

39

A. Employee will hold the confidential information received from EMG Brands, LLC in strict confidence and shall exercise a reasonable degree of care to prevent disclosure to others. Employee will strictly comply with all instructions form EMG Brands, LLC, including those contained in employee manuals or guidelines, relating to the treatment of confidential information.

B. Employee will not disclose or divulge either directly or indirectly the confidential information to others unless first authorized to do so in writing by EMG Brands, LLC.

C. Employee will not reproduce the confidential information nor use this information commercially or for any purpose other than the performance of his/her duties for EMG Brands, LLC.

D. Employee will immediately, upon the request or upon termination of his/her relationship with EMG Brands, LLC deliver EMG Brands, LLC any notes, documents, equipment, and materials received from or belonging to EMG Brands, LLC or origination from the Employee's employment by EMG Brands, LLC. The obligations of the Employee under this Agreement will survive the termination of Employee's employment by EMG Brands, LLC indefinitely, irrespective of the reason for such termination.

E. EMG Brands, LLC shall have all rights to any information received from the Employee during the course of the Employee's employment by EMG Brands, LLC, including the right to keep the same as a trade secret, to use and disclose the same without prior patent applications, to file copyright registrations in its own name or to follow any other procedure as EMG Brands, LLC may deem appropriate.

F. EMG Brands, LLC reserves the right to take disciplinary action, up to and including termination for violations of this Agreement.

G. Employee represents and warrants that it is not under any preexisting obligations inconsistent with the provisions of this Agreement.

(*Id.*).  The Confidentiality Agreements defined "Confidential Information" as "information that is or may be deemed to be confidential or proprietary to [EMG][10] . . . and includes, without limitation, any information of any kind, nature, or description concerning any matters affecting or relating to Employee's services for [EMG], the business or operations of [EMG], customer lists, customer information, pricing and plan information, and similar information relating to the business of [EMG]."  (*Id.*).

The customer information previously described in this opinion, contained in the Customer List, the Google Calendar, and M. McDonnell's Power House Subs Phone, falls within the definition of Confidential Information as outlined by the Confidentiality Agreements.  As discussed in detail above, C. McDonnell separated from PHCorp and retained access to the

---

[10]  The Court previously held that Plaintiffs may enforce the Confidentiality Agreements originally entered into with EMG, despite the absence of a specific assignability provision, because, when ownership of PHCorp transferred from EMG to REVZIP, EMG assigned its rights in the Confidentiality Agreements to REVZIP.  (ECF No. 176, pp. 35-36).

Google Calendar.  (ECF No. 198, ¶¶ 51-53).  He accessed the Google Calendar, PHCorp's confidential information, on multiple occasions after his separation from PHCorp.  The Court reasonably infers from the record evidence that C. McDonnell used this information in furtherance of operating Supreme.  C. McDonnell separated from PHCorp and began facilitating the operation of Supreme, a competing entity.  Supreme solicited PHCorp's customers and then performed fundraisers for at least ten of these customers.  (*Id.* ¶ 55).  The Court finds that C. McDonnell breached his Confidentiality Agreement by retaining access to PHCorp's confidential information after his separation from PHCorp, accessing that information after the separation, and using that information in furtherance of operating a competing entity.

Likewise, the Court finds that J. Bearer used PHCorp's confidential information in furtherance of Supreme's interests.  As demonstrated by the evidence discussed above, J. Bearer left his employment with PHCorp and began assisting M. McDonnell in operating Supreme – a competing entity.  Through his involvement with Supreme, J. Bearer used PHCorp's confidential customer information, through his access and access held by M. McDonnell and C. McDonnell, to solicit business away from PHCorp to Supreme.  For example, J. Bearer contacted Walter, a former PHCorp customer, using information obtained from M. McDonnell's Power House Subs Phone, a source of PHCorp's confidential customer information.  (Plaintiffs' Exhibit 44, pp. 1-2).  Supreme ultimately hosted a fundraiser for Walter, as well as for Denise Stone, Hilling, Children's Express, Portage Church, 4H State College, Stagers Store Casey Baseball, Mountain Top Fire Company, and West Vaco – other former customers of PHCorp.  (ECF No. 198, ¶ 57).  In light of this evidence, the Court finds that J. Bearer breached his Confidentiality Agreement by using PHCorp's confidential information to facilitate operation of Supreme by, in part, soliciting former PHCorp customers.

41

The Court finds that Plaintiffs suffered damages as a result of C. McDonnell's and J. Bearer's breach of the Confidentiality Agreements. Supreme performed at least ten fundraisers for former PHCorp customers, and most of those ten fundraisers generated over $1,000 in revenue. (*Id.* ¶ 55). Based on undisputed facts, PHCorp customers hired Supreme to perform fundraisers instead of PHCorp. Plaintiffs reasonably could have expected to have secured these fundraisers if C. McDonnell and J. Bearer were not using PHCorp's confidential information to contact and solicit customers. Thus, Plaintiffs suffered damages in the form of lost profits as a result of C. McDonnell's and J. Bearer's breaches of contract.

## H. Damages

### i. Lost Profits

Plaintiffs seek damages of $9,887.17 in lost profits and $22,770.72 in future profits – totaling $32,657.89. (ECF No. 208, pp. 17-18, 20, 22-25). Plaintiffs' Exhibit 37 shows a damage summary that Plaintiffs compiled based on the fundraisers that Defendants admit Supreme performed, or fundraisers there is evidence that Supreme performed, based on Defendants' text messages and bank records. (*See* Plaintiffs' Exhibits 26, 37, 41); (ECF No. 204, pp. 71-79). Plaintiffs compiled information regarding the fundraisers Supreme conducted, the date of the events, and the revenue generated, as reflected in Supreme's bank records. (ECF No. 204, p. 73). The gross revenue from the fundraisers Supreme performed was $28,249.05. (*Id.* at 75). Based on their knowledge and experience, Plaintiffs estimated that 65% of the gross revenue would be spent on labor, food, and other costs. (*Id.*); (*see also* Plaintiffs' Exhibit 40 (showing PHCorp's 2022 fundraising gross revenue, costs, and profits and demonstrating that PHCorp spent 36.21% of its revenue on goods and 29.13% of its revenue on payroll expenses)). Thus, Plaintiffs calculated that Supreme generated $9,887.17 in profits from the fundraisers that

42

were conducted in violation of the Operating Agreement, Asset Purchase Agreement, and License Noncompetition Agreement. (ECF No. 204, p. 77).

Plaintiffs also calculated their lost future profits. (*Id.*); (*see also* Plaintiffs' Exhibit 37). DelBaggio testified that PHCorp retains approximately 70% of its fundraising customers over a four-year period. (ECF No. 204, p. 77). Based on this calculation and the fundraisers hosted by Supreme, DelBaggio testified that PHCorp lost approximately $22,770.72 in future profits. (*Id.* at 78). This number excludes fundraisers conducted by Walter and Marcy's School of Dance as both customers returned to PHCorp after hiring Supreme to cater one fundraiser. (*Id.*).

Based on the evidence presented, the Court finds Plaintiffs' Exhibit 37 to be a credible representation of the revenue generated by Supreme's activities conducted in violation of the Operating Agreement (Count One), the Asset Purchase Agreement (Count Two), the License Noncompetition Agreement (Count Three), the DTSA (Count Five), the PUTSA (Count Six), and the Confidentiality Agreements (Count Fourteen). Further, the Court finds that these claimed damages resulted from C. McDonnell, J. Bearer, and D. Bearer's tortious interference with existing contractual relations (Count Four). The Court finds Defendants jointly and severally liable to Plaintiffs for their lost profits (including future profits) in the amount of $32,657.89.

  b. Exemplary Damages

Plaintiffs also seek exemplary damages in the amount of $45,541.44 against M. McDonnell and C. McDonnell jointly and severally. (ECF No. 208, p. 25). The imposition of exemplary or treble damages is essentially punitive in nature. Under Pennsylvania law, punitive damages are not recoverable in an action solely based upon breach of contract. *Thorsen v. Iron and Glass Bank*, 476 A.2d 928, 932 (Pa. Super. 1984*); see Standard Pipeline Coating Co. v.*

*Solomon & Teslovich, Inc.*, 496 A.2d 840, 844 (Pa. Super. 1985) (holding "punitive damages will not be assessed for mere breach of contractual duties, where no recognized trespass cause of action . . . arose out of the same transaction"). Whereas in contract actions, damages are awarded to compensate an injured party for the loss suffered due to the breach, *Empire Properties, Inc. v. Equireal Inc.*, 674 A.2d 297, 304 (Pa. Super. 1996), the purpose of punitive damages is to punish outrageous and egregious conduct done in a reckless disregard of another's rights; it serves a deterrence as well as a punishment function. *Schecter v. Watkins*, 577 A.2d 585, 595 (Pa. Super. 1990). Therefore, a court may award punitive damages only if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others. *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991). When sought in connection with tort causes of action, exemplary damages may only be awarded "when the act which creates actual damage also imports insult or outrage, and is committed with a view to oppress, or appears to have been committed in contempt of a plaintiff's rights." *Golomb v. Korus*, 396 A.2d 430, 431 (Pa. Super. 1978). "Malice is the important ingredient." *Id.*

Exemplary damages are also available under the DTSA and PUTSA. Federal law provides: "if the trade secret is willfully and maliciously misappropriated, [the court may] award exemplary damages in an amount not more than [two] times the amount of the damages awarded. *See* 18 U.S.C. § 1836(b)(3)(C); *Estate of Accurso v. Infra-Red Servs.*, 805 F. App'x 95, 107 (3d Cir. 2020). Similarly, "[u]nder Pennsylvania law, '[i]f willful and malicious [trade secrets] misappropriation exists, the court may award exemplary damages in an amount not exceeding twice [the amount of compensatory damages].'" *Id.* (quoting 12 Pa. Cons. Stat. § 5304(b)). However, a willful and malicious misappropriation alone does not necessarily mean that the prevailing party is entitled to exemplary damages. *See id.* (affirming the district court's denial of

punitive damages to defendants on a PUTSA claim). "Instead, courts consider a host of factors, including, but not limited to, the duration of misappropriative conduct, the defendant's consciousness of resulting injury, and any efforts to cover up malfeasance." *Arnold's Office Furniture, LLC v. Borden*, 2022 WL 3597239, at *1 (E.D. Pa. Aug. 23, 2022) (considering exemplary damages under the DTSA and PUTSA) (internal quotations omitted); *see also Proofpoint, Inc. v. Vade Secure, Inc.*, 2021 WL 5407521 (N.D. Cal. Nov. 18, 2021) (listing additional factors under the DTSA, including the degree of reprehensibility, the need to deter similar misconduct in the future, the amount of compensatory damages awarded, and the wealth of the defendant).

First, a "defendant's wealth is relevant in calculating exemplary damages." *Hirtle Callaghan Holdings v. Thompson*, 2021 WL 1163739, at *4 (E.D. Pa. Mar. 26, 2021). While there is not a notable amount of evidence in the record as to Defendants' financial status, in the Court's determination, Defendants do not have significant wealth. Defendants represented themselves as *pro se* litigants in this action. D. Bearer testified during her deposition that all Defendants lived in her household. (Plaintiffs' Exhibit 54.A, p. 49 ("I supported both Chris and Michael. They lived in my household. Paid no – paid no rent, paid no utilities, nothing.).

The judgment amount is also a relevant factor in deciding whether to award exemplary damages because "the purposes of exemplary damages are to punish for a past event and to prevent future offenses, and the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of a guilty person." *Vivino v. Everlast Sporting Goods Mfg. Co.*, 1987 WL 17571, at *2 (E.D. Pa. Sep. 25, 1987). The Court awarded Plaintiffs damages in the amount of $32,657.89. The Court's award of lost and future profits represents the entire amount of lost profits damages requested by Plaintiffs. This damages award may not

45

seem high or taxing. However, damage awards must be viewed in relation to the size of the litigation and the wealth of Defendants. Considering the size of this litigation, the situation of Defendants, and the amount of the judgment, the Court finds that an additional award of exemplary damages is not necessary to deter future misconduct. The judgment award is enough to compensate Plaintiffs.

For the forgoing reasons, Plaintiffs' request for exemplary damages is denied.

c. Attorneys' Fees

Plaintiffs also seek attorneys' fees under provisions in the License Noncompetition Agreement as well as 18 U.S.C § 1836(b)(3)(D) (ECF No. 80, ¶ 218) and 12 Pa. C.S. § 5305 (*id.* ¶ 226). Under the "American Rule," each party must pay its own legal fees, "unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Mosaica Academy Charter School v. Com. Dept. of Education*, 813 A.2d 813, 822 (Pa. 2002).

The License Noncompetition Agreement contained a provision stating that: "Each party shall pay all costs and expenses, including reasonable attorney fees, incurred by the other party in enforcing the provisions of this Agreement or in recovering any claims or damages arising from a breach of this Agreement if the other party is successful in its action." (Plaintiffs' Exhibit 3, p. 3). Given the Court's finding that (1) the License Noncompetition Agreement is a valid and enforceable agreement; (2) M. McDonnell breached the agreement; and (3) Plaintiffs suffered damages as a result of the breach, the Court holds that M. McDonnell must pay Plaintiffs' attorneys' fees incurred in enforcing the License Noncompetition Agreement.

The Court denies Plaintiffs' request for attorneys' fees pursuant to the DTSA and PUTSA. The DTSA permits, but does not require, the court to award reasonable attorney fees

for a "willful and malicious" misappropriation. *See* 18 U.S.C. § 1836(b)(3)(D). Likewise, under the PUTSA, a "court may award reasonable attorney fees, expenses and costs to the prevailing party [if] . . . willful and malicious misappropriation exists." 12 Pa. C.S. § 5305(3). "Just because a jury finds willful and malicious misappropriation does not necessarily mean that the prevailing party is entitled to attorneys' fees." *Arnold's Office Furniture*, 2023 WL 3851978, at *10. "The party seeking attorneys['] fees has the burden to prove that its request for attorneys['] fees is reasonable." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). For the reasons set forth above in denying exemplary damages, Plaintiffs' request for attorneys' fees under the DTSA and PUTSA are also denied. *See Harbor Compliance Corp. v. Firstbase.IO, Inc.*, 2025 WL 383804, at *20 (E.D. Pa. Feb. 4, 2025) (deciding exemplary damages and attorneys' fees under the DTSA and PUTSA together and noting that an award of exemplary damages and the entitlement to attorneys fees under the DTSA and PUTSA are determined by similar equitable factors).[11]

   d.  Permanent Injunction

   Plaintiffs request that the Court order Defendants to (1) deliver M. McDonnell's Power House Subs Phone to PHCorp within 14 days of the judgment order and (2) "cease all use of, and destroy all records containing, trade secrets and confidential information of PHCorp, and to provide to PHCorp satisfactory proof thereof within 14 days of [the judgment order]." (ECF No. 208, p. 25). Although Plaintiffs do not expressly state that they are seeking a permanent injunction, that is what their request is, in essence, seeking.

---

[11] The Court will accept attorneys' fee petitions within thirty days of the issuance of this Findings of Fact and Conclusions of Law. The Court notes that it finds the award of attorneys' fees is appropriate with respect to Count Three – only one count of the original sixteen. The Court will award appropriate and just fees with an award tailored as closely as possible to only the litigation of Count Three.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (internal citations omitted). Thus, "[i]f a less drastic remedy . . . [is] sufficient to redress [a plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) (citing *Monsanto*, 561 U.S. at 165). Both the DTSA and PUTSA authorize injunctive relief. *See* 18 U.S.C. § 1836(b)(3); 12 Pa. C.S. § 5303(a). Courts have found that injunctions may be imposed "without resort to the traditional equitable prerequisites if a statute expressly authorizes the injunction." *United States v. Preiss*, 2008 WL 2413895, at *4 (M.D.N.C. June 11, 2008) (internal citations omitted); *see also Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules*, 837 F.2d 171, 172 (4th Cir. 1988) ("[A] complainant need not allege or prove irreparable harm when it invokes a statute that authorizes injunctive relief. All that need be proved is a violation of the statute."). In *eBay*, however, the Supreme Court of the United States rejected the United States Court of Appeals for the Federal Circuit's practice of automatically imposing permanent injunctions after a finding of patent infringement. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-94 (2006); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) ("An injunction is a matter of equitable discretion [and issuance of an injunction] does not follow from success on the merits as a matter of course."). Since then, courts have applied *eBay*'s reasoning to other causes of action. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 279 (3d Cir. 2019) ("*eBay* abrogates our presumption of irreparable harm in copyright cases"); *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 206 (3d Cir. 2014) (holding that there is no presumption of irreparable harm in a Lanham Act case); *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009) (stating that it is inappropriate to presume irreparable harm when a trade secret misappropriator

"seeks only to use [the misappropriated] secrets—without further dissemination or irreparable impairment of value—in pursuit of profit."). Thus, the concept of presumed injunctive relief in a trade secret misappropriation case has been rejected in recent decisions. The Court will not apply that presumption here.

Thus, the first issue the Court must decide is whether it should apply federal or state law to Plaintiffs' request for injunctive relief. Under federal law, a plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. Under the PUTSA, the elements for a permanent injunction are: (1) the existence of a trade secret; (2) the communication of a trade secret pursuant to a confidential relationship; (3) the use or threatened use of the trade secret in violation of that confidence; and (4) harm. *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*, 2020 WL 1526940, at *23 (W.D. Pa. Mar. 31, 2020).

In *Warman v. Loc. Yokels Fudge, LLC*, 2024 WL 1285941 (W.D. Pa. Mar. 26, 2024), the court considered the plaintiff's request for a permanent injunction based on its trade secret misappropriation claims under the DTSA and PUTSA. *See Warman*, 2024 WL 1285941. The court considered whether the PUTSA's factors should control or whether the court should apply federal law but ultimately declined to decide the issue because under Pennsylvania's criteria, the "proper inquiry is not whether defendant already has used or disclosed [the trade secret], but whether there is sufficient likelihood, or substantial threat, of defendant doing so in the future.'" *See id.* at *10 (quoting *Den-Tal-Ez, Inc. v. Siemens Cap. Co*rp., 566 A.2d 1214, 1232 (Pa. Super.

1989)).   The court concluded that the party seeking an injunction failed to show that the defendants intended to use the trade secret in the future, which defeated a showing of irreparable harm.  *See id.* at *26. Accordingly, the court found that the injunction failed under both federal and state law.  *See generally id.*

In other cases, federal courts apply the PUTSA's factors in determining whether an injunction should issue.  *See, e.g., Kenset Corp. v. Ilanjian*, 600 F. App'x 827, 831 (3d Cir. 2015)).  These cases are distinguishable from the instant case, however, because they arose under diversity jurisdiction and involved injunctions only under the PUTSA, not the DTSA.  In *PPG*, the court applied the PUTSA standard after reasoning that "federal courts sitting in diversity must apply state substantive law" and "trendlines . . . point to permanent injunctions being substantive law." *See PPG Indus.*, 2020 WL 1526940, at *27 (holding that "state substantive law applies to the issuance of a permanent injunction").  Nevertheless, as the *PPG* court explained, the plaintiff's injunctive relief request was based solely on the PUTSA, not on the court's general equitable powers.  *See id.* at *70.

In sum, the case law surrounding whether to apply federal or the PUTSA's factors in issuing permanent injunctions in trade secret misappropriation cases contains internal inconsistencies and is not particularly helpful in deciding the appropriate standard.  There is also conflicting law in federal courts within the Commonwealth of Pennsylvania.  *See, e.g. Marcum v. Columbia Gas Transmission, LLC*, 2022 WL 19404192, at *1 n.1 (E.D. Pa. July 21, 2022) (stating that although the United States Court of Appeals for the Third Circuit has not squarely addressed the issue, federal law applies to the determination of a motion for a permanent injunction when a federal court is sitting in diversity "[b]ecause the rule governing injunctions is

procedural, rather than substantive" thus the federal standard would apply even where "the right upon which this cause of action is based is state-created.").

The Court does not need to decide this issue. Both the federal factors and PUTSA require that the party seeking the permanent injunction suffered irreparable injury or harm. Here, M. McDonnell and C. McDonnell misappropriated Plaintiffs' trade secret customer information to solicit customers from PHCorp to Supreme for fundraising operations. The Court finds that its award of lost profits (including future profits) to Plaintiffs adequately addresses Plaintiffs' harm. When Defendants misappropriated the trade secrets in the late summer of 2019, the customer information was current. PHCorp was just beginning to operate under new ownership. Now, almost six years later, PHCorp has had six years to establish its customer base and information. Any customer information that Defendants retain is six years old. The Court finds that, while Defendants misappropriated Plaintiffs' trade secret customer information in violation of the DTSA and PUTSA, issuing a permanent injunction requiring Defendants to (1) deliver M. McDonnell's Power House Subs Phone to PHCorp within 14 days of the judgment order and (2) "cease all use of, and destroy all records containing, trade secrets and confidential information of PHCorp, and to prove PHCorp satisfactory proof thereof within 14 days of [the judgment order,]" (ECF No. 208, p. 25), is unnecessary because Plaintiffs would no longer suffer harm if this information was revealed or disclosed. Given the nature of the trade secret information, the passage of approximately six years since the misappropriation renders any argument regarding harm to be essentially moot. The Court denies Plaintiffs' request for a permanent injunction.

e. Specific Performance

Plaintiffs request that the Court order (1) M. McDonnell to transfer the Power House Subs Phone number to PHCorp and deliver the Power House Subs Phone to PHCorp within 14

51

days of the issuance of the judgment order and (2) M. McDonnell to terminate or amend all entity names and fictitious names relating to Power House Subs within 30 days of the issuance of this order.  In other words, Plaintiffs are seeking specific performance of some of the unfulfilled terms of the Asset Purchase Agreement.

Pennsylvania law conforms to the general rules regarding the availability of specific performance.  "Specific performance should only be granted . . . where no adequate remedy at law exists."  *Clark v. Pennsylvania State Police*, 436 A.2d 1383, 1385 (Pa. 1981) (citing *Roth v. Hartl*, 75 A.2d 583 (Pa. 1970)).  "Equitable jurisdiction to grant specific performance depends upon the 'inadequacy' of the remedy at law."  *Petry v. Tanglwood Lakes, Inc.*, 522 A.2d 1053, 1056 (Pa. 1987).  With respect to what constitutes an adequate remedy at law, the Pennsylvania Supreme Court has observed that "[a]n action for damages is an inadequate remedy when there is no method by which the amount of damages can be accurately computed or ascertained."  *Clark*, 436 A.2d at 1385 (citing *Strank v. Mercy Hospital of Johnstown*, 117 A.2d 697 (Pa. 1955)). Damages cannot be accurately ascertained "where the subject matter of an agreement is an asset that is unique or one such that its equivalent cannot be purchased on the open market."  *Tomb v. Lavalle*, 444 A.2d 666, 668 (Pa. Super 1981).

The Court holds that the awarded lost profit damages of $32,657.89 is an accurate computation of damages Plaintiffs suffered from M. McDonnell's breach of the Asset Purchase Agreement.  Plaintiffs' Exhibit 37 shows how these damages were calculated considering the fundraisers Supreme performed, a profit rate of 35%, and a four-year customer retention rate of 70%.  (*See* Plaintiffs' Exhibit 37); (ECF No. 204, p. 71)  There is an adequate remedy for the breaches at law.  In 2019, when PHCorp was beginning to operate Power House Subs, M. McDonnell's Power House Subs Phone and Number may have been an invaluable asset – the

kind of which there is no adequate remedy for at law.  However, approximately six years after the execution of the Asset Purchase Agreement, the physical telephone and the number no longer have the same value.  M. McDonnell's Power House Subs Phone and Number have not been used to conduct Power House Subs business since 2019.  PHCorp has had six years to establish itself as a business independent from M. McDonnell.  Given that there are adequate remedies at law, the Court declines to grant specific performance.

### IV. CONCLUSION

For the reasons set forth above, judgment will be entered in favor of Plaintiffs in the amount of $32,657.89 against (1) M. McDonnell at Counts One, Two, Three, Five, and Six; (2) C. McDonnell at Counts Four and Fourteen; (3) J. Bearer at Counts Four and Fourteen; and (4) D. Bearer at Count Four.  Orders of Court will follow.

Dated: 8/4/25

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE